CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 1 6 2012

JULIA C. DUDLEY, CLERK
BY: H McDonald
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

## DANVILLE DIVISION

| | | |
|---|---|---|
| U.S. ex rel. FRANK SKINNER, | § | |
| | § | |
| Relator, | § | Civil Action No.: 4:12CV00045 |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMAND |
| ARMET ARMORED VEHICLES, INC, and | § | |
| WILLIAM R. WHYTE, | § | |
| | § | **FILED IN CAMERA AND UNDER** |
| Defendants. | § | **SEAL PURSUANT TO 31 U.S.C.** |
| | § | **§ 3730** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | |
| | § | **DO NOT ENTER IN CM/ECF** |
| | § | |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | § | |

# <u>FILED UNDER SEAL</u>

CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 1 6 2012

JULIA C. DUDLEY, CLERK
BY: H McKnand
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

### DANVILLE DIVISION



| U.S. ex rel. FRANK SKINNER, | § | |
| | § | |
| Relator, | § | Civil Action No.: 4:12CV00045 |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMAND |
| ARMET ARMORED VEHICLES, INC., | § | |
| WILLIAM R. WHYTE, | § | |
| | § | **FILED IN CAMERA** |
| Defendants. | § | **AND UNDER SEAL** |
| | § | **PURSUANT TO** |
| | § | **31 U.S.C. § 3730** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | |
| | § | **DO NOT ENTER IN CM/ECF** |
| | § | |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | § | |

---

## FEDERAL FALSE CLAIMS ACT COMPLAINT

### PRELIMINARY STATEMENT

1.     This lawsuit is based on the acts and actions, amounting to schemes, by the

defendants, Armet Armored Vehicles, Inc. and William R. Whyte, (hereinafter "Defendants" or

"Armet") to defraud the United States.  Relator, through undersigned counsel, and acting on the

behalf of and in the name of the United States of America, brings this civil action under the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.      Armet designs, manufactures, and sells armored vehicles. Armet's ideal customer is, therefore, the military, and such agencies as the Department of Defense, the Army, the Joint Contracting Command, and the Defense Logistics Agency have entered into contracts with the company. In addition, Armet has designed and manufactured armored vehicles for police departments, government entities, and high-net worth individuals around the world.

3.      After the U.S. entered Iraq in March 2003, the Department of Defense conducted most of its contracting for that operation through the United States Joint Contracting Command in Baghdad, Iraq ("JCCI"). In 2006, Armet contracted with JCCI to develop, manufacture, and ship thirty-two armored gun trucks to Iraq to be used for the transport of American and Iraqi officials throughout war-torn Iraq. In breach of the contract, Armet failed to meet the delivery deadlines for these thirty-two vehicles, only six vehicles were delivered and accepted, and all six that were delivered did not meet the ballistic and blast protection specifications outlined in the contracts between Armet and JCCI ("the Contracts").

4.      Despite having full knowledge that these vehicles were substandard and did not meet the specifications outlined in the Contracts, Armet continued to supply the Government, bill the Government pursuant to its contracts, and obtain payments for the vehicles. The Government, acting in reliance on the company's expertise and quality assurance system, would

not have paid for these vehicles had it known Armet supplied faulty products that were not properly built or failed to meet ballistic or blast protection specifications outlined in the Contracts. Thus, Armet presented false claims to the Government, in violation of the Federal False Claims Act, when it directly submitted substandard and defective vehicles to the Government for payment.

## PARTIES

5.      Relator Frank Skinner is a citizen of the United States and a resident of Virginia. Relator has over thirty-three years of experience in the defense industry.  In addition to his experience at Armet, Relator previously served in the U.S. Marines, where he served as an Explosive Ordinance Disposal Officer for over twenty years.  In 1984, as an active duty Marine, Relator was assigned to the Department of State Office of Diplomatic Security.  In 1986, Relator was reassigned to teach special operations skills, including explosive disposal techniques, to Marines at Quantico, Virginia.  In 1990, Relator retired from the Marine Corps and eventually began his own bodyguard business, where he protected members of the Saudi royal family and members of Disney on Ice when they traveled to volatile locations such as Cairo, Egypt or Belfast, Ireland.

6.      In 2005, Relator was hired by Mr. Whyte to be President of Armet.  As President, Relator oversaw government procurement of contracts, the hiring of subcontractors to assist in the building of vehicles, ordering and inventorying of steel and glass for the building of the

armored vehicles, and generally oversaw the running of both Armet's Florida and Virginia manufacturing facilities. Relator was forced to resign from the company in or about January 2007. Thus, due to Relator's previous experience in the defense industry, his training as an explosive ordinance disposal officer, and his time as President of Armet, he has personal knowledge of the logistics and necessity of protection against explosives and other weapons in volatile areas such as the Middle East. In addition, due to his military training, he understands the importance of this with respect to soldier safety and mission capability.

7.     Relator acknowledges that there has been a public disclosure of the particular allegations set forth in this case in a criminal indictment filed by the U.S. Government on July 19, 2012. However, Relator has personal knowledge that Armet made and shipped products which were defective by design, were not properly constructed to be suitable in the field, and otherwise failed to meet specific safety standards outlined in the Contracts. He is the original complaining witness who made a complaint to the FBI that led to the indictment. He worked with the Government as its confidential informant for approximately five years prior to the indictment. Thus, Relator is an original source of the facts and the information set forth in this case concerning the activities of the defendants. The facts averred herein are based upon his personal observations and documents in his possession.

8.     Accordingly, Relator has provided to the United States, prior to the public

disclosure and prior to the filing of this Complaint, a full disclosure of substantially all material facts, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2) and (e)(4)(B).

9.     Armet Armored Vehicles, Inc. is a business that designs, manufactures, and Supplies armored vehicles for government and commercial customers. It was founded in 1993 and incorporated in Florida. It is headquartered at 495 Grand Boulevard, Suite 206, Miramar Beach, Florida. Armet also operates offices in Danville, Virginia and Ontario, Canada.

10.    William R. Whyte is the owner and chief executive officer of Armet. He personally manages and supervises all the operations of Armet in Florida, Virginia, and Canada.

11.    Any and all acts alleged herein to have been committed by Armet Armored Vehicles, Inc. were committed by said parties' officers, directors, employees, representatives or agents, other than Relator, who at all times acted on behalf of the companies, and within the scope of their employment, and are collectively referred to herein as Armet.

## JURISDICTION AND VENUE

12.    This lawsuit is brought against defendant under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. Jurisdiction over this action is conferred upon this Court by the federal False Claims Act, 31 U.S.C. § 3732(a) and by 28 U.S.C. § 1331 and § 1345.

13.    This Court has jurisdiction over the defendant corporations pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in Virginia, including, but not necessarily limited to, entering into contracts with the Federal Government in Virginia, having an authorized

representative in Virginia, having a manufacturing facility in Virginia, and otherwise purposefully availing themselves of the laws of Virginia.

14.      Venue is also proper pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in Virginia.

## FACTS RELATING TO ALL COUNTS

### A.  Applicable Quality Assurance Standards

15.      Pursuant to the Federal Acquisition Regulations System ("FAR"), the ultimate burden of quality control is on the contractor.  Part 46 of the FAR "prescribes policies and procedures to ensure that supplies and services acquired under Government contract conform to the contract's quality and quantity requirements."  48 C.F.R. § 46.000.  Generally, the Government shall rely on the contractor to accomplish all inspection and testing needed to ensure that supplies or services…conform to contract quality before they are tendered to the Government."  48 C.F.R. § 46.202-(a).  When acquiring commercial items, the FAR expressly provides, that "the Government shall rely on contractors' existing quality assurance systems as substitute for Government inspection and testing before tender or acceptance unless customary market practices for the commercial item being acquired include any in-process inspection" by the Government.  48 C.F.R. § 46.202-1.

16.      Pursuant to the Department of Defense Federal Acquisition Regulations System

*United States ex rel. Frank Skinner v. Armet Armored Vehicles, Inc., et al.*
<u>FEDERAL FALSE CLAIMS ACT COMPLAINT</u>
**FILED UNDER SEAL**
Page 6 of 18

("DFAR"), a supplement to FAR, agencies are to "provide contractors the maximum flexibility in establishing efficient and effective quality programs to meet contractual requirements. Contractor control programs may be modeled on military, commercial, national, or international quality standards." 48 C.F.R. § 246.102(4).

17.     Quality assurance standards were set forth in Statements of Work ("SOWs") that  were agreed upon by the Defendants and the Government.  In the SOWs, Armet warranted "that the vehicles [would] be free from defects in materials and workmanship and [would] conform to the requirements" of the SOW, which contained the required blast and ballistic protection standards.

## B.   The Contracts

18.     After the United States entered Iraq in March 2003, the Department of Defense conducted most of its contracting for that operation through the United States Joint Contracting Command ("JCCI") in Baghdad, Iraq.

19.     On or about April 17, 2006, the JCCI issued a solicitation of work to acquire twenty-four armored vehicles for use by personal-security detail teams to protect American and Iraqi officials traveling in or through Iraq.  On or about April 21, 2006, Armet and Whyte responded to the solicitation with Armet Quote #PAF-2180-24-4.  On or about April 25, 2006, the JCCI awarded the contract to Armet, Order Number W91GY0-06-F-0028 ("the 0028 Contract), for the twenty-four armored gun trucks in the amount of $4,779,693.36.  Under the

0028 Contract, Armet was to deliver four armored gun trucks to Iraq within 45 days of the contract award and the remaining twenty trucks by July 31, 2006.  This contract called for payment per vehicle of approximately $199,000.

20.     On or about June 1, 2006, the JCCI issued a second solicitation of work to build eight additional armored gun trucks.  On or about June 8, 2006, Whyte and Armet responded to the second solicitation with Armet Quote #PAF-3042-8-1.  On or about June 18, 2006, the JCCI awarded a second contract to Armet, Order Number W91GY0-06-F-0047 ("the 0047 Contract"), for the eight additional armored gun trucks in the amount of $1,593,231.10.  Under the 0047 Contract, Armet was to deliver the eight armored gun trucks to Iraq within 90 days of the contract award for payment of approximately $199,000 per vehicle.

### C.   The Armoring Specifications of the Vehicles

21.     Both the 0028 Contract and the 0047 Contract (hereinafter, the "Contracts") stated that the armored gun trucks would provide security to Iraqi "VIPs," who regularly traveled by motorcade through "hostile and dangerous environment."  Both contracts set out specific requirements for the armoring and protective features of the vehicles.

22.     The Contracts required that each armored gun truck be "armor-protected with a minimum of Central European Norm (EU) B7 protection," a standard at which armor-piercing bullets of a given caliber and velocity will not penetrate the armor.  The Contracts required this

level of ballistic protection for a number of areas, including the passenger compartment and ceiling.

23.    The Contracts also required that the undercarriage of each armored gun truck have armored mine plating protection and "at a minimum, the protection level acceptable shall withstand blast underneath the vehicle from grenades and/or blasts of whatever nature equivalent to the strength of two DM51 German ordinances."

24.    Lastly, the Contracts required that the armored gun trucks have run-flat tires, plus one spare, so that the armored gun trucks could continue to operate even if their tires had been shot or otherwise flattened.

### D.    Contract Deliveries and Termination

25.    Despite the requirement in the 0028 Contract that all twenty-four armored gun trucks be delivered by July 31, 2006, Whyte and Armet failed to ship a single armored gun truck by that deadline.  Whyte and Armet shipped the first and second armored gun trucks to Iraq on or about August 12, 2006, and the third and fourth armored gun trucks on or about October 17, 2006.

26.    Upon the delivery of each armored gun truck, Defendants submitted to the JCCI a "Material Inspection and Receiving Report," called a DD-250, and an invoice.  Defendants prepared these forms for submission to the JCCI in their offices, including their office in Danville, Virginia.

27.     The United States paid those charges of approximately $199,000 per vehicle
through the JCCI and the U.S. Army Corps of Engineers Finance Center in Millington,
Tennessee.

28.     On or about November 1, 2006, Defendants, citing cash-flow problems,
submitted a DD-250 Form and a Contractor's Request for Progress Payment, Form 1443, to the
JCCI seeking an advance or progress payment of $1 million from the United States Government.
Defendants told the JCCI that they needed these funds to continue to produce the armored gun
trucks under the two Contracts with the JCCI.  On or about December 6, 2006, the JCCI
approved a progress payment of $824,531 for Armet and wired that amount to Armet's bank
account.

29.     Despite receiving that progress payment, between December 2006 and January
2008, Defendants delivered and billed for only three additional armored gun trucks.  On or about
February 9, 2007 and September 21, 2007, Defendants delivered and billed for the fifth and sixth
armored gun trucks.  The JCCI accepted these two armored gun trucks and paid Armet over
$398,000.  On or about January 1, 2008, Defendants delivered and billed for a seventh armored
gun truck, but the JCCI did not accept or pay for this seventh vehicle.

30.     On or about February 11, 2008, the JCCI issued a "Show Cause Notice" to
Defendants notifying them that Armet was in breach of the Contracts for failure to make the
deliveries Armet had promised.  Armet attempted to terminate or renegotiate the Contracts on

*United States ex rel. Frank Skinner v. Armet Armored Vehicles, Inc., et al.*
FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page 10 of 18

approximately March 9, 2008, and then JCCI terminated the Contracts on or around March 24, 2008.

31.     Of the thirty-two armored vehicles that Defendants agreed to deliver under the Contracts, Defendants delivered only seven, six of which JCCI accepted.  In all, Defendants billed $1,194,923.36 for those six vehicles and received a total of $2,019,454.36 in federal funds from the JCCI, including the December 2006 progress payment.

### E.   Defective Vehicles

32.     None of the six armored vehicles Defendant delivered to the Government met the ballistic and blast protection requirements of the Contracts.  Specifically, none of the armored gun trucks satisfied the B7 ballistic protection standard, and none of the armored gun trucks had sufficient blast protection to withstand the detonation of two German DM51 ordinances.  Also, at least the first five armored vehicles that Defendants delivered did not have run-flat tires.

### F.   Fraudulent Contract Billings and Certifications, and the Resulting Payments

33.     In each of their quotes to the JCCI, Defendants stated that Armet's ballistic armoring was tested and that its armored vehicles would meet the ballistic and blast protection standards the Contracts required.  The quotes specifically promised B7 ballistic protection on the ceiling and stated, "The ceiling armor was tested to defeat three hits" of the requisite ordinance with the "target being placed at a 90-degree angle from the weapon."  The quotes further promised, "The floor in this vehicles [sic] defeat [sic] the blast of two German DM51 or two US

M67 anti-personnel grenades."   In addition, Defendants asserted that the proprietary blast material they intended to use, which they called Thika Mineplate, "with a layered thickness of 12 mm…will defeat 600 grams of C4 or Semtex (RDX & PETN) plastic explosive at a point blank range."  Defendants further promised to provide run flat tires for each armored gun truck.  All of these specifications were adopted and incorporated into the Contracts between Defendants and the JCCI.

34.    Defendants knew that each of the seven armored vehicles that they delivered to JCCI failed to meet the ballistic and blast protection requirements of the Contracts and that at least five armored vehicles lacked run-flat tires as required in the Contracts.

35.    Defendants knew that their billings to the JCCI were false and fraudulent because the armored gun trucks that they shipped did not comply with the ballistic and blast protection requirements of the Contracts and did not have run-flat tires.

36.    Defendants obtained the December 2006 advance progress payment of $824,531.00 based on Defendants' representations that they needed the funds to produce the armored gun trucks under the Contracts.  Instead of using those funds to build and ship more armored gun trucks, however, Defendants intentionally diverted the funds to other business and personal expenditures.

37.    Defendants knew that all of the armored vehicles they had provided were

defective and would not protect the officials that they were intended to protect, and that in doing so they were consciously or recklessly risking serious personal injury to the occupants of those armored gun trucks.

### G.   Relator's Learning of the Fraud, the FBI Investigation of Defendants' Fraud, and  the July 2012 Criminal Indictment of Defendants Armet and Whyte

38.      Originally, the vehicles were to be manufactured at Armet's Florida facility under Relator's supervision.   However, before any vehicles were manufactured, Defendant Whyte felt that they could be built more efficiently at Armet's Ontario facility and moved all of the work to this facility in June 2006.   At this time, Relator was relocated to the Danville, Virginia facility.

39.      After the vehicles were moved, Relator was told by Armet's Florida Plant Engineer, Scott Verona, that the door handle design for the vehicles was not armor-reinforced, making it a potential opening for shrapnel or fire from an explosion to enter the vehicle. Subsequent to this conversation, Defendants missed their initial deadline and then immediately manufactured four vehicles within one month's time.   This made Relator suspicious of Armet's ability to comply with the Contract specifications while producing these highly specialized vehicles so quickly.   Relator spoke with Defendant Whyte to verify that the vehicles were being built according to the ballistic and blast protection specifications required under the Contracts.

Mr. Whyte became angry at Relator's inquiry, but assured Relator that the vehicles met the Contracts' specifications and all future vehicles would do the same.

40.    Subsequently, Relator's suspicions were not assuaged by Mr. Whyte's assurances.  Thus, in August 2006, he sent the foreman of the Armet Danville facility, John Ventimiglia, to Defendants' Ontario facility to inspect the operation's compliance.   Mr. Ventimiglia reported back to Relator that the vehicles were not meeting the ballistic and blast protection standards set forth in the Contracts.

41.    Soon after, in or around the beginning of September 2006, the Relator reported Defendants misconduct to the United States Federal Bureau of Investigations ("FBI").  Shortly after his initial report, Relator met with FBI special agent Cody Monk, who asked Relator to participate in an undercover sting to gather evidence of Defendants' fraud against the United States.  From the beginning of the investigation, Mr. Monk gave the Relator an explicit directive to keep their work confidential and not reveal the investigation or its facts to anyone.  This directive was also given to Relator by other FBI personnel, Defense Criminal Investigative Service ("DCIS") personnel, and criminal prosecutors throughout the almost six year investigation.   The FBI, DCIS, and U.S. Attorneys recently released Relator from this confidentiality directive when the indictment was filed on or about July 19, 2012.

## COUNT ONE

### FALSE CLAIMS RELATED TO PROVISION OF SUBSTANDARD PRODUCTS

42.     Relator re-alleges and incorporates the allegations in paragraphs 1 – 41 as if fully set forth herein.

43.     Armet, in providing to U.S. Government entities, such as the Department of Defense and JCCI, products that did not meet basic ballistic and blast protection standards and charging and collecting payment for these products, knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(A) & (B) (2009).

44.     Armet further violated the federal False Claims Act by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid, in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

45.     Finally, because the United States government paid for products that were supposed to conform with basic ballistic and blast protection standards, but actually received substandard and faulty products, and Armet nevertheless charged the United States government for products that did not meet quality specifications when it provided substandard products without providing any type of credit to the United States,  Armet has retained overpayments in violation of 31 U.S.C. § 3729(a)(1)(D) (2009) and has knowingly and improperly avoided or decreased its obligation to transmit the windfall it has gained back to the Government in violation of 31 U.S.C. § 3729(a)(1)(G) (2009).

## COUNT TWO

### FALSE CLAIMS RELATED TO FRAUDULENT MISREPRESENTATIONS

46.     Relator re-alleges and incorporates the allegations in paragraphs 1 - 45 as if fully set forth herein.

47.     Armet, by fraudulently misrepresenting its capacity to make compliant products in order to get contracts with the U.S. Government and its agencies knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(A) & (B) (2009).

48.     The representations that Armet made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet. Had the U.S. Government and its agencies known that Armet was not capable of providing compliant, conforming products in the quantities needed, they would not have entered into contracts with Armet.

### PRAYER FOR RELIEF

Relator respectfully requests that this Court enter judgment against Defendants as follows:

*United States ex rel. Frank Skinner v. Armet Armored Vehicles, Inc., et al.*
FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page 16 of 18

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief, including a restraining order to freeze property traceable to the fraud, to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2); and

(f)     That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated:  October __16__, 2012                    Respectfully submitted,

By: _Scott Oswald/ w/permission AWII_

R. Scott Oswald
David Scher[1]
The Employment Law Group
888 17th Street, NW, Suite 900
Tel. (202) 331-2883
Fax. (202) 261-2835
SOswald@employmentlawgroup.net
dscher@employmentlawgroup.com

Wm. Paul Lawrence, II (Va. Bar No. 82950)*[2]
37163 Mountville Road
Middleburg, Virginia 20117
Tel. (540) 687-6999
Fax (540) 687-5457
plawrence@waterskraus.com

Anne Nicole Izzo[3]
Waters & Kraus, LLP
315 North Charles Street
Baltimore, Maryland 21201
Tel. (410) 528-1153
Fax. (410) 528-1006
aizzo@waterskraus.com

---

[1] Mr. Oswald is admitted to practice in the Western District of Virginia.  However, Mr. Scher is not, and subsequent to this filing, will be seeking admission *pro hac vice* in this case.
[2] Mr. Lawrence has applied to the Western District of Virginia federal bar and his admission is currently pending.
[3] Ms. Izzo is not admitted to practice in the Western District of Virginia, however, subsequent to this filing, Ms. Izzo will be seeking admission *pro hac vice* in this case.

*United States ex rel. Frank Skinner v. Armet Armored Vehicles, Inc., et al.*
FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page 18 of 18