IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| FRANK SKINNER, | ) | |
| | ) | |
| Plaintiff/Relator, | ) | Case No. 4:12-cv-00045 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ARMET ARMORED VEHICLES, INC., | ) | By: Hon. Jackson L. Kiser |
| and WILLIAM R. WHYTE, | ) |     Senior United States District Judge |
| | ) | |
| Defendants. | ) | |

On October 16, 2012, Plaintiff Frank Skinner ("Plaintiff") filed an action against Defendants Armet Armored Vehicles, Inc. ("Armet"), and William R. Whyte ("Whyte") (collectively "Defendants") pursuant to the *qui tam* provisions the False Claims Act, 31 U.S.C. § 3729 et seq. The United States elected not to intervene in the action. (See Notice of Election by U.S. to Decline Intervention, Aug. 14, 2013 [ECF No. 18].) Plaintiff served both Defendants with a summons and a copy of the Complaint on May 22, 2014, and Defendants have moved to dismiss the Complaint. Before me are Whyte's Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 39], and Armet's Motion to Dismiss for Failure to State a Claim [ECF No. 41]. The matter has been fully briefed, and the parties appeared before me on July 29, 2014 to argue their respective positions in open court. For the reasons stated herein, I will grant Whyte's Motion to Dismiss, and I will grant in part and deny in part Armet's Motion to Dismiss. Plaintiff will be allowed fourteen (14) days to file an amended complaint, if he so chooses. See Fed. R. Civ. P. 15(a)(2).

I.  **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[1]

A. The Contracts

Armet is a designer, manufacturer, and seller of armored vehicles. (Compl. ¶ 2 [ECF No. 3].) Armet was founded in 1993 and has its headquarters in Miramar Beach, Florida. (Id. ¶ 9.) It has manufactured and sold armored vehicles to police departments, government entities, the military, and high-net-worth individuals around the world. (Id. ¶ 2.) Whyte is the owner and Chief Executive Officer of Armet. (Id. ¶ 10.) According to Plaintiff, Whyte "personally manages and supervises all the operations of Armet in Florida, Virginia, and Canada." (Id.) In 2005, Whyte hired Plaintiff to be President of Armet.[2]

Following the United States' invasion of Iraq in 2003, the Department of Defense conducted the majority of its contracting for operations in Iraq through the United States Joint Contracting Command in Baghdad, Iraq ("JCCI"). (Id. ¶ 18.) On or about April 17, 2006, JCCI issued a solicitation of work to acquire twenty-four (24) armored vehicles for use by personal security forces tasked with protecting American and Iraqi officials traveling in or through Iraq. (Id. ¶ 19.) Armet and Whyte responded to the solicitation four days later and, four days after that, JCCI awarded the contract ("0028 Contract") to Armet at an agreed-upon price of $4,779,693.36. (Id.) Under the terms of the contract, Armet was to deliver four (4) armored truck to Iraq within forty-five (45) days, and an additional twenty (20) trucks by July 31, 2006. (Id.) The contract called for payment per vehicle of approximately $199,000.00. (Id.)

---

[1] The facts are taken from Plaintiff's Complaint. For consideration of Armet's 12(b)(6) motion, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

[2] Prior to accepting that position, Plaintiff served in the Marine Corps and, following his retirement from the Marines, began his own bodyguard business. (Compl. ¶ 5.)

- 2 -

On June 1, 2006, JCCI issued another solicitation to build an additional eight (8) armored gun trucks. (Id. ¶ 20.) On June 18, 2006, JCCI awarded a second contract to Armet in the amount of $1,593,231.10. (Id.) Armet was to deliver the gun trucks to Iraq within ninety (90) days, and the awarded payment per vehicle was $199,000.00. (Id.) Both contracts detailed the specifics for armoring the vehicles, as the vehicles would routinely be used to ferry individuals through hostile and dangerous parts of war-torn Iraq. (Id. ¶ 21.)

Despite the 0028 Contract's requirement that all twenty-four armored gun trucks be delivered by July 31, 2006, Whyte and Armet failed to ship a single truck by that deadline. Defendants shipped the first two trucks on August 12, 2006, and the third and fourth on October 17, 2006. (Id. ¶ 25.) Upon delivery of each armored truck, Defendants submitted a "Material Inspection and Receiving Report," along with an invoice, to JCCI. (Id. ¶ 26.) Defendants prepared these reports in their offices in Florida and Virginia.[3] (Id.) The United States paid approximately $199,000.00 per vehicle. (Id. ¶ 27.)

On or about November of 2006, Defendants requested a cash advance of approximately $1,000,000.00 from the United States government. (Id. ¶ 28.) "Defendants told the JCCI that they needed these funds to continue to produce the armored gun trucks under the two contracts with the JCCI." (Id.) JCCI approved a "progress payment" of $824,531.00 for Armet and wired that amount to Armet's bank account.[4] (Id.) Despite receiving that payment, Defendants delivered and billed for only three (3) additional armored gun trucks. JCCI accepted the first two

---

[3] Plaintiff does not allege what role Whyte played in preparing the invoices, and whether his involvement occurred in Virginia, Florida, or Canada.

[4] Plaintiff does not allege where Armet's bank account is located, from where the transfer originated, or to where the initial request was sent.

- 3 -

trucks and paid over $398,000.00 for them, but declined to accept or pay for the third.[5] (Id. ¶ 29.)

On February 11, 2008, JCCI issued a "Show Cause Notice" to Defendants notifying them that Armet was in breach of the contract for failure to make delivery of the vehicles as agreed. (Id. ¶ 30.) Defendants attempted to terminate or renegotiate the contracts in March 2008, and JCCI terminated the contracts that month. (Id.) In total, of the thirty-two (32) vehicles that Defendants agreed to deliver under the contracts, Defendants only delivered seven vehicles. (Id. ¶ 31.) JCCI accepted six. (Id.) Defendants billed $1,194,923.36 for those six vehicles, and received a total of $2,019,454.36 in federal funds from JCCI, including the December 2006 progress payment. (Id.)

In its quotes to JCCI for both contracts, Armet asserted that the vehicles would meet the ballistic and blast protection standards set forth in the solicitations. (Id. ¶ 33.) These specifications were ultimately adopted in the two contracts entered into by Armet and JCCI. (Id. ¶ 33.) Nevertheless, "[n]one of the six armored vehicles Defendant[s] delivered to the Government met the ballistic and blast protection requirements of the Contracts." (Id. ¶ 32.) In addition to failing to satisfy the B7 ballistic protection standards and lacking sufficient blast protection, at least five of the armored vehicles Defendants delivered did not have "run-flat" tires. (Id.) Plaintiff alleges that Defendants were aware that the armored trucks failed to meet the contract specifications regarding ballistic and blast protection standards, yet continued to manufacture, ship, and bill JCCI for the vehicles. (See id. ¶ 35.) Regarding the December 2006 advance of $824,531.00, Plaintiff alleges that Defendants diverted those funds to other business and personal expenditures rather than use the funds to build and ship the vehicles ordered by JCCI. (Id. ¶ 36.)

---

[5] Plaintiff does not state what reason, if any, JCCI gave for rejecting the third vehicle.

### B. Plaintiff's Role with Armet and Uncovering the Fraud

Originally, the vehicles were to be manufactured at Armet's Florida facility under Plaintiff's supervision. (Id. ¶ 38.) Before construction began, however, Whyte moved the production to Armet's Ontario facility, and Plaintiff was transferred to Armet's Danville facility. (Id.)

After Whyte moved production of the vehicles to Ontario, Armet's Florida plant engineer, Scott Verona, informed Plaintiff of several defects in the design of the vehicles. (Id. ¶ 39.) Following that conversation, Defendants missed their initial deadline to deliver the vehicles and then immediately manufactured four vehicles within a month's time. (Id.) Plaintiff became suspicious of Armet's ability to comply with the highly specialized contract it had entered into with JCCI, and Plaintiff spoke with Whyte to verify that the vehicles were being built according to JCCI's specifications. (Id.) Whyte became angry at Plaintiff's inquiry, but assured him that the vehicles complied with the contract specifications. (Id.)

Plaintiff's fears were not assuaged. (Id. ¶ 40.) In October 2006, Plaintiff sent the foreman of Armet's Danville facility, John Ventimiglia, to Defendants' Ontario facility to inspect the operation's compliance with JCCI's specifications. (Id.) Ventimiglia reported to Plaintiff that the vehicles were *not* meeting the ballistic and blast protection standards. (Id.) Soon thereafter, Plaintiff reported Defendants' misconduct to the Federal Bureau of Investigation ("FBI"). (Id.) Plaintiff began working with the FBI as a confidential informant while the FBI put together a case against Defendants. (Id.) From the inception of the investigation, Plaintiff was under explicit instructions to keep his role confidential. (Id.) Numerous government agents and personnel repeated those instructions during the six-year investigation. (Id.) Ultimately,

Defendants were indicted by the Government on July 19, 2012, and Plaintiff was released from his confidentiality directive on that date. (Id.)

On October 16, 2012, Plaintiff filed a *qui tam* action under seal in this Court alleging that Armet and Whyte violated the False Claims Act, 31 U.S.C. §§ 3729, et seq. (See Mot. to File Compl. in Camera and Under Seal, Oct. 16, 2012 [ECF No. 1].) The United States elected not to intervene in Plaintiff's action. (See Not. of Election to Decline Intervention, Aug. 14, 2013 [ECF No. 18].) Plaintiff obtained service on Armet on September 24, 2013.[6] (See Return of Service, Sept. 14, 2013 [ECF No. 24].) Following two extensions, Plaintiff was able to obtain service on Whyte on May 22, 2014. (Return of Service, May 22, 2014 [ECF No. 38].) On June 12, 2014, Whyte filed a Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and Armet filed a Motion to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6). (See Whyte Mot. to Dismiss, June 12, 2014 [ECF No. 39]; Armet Mot. to Dismiss, June 12, 2014 [ECF No. 41].) Both motions were fully briefed by the parties, and I heard oral arguments on the motions on July 29, 2014.

## II. STANDARD OF REVIEW

When a defendant challenges a court's power to exercise personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citing Mylan Labs, Inc. v. Akzo, N.V., 2 F.3d 56, 59–60 (4th Cir. 1993)). When, as here, a district court is compelled to decide a pretrial jurisdictional challenge "on the basis of only motion papers, supporting legal memoranda[,] and the relevant allegations of a complaint" without conducting an evidentiary hearing, "the burden is on the plaintiff to

---

[6] Armet was served again on May 22, 2014. (See Return of Service, May 22, 2014 [ECF No. 37].)

make a *prima facie* showing" of personal jurisdiction. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). When making such a determination, a court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id.; see also Mylan Labs, Inc., 2 F.3d at 60. Although the standard to make a *prima facie* showing of personal jurisdiction is lenient, a court does not need to "credit conclusory allegations or draw farfetched inferences." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In determining facial plausibility, I must accept all factual allegations in the complaint as true. Id. The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the complaint must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

### III. ANALYSIS

A. Defendant William Whyte's Motion to Dismiss for Lack of Personal Jurisdiction

In order for a court to exercise personal jurisdiction,[7] the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). These "minimum contacts" can give rise to personal jurisdiction under a theory of general or specific jurisdiction.[8] "Where Congress has authorized nationwide service of process by federal courts under specific federal statutes, so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over

---

[7] "As prerequisites to exercising personal jurisdiction over a defendant, a federal court must have jurisdiction over the subject matter of the suit, venue, 'a constitutionally sufficient relationship between the defendant and the forum,' and 'authorization for service of a summons on the person.'" ESAB Group v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997) (quoting Omni Capital Int'l v. Rudolph Wolff & Co., 484 U.S. 97, 104 (1987)). There is no dispute that there is subject matter jurisdiction over this suit, as the case arises under the False Claims Act ("FCA"), a federal statute. See 28 U.S.C. § 1331 (2014); 31 U.S.C. § 3732(a) (2014). Likewise, venue is proper because the FCA provides that venue is appropriate where, "in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by [31 U.S.C. § 3729] occurred." 31 U.S.C. § 3732(a) (2014). It is undisputed that Armet was located and transacted business in Danville, Virginia, and thus that this court is an appropriate venue. Finally, the FCA authorizes the district court to issue a summons and that it may be "served at any place within or outside the United States." Id. Because Whyte was served with a summons in Canada, the statute is satisfied. The only remaining question, therefore, is whether there is a "constitutionally sufficient relationship between the defendant and the forum." ESAB Group, 126 F.3d at 622.

[8] General jurisdiction attaches when a defendant is shown to have had "continuous and systematic" contacts with the forum. CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15 (4th Cir. 2009). "[T]he threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." ALS Scan, Inc v. Digital Serv. Consultants, Inc., 293 F.3d 707, 715 (4th Cir. 2002). Specific jurisdiction, on the other hand, exists where a defendant's alleged liability arises from or is related to an activity conducted within the forum. Mitrano v. Hawes, 377 F.3d 402, 406−07 (4th Cir. 2004). When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation, while the "constitutional touchstone remains whether the defendant purposefully established minimum contacts with the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

- 8 -

the person of the defendant." Hogue v. Milodon Eng'g, Inc., 736 F.2d 989, 991 (4th Cir. 1984); see also ESAB Group v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997).

In this case, the FCA authorizes nationwide and worldwide service of process. See 31 U.S.C. § 3732(a). As a result, when determining whether the exercise of personal jurisdiction comports with due process, the relevant inquiry is "whether the defendant[] [has] minimum contacts with the United States as a whole," United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, 976 F. Supp. 207, 210 (S.D.N.Y. 1997), and "not the traditional inquiry of whether the defendant[] [has] minimum contacts with the forum state." United States v. Gwinn, Case No. 5:06-cv-00267, 2008 WL 867927, at *16 (S.D.W. Va. Mar. 31, 2008). This is commonly referred to as the "national contacts" test. See ESAB Group, 126 F.3d at 626 (holding that, under RICO statute which permits nationwide service of process, personal jurisdiction was proper even though defendants did not have sufficient minimum contacts with forum state to justify personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(A)). Where the analysis involves conduct on behalf of a corporation, a court must also consider the *nature* of a defendant's contacts with the United States.

It is axiomatic that "[a]n individual and a corporation of which that individual is the principal are separate legal entities." Birrane v. Master Collectors, Inc., 738 F. Supp. 167, 169 (D. Md. 1990) (citing United States v. Van Diviner, 822 F.2d 960, 963 (10th Cir. 1987)). In certain circumstances, however, a corporation's activities may give rise to personal jurisdiction over its principals. As the Birrane court noted:

> If the grounds exist for "piercing the corporate veil" generally, the corporate veil can be pierced for jurisdictional purposes. Absent such grounds, however, there is no basis whatsoever for holding that merely because a corporation transacts business in the state, contracts to supply goods or services in the state, or has other substantial contacts with the state, an individual who is its

- 9 -

> principal should be deemed to have engaged in those activities personally. . . . An individual who has chosen simply to transact business in a state through a valid and viable corporation has not necessarily "purposefully avail[ed]" himself of "the privilege of conducting activities within . . . [that] State" in his individual capacity.

Id. (internal citations omitted). In the absence of such a showing, Whyte's actions (as pleaded) must be analyzed separate and apart from Whyte's actions taken on behalf of Armet. See Calder v. Jones, 465 U.S. 783, 790 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually.").

In Plaintiff's Complaint, he makes several references to Whyte. The problem, however, is that all of these actions were taken by Whyte in his capacity as owner and CEO of Armet. For example, Plaintiff alleges that Whyte directed that the production of the armored cars be moved to Ontario, and that Plaintiff be relocated to Virginia. (See Compl. ¶ 38.) Further, Plaintiff alleges that Whyte and Armet submitted invoices and a request for a payment advance to JCCI. (See Compl. ¶¶ 26–28.) At no point, however, does Plaintiff ever indicate what actions, if any, Whyte took in his individual capacity.

Accordingly, Plaintiff cannot establish general or specific jurisdiction over Whyte. To make a showing of general jurisdiction, Plaintiff would need to establish that Whyte has some systematic and continuous connection with the United States. This could be done by pleading that Whyte owns property in the United States or that he (in his individual capacity) regularly transacts business here.[9] See, e.g., Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp. 2d

---

[9] Although Plaintiff contends he has made such a pleading, I disagree. In fact, in his brief, Plaintiff displays the flaw of his argument—his apparent contention that Armet and Whyte are the same entity for jurisdictional purposes. He argues, "[I]t is evident that Relator established that *Whyte's company*"

- 10 -

464, 469 (M.D.N.C. 2013). Alternatively, Plaintiff could establish specific jurisdiction by pleading facts sufficient to show that Whyte's liability under the FCA arose from his activities in or directed towards the United States. In the absence of such a showing, however, Plaintiff fails to make even a *prima facie* showing of personal jurisdiction.

The primary case cited by the parties supports the conclusion that, at present, Plaintiff has not adequately pleaded facts sufficient to establish personal jurisdiction over Whyte. In <u>United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Inc.</u>, 976 F. Supp. 207 (S.D.N.Y. 1997), Jeffrey Thistlethwaite brought an action under the *qui tam* provisions of the FCA against an English company and two employees of that company, both of whom were English residents. <u>See</u> <u>id.</u> at 209. The individual defendants moved to dismiss the complaint on the grounds that the court lacked personal jurisdiction over them. <u>Id.</u> The court ultimately determined that there was personal jurisdiction because the individual British defendants "participated in the negotiation of [the] contracts [at issue] and travelled repeatedly to Oklahoma and California to meet with representatives of the United States parties to those contracts." <u>Id.</u> at 210.

In the present case, however, there is no claim that Whyte traveled to the United States to negotiate the contracts, nor is there an allegation that the entity with whom Whyte negotiated was in the United States. At most, Plaintiff pleads that Whyte contracted with JCCI, "the United States Joint Contracting Command *in Baghdad, Iraq*." (Compl. ¶ 3 (emphasis added).) Moreover, the contract stipulated that the completed vehicles were to be delivered to Iraq, not to the United States. (<u>See</u> <u>id.</u> ¶¶ 19–20.) Finally, Plaintiff does not indicate to where or to whom the invoices and requests for payment were sent. He only alleges that the invoices and attendant paperwork were prepared at Armet's offices, including the Danville, Virginia, location. (<u>See</u> <u>id.</u>

---

maintained offices in the United States and regularly transacted business there. (<u>See</u> Pl.'s Br. in Opp. to Whyte's Mot. to Dismiss pg. 11, June 26, 2014 [ECF No. 50] (emphasis added).)

¶ 26.) He does not indicate what role Whyte played in the production of these invoices; he simply lumps Whyte and Armet together to make the conclusory statement that they "prepared these forms for submission to the JCCI in their offices, including their office in Danville, Virginia." (Id.)

This would be a closer question if Plaintiff had alleged that Whyte negotiated the contracts with JCCI in the United States, that he prepared the invoices in the United States, or that he sent them to the United States, but that is not included in Plaintiff's Complaint. Even if Whyte's actions were similar to those of the Thistlethwaite defendants, there is simply no allegation that *any* aspect of the negotiation, contracting, manufacture, or payment actually took place in the United States. Accord Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp. 2d 464, 470 (M.D.N.C. 2013) (holding no personal jurisdiction over individual defendant with no ties to North Carolina). "[J]urisdiction over [Whyte], as an officer of [Armet], cannot be predicated solely upon this Court's jurisdiction over [Armet] itself." Mates v. N. Am. Vaccine, Inc., 53 F. Supp. 814, 821 (D. Md. 1999). Under the facts as Plaintiff presented them in his Complaint, there is simply no basis to assert jurisdiction over Whyte in his personal capacity.

B. <u>Defendant Armet's Motion to Dismiss for Failure to State a Claim</u>

In adopting the False Claims Act ("FCA"), "the objective of Congress was broadly to protect the funds and property of the government." Rainwater v. United States, 356 U.S. 590, 592 (1958). To that end, the FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, to [the United States government] a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a) (2014). To plead an FCA claim, "a relator must plausibly allege four distinct

- 12 -

elements: '(1) [] there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter [knowledge]; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim').'" United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 700 (4th Cir. 2014) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999)). Under the FCA, "the term 'false or fraudulent claim' includes those instances 'when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct.' That is, the fraud may be in the inducement." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (quoting Harrison, 176 F.3d at 787).

"To satisfy the first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood. As a result, mere allegations of poor or inefficient management of contractual duties are not actionable under the [FCA]. Likewise, imprecise statements or differences of interpretation growing out of a disputed legal question are similarly not false under the FCA." Id. at 376−77 (internal quotations and citations omitted).

> Congress crafted the FCA to deal with fraud, not ordinary contractual disputes. The FCA plays an important role in safeguarding the integrity of federal contracting, administering strong medicine in situations where strong remedies are needed. Allowing it to be used in run-of-the-mill contract disagreements . . . would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public.

United States ex rel. Owens v. First Kuwaiti Trading & Contracting Co., 612 F.3d 724, 726−27 (4th Cir. 2010); see also Wilson, 525 F.3d at 373.

The second element of an FCA claim—the requisite scienter—"does not demand 'specific intent to defraud' and can be satisfied by proving 'reckless disregard of the truth or falsity of the information.'" Owens, 612 F.3d at 728 (quoting 31 U.S.C. §§ 3729(b)(1)(A)(iii),

(b)(1)(B)).  The knowledge element may also be satisfied by showing "deliberate ignorance of the truth or falsity of the information," or "actual knowledge of the information," 31 U.S.C. §§ 3729(b)(1)(A)(i), (ii).  Knowledge is an important element of the statute because "[t]he FCA is a fraud prevention statute." United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir. 1999).  The statute—and the knowledge element in particular—does not permit a *qui tam* relator to "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the [FCA]." Wilson, 525 F.3d at 373.

Plaintiff's Complaint sets forth three instances that Plaintiff contends gives rise to FCA liability.  First, Plaintiff alleges that Defendants entered into the contract with JCCI even though Armet was not able to meet the ballistic and blast protection standards set forth in the solicitations (the "fraud in the inducement" claim).  Second, Plaintiff alleges that Defendants falsely certified that the vehicles complied with the contract specifications each time it sent JCCI an invoice (the "invoices" claim).  Finally, Plaintiff asserts that Defendants falsely claimed in its application for a progress payment that the funds would be used to manufacture JCCI's vehicles; instead, Defendants used the money to manufacture other orders and to pay incidental business and personal expenses unrelated to JCCI's contracts (the "progress payment" claim).

    i. Fraud in the Inducement

The Supreme Court has held that the FCA may be used to impose liability on those who fraudulently induce the government to enter into a contract.  "In these cases, courts . . . [have] found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 787 (4th Cir. 1999).  In the leading case on fraud in the inducement under the FCA, the

- 14 -

Supreme Court held that liability attached to each claim submitted under contracts that were obtained through fraud or misrepresentation. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 542 (1943) (overruled by statute on other grounds).

In the present case, Plaintiff has not pleaded all that is necessary to make a fraud-in-the-inducement claim. Most notably, Plaintiff does not allege in the Complaint that, at the time Defendants entered into the contracts with JCCI, they *knew* they would not be able to manufacture the armored cars to the contracts' specifications. At most, the Complaint alleges that Armet was not able to meet the ballistic and blast protections standards, but Plaintiff wholly fails to plead that Whyte and Armet were *aware* of its inability to comply at the time it entered into the contracts. In order to make out an FCA claim, Plaintiff is required to plead and prove that Defendants knew any such statement was false at the time they made the statement. Accord Harrison, 176 F.3d at 781, 791 (holding that the plaintiff's allegation that the defendant represented that a particular project would take 1.5 years to complete, even though it knew it would take significantly longer, constituted a false statement under the FCA).

In paragraphs 3 and 4 of his Complaint, Plaintiff alleges that Armet "failed to meet the delivery deadlines for these thirty-two vehicles," and that, "[d]espite having full knowledge that these vehicles were substandard . . . , Armet continued to supply the Government . . . ." (Compl. ¶¶ 3−4.) These allegations, while serious, do not establish that Armet and Whyte knew they would be unable to fill the contracts on time and to specification *when they entered into the contracts with JCCI*. Moreover, although the Complaint details the contracting process and protection specifications at length (see Compl. ¶¶ 18−24), Plaintiff fails to allege the extent of Defendants' knowledge (when they entered into the contracts) about their ability to comply with the requirements. The most Plaintiff alleges regarding Defendants' knowledge is his allegation

- 15 -

that Defendants "knew that each of the seven armored vehicles that they delivered to JCCI failed to meet the ballistic and blast protection requirements of the Contracts . . . ." (Compl. ¶ 34.) At most, these allegations would support a breach of contract claim, but they do not satisfy the knowledge requirement necessary to establish fraud in the inducement.

Plaintiff makes an attempt to plead the element of scienter for this claim. In paragraph 47 of the Complaint, he states: "Armet, by fraudulently misrepresenting its capacity to make compliant products in order to get contracts with the U.S. Government and its agencies knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statements material to a false or fraudulent claim . . . ." (Compl. ¶ 47.) This conclusory statement, which is completely lacking in factual support, is exactly the type of pleading the Supreme Court cautioned against in <u>Iqbal</u> and <u>Twombly</u>. Without further evidentiary support, Plaintiff's single, conclusory allegation is insufficient to state a claim under the FCA for fraud in the inducement. Insofar as Plaintiff asserts such a claim, it is dismissed without prejudice. Plaintiff will be granted leave to amend his Complaint.

  ii. <u>Invoices</u>

Plaintiff's claim that Defendants fraudulently certified that the vehicles complied with the contract when they submitted the invoices and the Form DD-250s to JCCI presents a much more typical FCA claim than the fraud-in-the-inducement version. Like the prior claim, however, I find that Plaintiff has failed to plead the necessary elements.

An FCA claim requires, at the most basic level, a "false statement or fraudulent course of conduct." <u>Harrison</u>, 176 F.3d at 788. Although Defendants' arguments regarding whether Form DD-250s may form the basis for an FCA claim are interesting, they are ultimately irrelevant.

The gravamen of Plaintiff's allegations is that Defendants submitted invoices and Form DD-250s to JCCI for each vehicle they delivered. The Complaint does not allege that JCCI was billed for vehicles that were not delivered. Thus, the invoices accurately represented the quantity of goods that were delivered to Iraq. There is no allegation that any statement regarding quantity was false.

Rather, Plaintiff contends that, because the vehicles did not meet the contract specifications regarding ballistic and blast protection, the invoices were "false." Notably, however, Plaintiff does not allege what statements regarding *quality*, if any, were included with the invoices and DD-250s. If, for example, the invoice or DD-250 indicated that the vehicles complied with the contracts, then Plaintiff likely would have stated an FCA claim. But he has not made any such allegation. Rather, Plaintiff pleads nothing more than a "run-of-the-mill" breach of contract claim. Under the Complaint as written, Defendants properly billed for completed vehicles; those vehicles simply did not meet JCCI's specification. In the absence of some false statement made in conjunction with the invoices, Plaintiff has not pleaded an FCA claim. Contrary to Plaintiff's claim in his brief, the Complaint does *not* allege that "Armet stated, in each of its invoices to the JCCI, that its ballistic armor had been tested and that its armored vehicles met the ballistic and blast protection standards the [c]ontracts required." (Pl.'s Br. in Opp. to Armet's Mot. to Dismiss, at pg. 10, June 26, 2014 [ECF No. 52].) No fair reading of the Complaint supports Plaintiff's contention.

Some courts have ascribed to an "implied certification" theory under the FCA, meaning that the submission of an invoice "implies" that the goods for which the government has been billed meet the relevant contractual specifications. See Harrison, 176 F.3d at 786 & n.8. The Fourth Circuit has noted that such claims are "questionable" in this Circuit. Id.; see also United

- 17 -

States ex rel. Herrera v. Danka Office Imaging Co., 91 Fed. App'x 862, 864 n.3 (4th Cir. 2004) (unpublished). Nevertheless, even if an "implied certification" theory were valid in this Circuit, Plaintiff has failed to plead it. Under such a theory, "[t]here can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information." United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama, 104 F.3d 1453, 1461 (4th Cir. 1997). Plaintiff has not alleged any facts sufficient to show that, under its agreement with JCCI, Armet's invoices were understood to imply compliance with the contracts. Moreover, there is no allegation that Defendants omitted information that was supposed to be included in the invoices or on the DD-250. In the absence of any facts to support the claim, there can be no violation of the FCA under an "implied certification" theory. Therefore, Plaintiff's Complaint wiil be dismissed without prejudice as to the alleged violation of the FCA vis-à-vis the submission of invoices. Plaintiff will be granted leave to amend his Complaint.

      iii.     Progress Payment

The final theory on which Plaintiff bases a claim of an FCA violation is his assertion that "Defendants obtained the December 2006 advance progress payments of $824,531.00 based on Defendants' representations that they needed the funds to produce the armored gun trucks under the [c]ontracts. Instead of using those funds to build and ship more armored gun trucks, however, Defendants intentionally diverted the funds to other business and personal expenditures." (Compl. ¶ 36.) Unlike Plaintiff's other claims, he has adequately pleaded an FCA violation in regards to this claim.

Plaintiff alleges that Defendants, "citing cash-flow problems, submitted a . . . Contractor's Request for Progress Payment, Form 1443, to the JCCI seeking an advance or progress payment of $1 million from the United States government. Defendants told the JCCI

- 18 -

Case 4:12-cv-00045-JLK-RSB   Document 58   Filed 08/26/14   Page 18 of 20   Pageid#: 292

that they needed these funds to continue to produce the armored gun trucks under the two [c]ontracts with the JCCI." (Id. ¶ 28.) The government ultimately approved a partial advance payment and remitted $824,531.00 to Armet. (Id.)

Rather than using these funds to manufacture the vehicles, Plaintiff alleges that Whyte and Armet diverted the funds to pay personal expenditures. (Id. ¶ 36.) In other words, when Whyte and Armet told the government they needed $1 million to manufacture the vehicles, they lied. That lie was for the sole purpose of inducing the government to pay out money, and the government complied. Plaintiff alleges that this was done "intentionally." (Id.) Thus, Plaintiff has alleged an intentional, material false statement that "caused the government to pay out money . . . ." Rostholder, 745 F.3d at 700. He has pleaded a valid FCA claim, and Armet's Motion to Dismiss will be denied on that count.

### IV. CONCLUSION

Plaintiff has not pleaded any facts to establish the nature and extent of Whyte's contacts with the United States in his personal capacity. Absent grounds to pierce the corporate veil, Whyte's actions as a corporate officer for Armet cannot—standing alone—form the basis of personal jurisdiction over Whyte individually. For this reason, Whyte' motion to dismiss for lack of personal jurisdiction will be granted. Plaintiff will be afforded fourteen (14) days to amend his Complaint, if he so chooses.

Regarding Armet's 12(b)(6) motion, Plaintiff has not alleged that Defendants *knew*, at the time they entered into the contracts with JCCI, that they would be unable to meet their obligations under the contracts. Thus, absent the necessary allegation of scienter, Plaintiff has not pleaded a fraud-in-the-inducement claim under the FCA. With regard to the invoices and DD-250s, there is no factual allegation regarding what statements, if any, were made in

conjunction with these filings. Likewise, there is no factual support for the allegation that Defendants knew the vehicles they were delivering to JCCI did not comply with the contracts. In the absence of some false statement or the requisite knowledge, Plaintiff has not alleged a violation of the FCA. Armet's Motion to Dismiss will be granted as to these claims. The Motion will be denied, however, with respect to the claims arising from Armet's request for a progress payment. Plaintiff has adequately pleaded the necessary elements of an FCA claim, and that claim will survive. Plaintiff will be afforded fourteen (14) days to amend his Complaint, if he so chooses.

    The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

    Entered this 26th day of August, 2014.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE

- 20 -

Case 4:12-cv-00045-JLK-RSB   Document 58   Filed 08/26/14   Page 20 of 20   Pageid#: 294