**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**DANVILLE DIVISION**

|  |  |  |
|---|---|---|
| **U.S. ex rel. FRANK SKINNER,** | ) | |
| | ) | |
| **Relator,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No: <u>4:12-cv-00045</u>** |
| | ) | |
| **ARMET ARMORED VEHICLES, INC.,** | ) | |
| **WILLIAM R. WHYTE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>FIRST AMENDED FALSE CLAIMS ACT COMPLAINT</u>

### PRELIMINARY STATEMENT

1.  This lawsuit is based on the acts and actions, amounting to schemes, by the defendants, William R. Whyte and Armet Armored Vehicles, Inc., (hereinafter referred to as ″Whyte″, ″Armet″, or ″Defendants″) to defraud the United States.  Relator, through undersigned counsel, and acting on the behalf of and in the name of the United States of America, brings this civil action under the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.  Whyte is the Owner and CEO of Armet, a company that designs, manufactures, and sells armored vehicles.  Armet′s ideal customer is the military, and such agencies as the Department of Defense, the Army, the Navy, the Joint Contracting Command, and the Defense Logistics Agency have entered into contracts with Armet.  In addition, Armet has designed and manufactured armored vehicles for police departments, government entities, and high net worth individuals around the world.

3.   After the U.S. entered Iraq in March 2003, the Department of Defense conducted most of its contracting for that operation through the United States Joint Contracting Command in Baghdad, Iraq ("JCCI").

4.   Most of the payments made as a result of contracts with the JCCI were processed by the United States Army Corps of Engineers Finance Center, located in Millington, Tennessee.

5.   In 2006, Armet entered into two contracts, numbers W91GY0-06-F-0028 and W91GY0-06-F-0047 (hereinafter referred to as "the Contracts," "the 0028 Contract," or "the 0047 Contract") with the JCCI to develop, manufacture, and ship thirty-two (32) armored gun trucks (hereinafter referred to as the "Kestrel/ Gurkha") to Iraq.   The armored gun trucks were to be used for the transport of American and Iraqi officials throughout the country.

6.   Prior to delivery of the first vehicle, Whyte and numerous Armet employees were aware that the vehicles were substandard and did not meet the specifications required by the Contracts. Despite this knowledge, Whyte and Armet continued to supply vehicles to the Government, bill the Government pursuant to the Contracts, and obtain payments for the vehicles.

7.   In breach of the Contracts, Armet only delivered seven (7) of the thirty-two vehicles, failed to meet delivery times for any of the vehicles, and all vehicles delivered did not meet the ballistic and blast protection standards outlined in the contracts between Armet and the JCCI.

8.   The Government acted in reliance on Whyte and Armet's expertise and quality assurance program, and would not have paid for the vehicles had it known that the vehicles were not properly built or failed to meet the ballistic or blast protection specifications outlined in the Contracts.   Thus, Whyte and Armet presented false claims to the Government, in violation of the federal False Claims Act, when it knowingly and directly submitted substandard and defective vehicles to the Government for payment.

2

**PARTIES**

9.   Relator Frank Skinner is a citizen of the United States and a resident of Virginia.  Relator has over thirty-three years (33) of experience in the defense industry.  Prior to working at Armet, Relator served as an Explosive Ordnance Disposal Officer with the U.S. Marine Corps for over twenty (20) years.  In 1984, as an active duty Marine, Relator was assigned to the Department of State Office of Diplomatic Security.  In 1986, Relator was reassigned to teach special operations skills, including explosive Ordnance Disposal techniques, to U.S. Marines at Quantico, Virginia. In 1990, Relator retired from the Marine Corps and started his own bodyguard business, where he provided security for the Saudi royal family and for members of Disney on Ice when they traveled to volatile locations such as Cairo, Egypt and Belfast, Northern Ireland.

10. In 2005, Relator was hired by Whyte to be President of Armet.  As President, Relator effectuated procurement of government contracts, the hiring of subcontractors to assist in the building of vehicles, ordering and inventorying of steel and glass to be used in the armored vehicles, and generally oversaw Armet's Florida and Virginia manufacturing facilities.

11. Thus, due to Relator's previous experience in the defense industry, his training as an Explosive Ordnance Disposal Officer, and his time as President of Armet, he has personal knowledge of the logistics and requirements necessary to build vehicles that protect against explosives and other weapons.  As a former U.S. Marine, he understands the importance of soldier safety and mission capability.

12. Relator acknowledges that there has been a public disclosure of the particular allegations set forth in this case in a criminal indictment filed by the U.S. Government on July 19, 2012. However, Relator has personal knowledge that Whyte and Armet knowingly made and shipped

defective products that were not compliant with the Contracts, falsely certified the products'

compliance with the Contracts, and continued to bill the U.S. Government and accept payments

for the defective products.  Moreover, Relator is the original complaining witness who made a

complaint to the FBI that lead to the indictment.  Relator worked with the Government as a non-

compensated confidential informant for approximately five years prior to the indictment.  Thus,

Relator is an original source of the facts and information set forth in this Complaint concerning

the activities of the Defendants.  The facts averred herein are based upon his personal

observations and documents in his possession.

13. Accordingly, Relator has provided to the United States, prior to the public disclosure and

prior to the filing of this Complaint, a full disclosure of substantially all material facts, as

required by the False Claims Act, 31 U.S.C. § 3730(b)(2) and (e)(4)(B).

14. Armet Armored Vehicles, Inc. is a business that designs, manufactures, and supplies

armored vehicles for government and commercial customers.  Armet was founded in 1993 and is

incorporated in Florida.

15. Armet has maintained its headquarters at various locations in the United States from 1993

to the present.  From 1993 to 2005 Armet was headquartered at 12600 Belcher Road, Largo,

Florida, 33773. From 2006 to 2011 Armet was headquartered at 121 Maxine Road, Danville,

Virginia, 24541.  From 2011 to the present Armet has maintained headquarters at 495 Grand

Blvd., Ste. 206, Miramar Beach, Florida, 32550.  Armet also operates offices in Largo, Florida

and Ontario, Canada, and previously operated offices and manufacturing facilities in Danville,

Virginia.

16. William R. Whyte is the owner and Chief Executive Officer of Armet.  He personally

manages all of Armet's operations, including operations at Armet's Florida and Virginia

facilities.  Whyte routinely travelled to both U.S. facilities to monitor operations, communicated with Relator and other Armet employees regarding daily operations, and made logistical, personnel, and financial decisions at both facilities.

17. Any and all acts alleged herein to have been committed were directed by Whyte and carried out by Armet's officers, directors, employees, representatives or agents, other than Relator, who at all times acted on behalf of the company, and within the scope of their employment, and are collectively referred to herein as Armet.

**JURISDICTION AND VENUE**

18.   This lawsuit is brought against defendant under the federal False Claims Act, 31 U.S.C. §§ 3729-3733.  Jurisdiction over this action is conferred upon this Court by the federal False Claims Act, 31 U.S.C. § 3732(a) and by 28 U.S.C. § 1331 and § 1345.

19.   This Court has jurisdiction over the defendant corporations pursuant to 31 U.S.C. § 3732(a) and because Defendants Whyte and Armet transact business in the Commonwealth of Virginia, including, but not necessarily limited to entering contracts with the Federal Government in Virginia, having an authorized representative in Virginia, having a manufacturing facility in Virginia, having listed Armet's principal place of business as being in Virginia, and otherwise purposefully availing themselves of the laws of Virginia.

**FACTS RELATING TO ALL COUNTS**

**Applicable Quality Assurance Standards**

20.   Pursuant to the Federal Acquisition Regulations System ("FAR"), the ultimate burden of quality control is on the contractor.  Part 46 of the FAR "prescribes policies and procedures to ensure that supplies and services acquired under Government contract conform to the contract's quality and quantity requirements."  48 C.F.R. § 46.000.  Generally, the Government shall rely

on the contractor to accomplish all inspection and testing needed to ensure that supplies or services...conform to contract quality before they are tendered to the Government." 48 C.F.R. § 46.202-(a). When acquiring commercial items, the FAR expressly provides that "the government shall rely on contractors' existing quality assurance systems as substitute for Government inspection and testing before tender or acceptance unless customary market practices for the commercial item being acquired include any in-progress inspection" by the Government. 48 C.F.R. § 46.202-1.

21. Pursuant to the Department of Defense Federal Acquisition Regulations System ("DFAR"), a supplement to FAR, agencies are to "provide contractors the maximum flexibility in establishing efficient and effective quality programs to meet contractual requirements. Contractor control programs may be modeled on military, commercial, national, or international quality standards." 48 C.F.R. § 246.102(4).

22. Quality assurance standards were set for in Statements of Work ("SOWs") that were agreed upon by Whyte, Armet employees, and the Government. In the SOWs, Armet warrantied "that the vehicles [would] be free from defects in materials and workmanship and [would] conform to the requirements" of the SOW, which contained the required blast and ballistic protection standards.

## **William Whyte's Extensive Personal Ties to the United States**

23. Whyte was the Owner and CEO of Armet, a company incorporated in Florida and currently headquartered at 495 Grand Boulevard, Suite 206, Miramar Beach, Florida 32550.

24. As an individual, Whyte continuously and systematically availed himself of the privileges and protections of the United States.

### I. Whyte Maintained a Bank Account in the United States

25.   Whyte personally maintained a Chase Visa account in his name, with an account number ending in 0926.[1]

26.   J.P. Morgan Chase & Co. is a large American bank that transacts business in all 50 States.

27.   J.P. Morgan Chase & Co. is headquartered in Manhattan, New York and is incorporated in Dover, Delaware.

28.   Whyte's Chase Visa account summary lists his address as 12600 Belcher Rd S Unit B, Largo, Florida 33773-1656.



29.   Whyte permitted Armet Employees Scott Verona, Andrea Grandinetti, and John Ventimiglia to use Whyte's Chase account to make business-related purchases within the United States.

30.   Between May 15, 2006 and June 13, 2006, Whyte permitted Verona, Grandinetti, and Ventimigilia to use his account to make purchases totaling $4,731.21.

---

[1] As per Federal Rule 5.2(a), Relator has redacted all but the last four digits of Whyte's U.S. bank account number. Should the Court require more complete information, Relator can provide Whyte's full account number.

31.   On June 9, 2012, Whyte made a $7,000 deposit into his Chase Visa account to pay down the outstanding balance on the card.

| | | TOTAL ████ 3893 | $1,715.33 | | |
|---|---|---|---|---|---|
| 06/05 | | OVERLIMIT FEE | | | 39.00 |
| 06/09 | 11601602929079913200007 | PAYMENT - THANK YOU WILLIAM WHYTE | | 7,000.00 | |
| | | TOTAL ████ 0926 | $-6,961.00 | | |
| | | | | | 53.00 |

## II. Whyte Owned Multiple Properties in the United States.

32.   Whyte personally owned multiple properties in the United States.

33.   Whyte was the registered property owner of Armet's Largo facility, located at 12600 Belcher Road S. Unit B, Largo, Florida 33733-1656.

34.   In or around 2006, Whyte sold his Largo, Florida property for approximately $300,000.00.

35.   Whyte pocketed the proceeds from the Largo sale; the $300,000 from the sale of Whyte's property was immediately transferred to Whyte's bank account in Canada.

36.   In or around the spring of 2006, Whyte leased property in Danville, Virginia.

37.   Whyte leased property in Danville from Mount Cross Welding, a privately held company headquartered and incorporated at 108 Oakhaven Drive, Danville, Virginia 24541.

38.   In or around 2006, Whyte bought the property from Mount Cross Welding.

39.   In or around October 2013 Whyte sold his property in Danville to Unilin Flooring NC, LLC.

## III. Whyte Routinely Travelled to Armet's Danville, Virginia and Largo, Florida Facilities

40.   Whyte directly supervised Armet's operations in Danville, Virginia and Largo, Florida, travelling to both locations on multiple occasions.

41.   Whyte visited Armet's Largo facility approximately every two months, or six times per year.

42.   Each of Whyte's visits to Largo was approximately three to five days in length.

43.   In or around the spring of 2006, Whyte visited Largo in order to meet with Armet's Largo-area vendors.

44.   During this visit, Whyte personally met with Armet's Largo-area vendors to tell them that Armet would not pay their contracts in full.

45.   Whyte personally demanded that Armet's Largo-area vendors accept a settlement offer, because otherwise Armet would go bankrupt and the vendors would not be paid at all.

46.   During the meeting, Whyte told Armet's Largo-area vendors that they could either take the settlement or Armet would go bankrupt and the vendors would not receive any payment.

47.   In an email dated September 12, 2006, Whyte told Relator that "We will discuss [the business] situation further when I arrive in Largo on Sunday."

48.   On or around Sunday, September 17, 2006, Whyte travelled from Canada to Largo, Florida to meet with Relator in person.

49.   In or around the spring of 2006, Whyte travelled to Danville, Virginia to select a site for Armet's facility.

50.   Whyte travelled to Danville in order to personally assess potential properties' proximity to a firing range.

51.   In or around the fall of 2006, Whyte travelled to Danville to meet with Jim Basnight, a representative from the United States Navy.

52.   Basnight was interested in ordering from Armet additional up-armored GMC Surburban and Toyota Land Cruiser vehicles.

53.   During his visit, Whyte, Basnight and Relator toured Armet's Danville facility.

54.   Following the tour, Whyte took Basnight and Relator to dinner.

**IV. Whyte was in Constant Communication with Armet Employees in the United States**

55.   Whyte routinely communicated with Armet employees based in Danville, Virginia and Largo, Florida.

56.   Whyte communicated with Armet employees via telephone and from his Armet email address, "whyte@aavi.com."

57.   Whyte spoke with Relator via phone approximately three days a week regarding operations at Armet's facilities.

58.   Whyte also sent emails to Relator on a daily basis regarding business operations at Largo and Danville.

59.   Whyte also spoke via phone with Scott Verona, the Largo Plant Manager, approximately three days per week.

60.   Whyte also sent Verona emails on a daily basis regarding business operations at Largo.

61.   On or around February 17, 2006, Whyte spoke with Relator in order to select a site for Armet's Danville facility.

62.   On July 29, 2006, Whyte sent an email to Relator, stating "Frank, It's getting a little tiring hitting consistently low balls.  I'm fucking Sharman's business, having sucked out what is not her's, it's (sic) very risky.  Look what happened to Enron!"

63.   On July 29, 2006, Whyte sent a detailed email to Relator regarding financial management at the Largo facility, stating "I would like to talk to you on Sunday afternoon..."

64.    On August 1, 2006, Whyte forwarded an email to Relator regarding a welding contract with a vendor in Danville, Virginia, signing the email "Bill."

65.    On August 14, 2006, Whyte communicated with John Ventimigilia, the Foreman at Armet's Danville facility, via email in order to discuss buying parts for Armet's Kestrel/Gurkha vehicles at Home Depot.

66.    On September 9, 2006, Whyte sent an email to Relator and another Armet employee stating, in part, "We will discuss the situation further when I arrive in Largo on Sunday."

67.    On May 20, 2007, Whyte sent an email to Relator denying that either he or Armet had circumvented U.S. and Canadian export laws by improperly shipping armored Kestrel/Gurkha vehicles to Nigeria.

## William Whyte's Business Ties to the United States

68.    As Owner and CEO of Armet, Whyte continuously and systematically availed himself of the laws, privileges, and protections of the United States in order to conduct and direct business activities within and towards the United States.

**I.    Whyte Repeatedly Certified to the Florida Department of State, Division of Corporations, that his Personal Address was in Either Largo, Florida or Danville, Virginia.**

69.    From 1993 to 2014, Whyte continuously and systematically conducted business operations in multiple States within the United States.

70.    On multiple occasions between 1993 and 2014, Whyte personally signed the documentation necessary to maintain Armet's listing as a for-profit corporation in Florida.

71.    On multiple occasions, Whyte registered her personal address as being in Largo, Florida or Danville, Virginia.

72.   Whyte systematically engaged in business inside multiple U.S. States, a detailed account of which follows below:

73.   On May 3, 1993, Whyte registered Armet Armored Vehicles, Inc. as a corporation in Florida.



74.   On October 7, 1998, Whyte refiled Armet's registration with the Florida Department of State, personally signing Armet's For Profit Corporation Annual Report.

75.   Whyte personally signed the form, and listed his contact phone number as being a Tampa, Florida area number.

FILE NOW: FILING FEE AFTER MAY 1ST IS $550.00

| PROFIT CORPORATION ANNUAL REPORT 1998 | FLORIDA DEPARTMENT OF STATE Sandra B. Mortham Secretary of State DIVISION OF CORPORATIONS | FILED Oct 07 1998 8:00am Secretary of State |

DOCUMENT # P93000031837 (6)

1. Corporation Name:
ARMET ARMORED VEHICLES INC.

| Principal Place of Business | Mailing Address | DO NOT WRITE IN THIS SPACE |
| 12600 BELCHER RD LARGO FL 33773 US | 12600 BELCHER RD LARGO FL 34643 US | |

| | | 3. Date Incorporated or Qualified 05/03/1993 |
| 2. Principal Place of Business 21 | 2a. Mailing Address 26 | 4. FEI Number 59-3215490 | Applied For Not Applicable |
| Suite, Apt. #, etc. 22 | Suite, Apt. #, etc. 27 | 5. Certificate of Status Desired ☐ | $8.75 Additional Fee Required |
| City & State 23 | City & State 28 | 6. Election Campaign Financing Trust Fund Contribution ☐ | $5.00 May Be Added to Fees |
| Zip 24 | Country 25 | Zip 33773 29 | Country 30 | 8. This corporation owes or has paid the current year Intangible Personal Property Tax due June 30. ☑ Yes ☐ No |

14. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this annual report or supplemental annual report is true and accurate and that my signature shall have the same legal effect as if made under oath, that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears in Block 17 or Block 18 if changed, or on an attachment with an address.

SIGNATURE: _____ WILLIAM WHYTE   1/12/98   813-535-3359

76. On May 10, 2001, Whyte filed an updated Uniform Business Report with the Secretary of State for the State of Florida, indicating that his address was 12600 Belcher Rd. S. Ste B, Largo, FL 33773.

77. Whyte listed a Pinellas County, Florida phone number as his contact number.

## 2001 UNIFORM BUSINESS REPORT (UBR)

DOCUMENT # P93000031837

**FILED**

**May 10, 2001 8:00 am**
**Secretary of State**
05-10-2001 90157 030 ***150.00

**1.** Entity Name
ARMET ARMORED VEHICLES INC.

| Principal Place of Business | Mailing Address |
|---|---|
| 12600 BELCHER RD<br>LARGO FL 33773<br>US | 12600 BELCHER RD<br>LARGO FL 33773<br>US |

DO NOT WRITE IN THIS SPACE

| 2. Principal Place of Business | 3. Mailing Address | 4. FEI Number | |
|---|---|---|---|
| 12600 Belcher Rd. S<br>Suite. Apt. #, etc.<br>Suite B | 12600 Belcher Rd. S.<br>Suite, Apt. #, etc.<br>Suite B | 59-3215490 | Applied For<br>Not Applicable |
| City & State<br>Largo | City & State<br>FL | 5. Certificate of Status Desired ☐ | $8.75 Additional<br>Fee Required |
| Zip<br>33773 | Country<br>USA | Zip<br>33773 Country<br>USA | | |

**6. Name and Address of Current Registered Agent**

PEREZ, FERNANDO III E
ANDERSON & ORCUTT P.A.
401 E JACKSON ST SUITE 2400
TAMPA FL 33602

**7. Name and Address of New Registered Agent**

Name: Perez III, Fernando
Street Address (P.O. Box Number is Not Acceptable):
101 EAST Kennedy Blvd.
Suite 3200
City: Tampa    FL   Zip Code 33602

**8.** The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:
Signature, typed or printed name of registered agent and title if applicable.    (NOTE: Registered Agent signature required when reinstating)    DATE 4/25/01

**9.** This corporation is eligible to satisfy its intangible Tax filing requirement and elects to do so. ☐
(See criteria on back)

**FILE NOW!!! FEE IS $150.00**
After MAY 1, 2001 Fee will be $550.00
Make Check Payable to Department of State

**10.** Election Campaign Financing
Trust Fund Contribution. ☐    $5.00 May Be
Added to Fees

| **11.** | OFFICERS AND DIRECTORS | | **12.** | ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 11 | |
|---|---|---|---|---|---|
| TITLE | ST | ☐ Delete | TITLE | D, P | ☒ Change ☐ Addition |
| NAME | VENTIMIGLIA, JOHN | | NAME | William Whyte | |
| STREET ADDRESS | 7992 SMOKETREE COURT | | STREET ADDRESS | 12600 Belcher Rd. S. Ste B | |
| CITY-ST-ZIP | LARGO FL | | CITY-ST-ZIP | Largo, FL 33773 | |
| TITLE | PV | ☒ Delete | TITLE | | ☐ Change ☐ Addition |
| NAME | SWANSON, GARY | | NAME | | |
| STREET ADDRESS | 12600 BELCHER ROAD | | STREET ADDRESS | | |
| CITY-ST-ZIP | LARGO FL | | CITY-ST-ZIP | | |
| TITLE | | ☐ Delete | TITLE | | ☐ Change ☐ Addition |

**13.** I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears in Block 11 or Block 12 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE:    26 April 2001   727-535-3359
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #
William Whyte

78.   In 2005, Whyte updated Armet's listing with the Secretary of State for the State of Florida, certifying that he was the CCEO of Armet, and reaffirming that he maintained a personal address in Florida.

## 2005 FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P93000031837

Entity Name: ARMET ARMORED VEHICLES INC.

**FILED**
**Jan 06, 2005**
**Secretary of State**

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|
| 12600 BELCHER RD SUITE B<br>LARGO, FL 33773 US | 12600 BELCHER RD S.<br>UNIT B<br>LARGO, FL 33773 US |

| **Current Mailing Address:** | **New Mailing Address:** |
|---|---|
| 12600 BELCHER RD SUITE B<br>LARGO, FL 33773 US | 12600 BELCHER RD S.<br>UNIT B<br>LARGO, FL 33773 US |

FEI Number: 59-3215490     FEI Number Applied For ( )     FEI Number Not Applicable ( )     Certificate of Status Desired ( )

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|
| CFRA, LLC<br>CORPORATE CENTER THREE AT INT'L PLAZA<br>4221 W BOY SCOUT BLVD., 10TH FLOOR<br>TAMPA, FL 336075736 US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:

_____
Electronic Signature of Registered Agent                                              Date

Election Campaign Financing Trust Fund Contribution ( ).

| **OFFICERS AND DIRECTORS:** | | **ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:** | |
|---|---|---|---|
| Title: | DPST     ( ) Delete | Title: | DPST     (X) Change ( ) Addition |
| Name: | WHYTE, WILLIAM R CCEO | Name: | WHYTE, WILLIAM R CCEO |
| Address: | 12600 BELCHER RD SUITE B | Address: | 12600 BELCHER RD S. UNIT B |
| City-St-Zip: | LARGO, FL 33773 | City-St-Zip: | LARGO, FL 33773 |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE: WILLIAM R WHYTE                                              CCEO           01/06/2005
                     Electronic Signature of Signing Officer or Director                                              Date

79. On February 15, 2006, Whyte again updated Armet's For Profit Corporation Annual

Report, recertifying himself as the CCEO of Armet, and certifying that his personal address was

in Florida.

## 2006 FOR PROFIT CORPORATION ANNUAL REPORT

FILED
Feb 15, 2006
Secretary of State

DOCUMENT# P93000031837

**Entity Name:** ARMET ARMORED VEHICLES INC.

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|

12600 BELCHER RD S.
UNIT B
LARGO, FL  33773    US

| **Current Mailing Address:** | **New Mailing Address:** |
|---|---|

12600 BELCHER RD S.
UNIT B
LARGO, FL  33773    US

| FEI Number: 59-3215490 | FEI Number Applied For ( ) | FEI Number Not Applicable ( ) | Certificate of Status Desired ( ) |
|---|---|---|---|

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|

CFRA, LLC
CORPORATE CENTER THREE AT INT'L PLAZA
4221 W BOY SCOUT BLVD., 10TH FLOOR
TAMPA, FL  336075736  US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                        Date

**Election Campaign Financing Trust Fund Contribution ( ).**

| **OFFICERS AND DIRECTORS:** | **ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:** |
|---|---|

| Title: | DPST         ( ) Delete | Title: | ( ) Change  ( ) Addition |
|---|---|---|---|
| Name: | WHYTE, WILLIAM R CCEO | Name: | |
| Address: | 12600 BELCHER RD S. UNIT B | Address: | |
| City-St-Zip: | LARGO, FL  33773 | City-St-Zip: | |

80.   On November 18, 2009, Whyte reinstated Armet's corporation registration in Florida, and changed both his personal address and Armet's principal office address to 121 Maxine Road, Danville, Virginia, 24541.

· PLEASE READ ALL INSTRUCTIONS BEFORE COMPLETING THIS FORM.

| **CORPORATION REINSTATEMENT** | FLORIDA DEPARTMENT OF STATE<br>Secretary of State<br>DIVISION OF CORPORATIONS | FILED<br>SECRETARY OF STATE<br>TALLAHASSEE, FLORIDA<br><br>09 NOV 18 PM 4: 53 |

DOCUMENT # P93000031837

1. Corporation Name

Armet Armored Vehicles Inc.

KS

000162930450
11/19/09--01001--010   **1050.00

REINSTATEMENT (109) 07-09

| 2. Principal Office Address - No P.O. Box # | 3. Mailing Office Address | |
|---|---|---|
| 121 Maxine Road | 121 Maxine Road | |
| Suite, Apt. #, etc. | Suite, Apt. #, etc. | |

| City & State | City & State |
|---|---|
| Danville, VA | Danville, VA |

| Zip | Country | Zip | Country |
|---|---|---|---|
| 24541 | USA | 24541 | USA |

4. Date Incorporated or Qualified
To Do Business in Florida 05/03/1993

| 5. FEI Number | |
|---|---|
| 593215490 | Applied For<br>Not Applicable |

6. CERTIFICATE OF STATUS DESIRED ☑  $8.75 Additional Fee required for a Certificate of Status

7. Name and Address of Current Registered Agent

Name
Robert Kapusta, Jr.

Street Address (P.O. Box Number Is Not Acceptable)
100 Second Avenue South

Suite, Apt. #, Etc.
Suite 701

| City | | State | Zip Code |
|---|---|---|---|
| St. Petersburg | | FL | 33701 |

☐ The reinstatement fee is imposed, except in circumstances which the entity did not receive the prior notices. By checking this box, you are certifying the prior notices were not received and requesting the reinstatement fee be waived.

8. I, being appointed the registered agent of the above corporation, am familiar with and accept the obligations of section 607.0505 or 617.0503, F.S.

Signature of
Registered Agent _____     Date  11/17/09

REGISTERED AGENT MUST SIGN

9. Names and Street Addresses of Each Officer and/or Director (Florida nonprofit corporations must list at least 3 directors)

| Titles | Name of Officers and/or Directors | Street Address of Each Officer and/or Director | City / State / Zip |
|---|---|---|---|
| P | Sharman Fullerton | 121 Maxine Road | Danville, VA 24541 |
| DST | William R. Whyte | 121 Maxine Road | Danville, VA 24541 |
| V | John Ventimiglia | 121 Maxine Road | Danville, VA 24541 |

10. E-mail Address: whYte@aavi.com

(To be used for future annual report notification)

11. I certify that I am an officer or director or the receiver or trustee empowered to execute this application as provided for in chapter 607 or 617, F.S. I further certify that when filing this reinstatement application, the reason for dissolution has been eliminated, the corporate name satisfies the requirements of section 607.0401 or 617.0401, F.S., that all fees owed by the corporation have been paid. I further certify the information indicated on this application is true and accurate, and my signature shall have the same legal effect as if made under oath.

SIGNATURE: _____     William R. Whyte     1 5 2009   905 833 2221

SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR     Date     Daytime Phone #

81. On April 29, 2011, Whyte again renewed Armet's listing as a for-profit corporation in Florida, listing himself as Armet's Principal Director, and his address as 121 Maxine Road, Danville, VA 24541.

---

## 2011 FOR PROFIT CORPORATION REINSTATEMENT

**FILED**
**Apr 29, 2011**
**Secretary of State**

DOCUMENT# P93000031837

**Entity Name:** ARMET ARMORED VEHICLES INC.

**Current Principal Place of Business:**

121 MAXINE ROAD
DANVILLE, VA  24541    US

**New Principal Place of Business:**

**Current Mailing Address:**

121 MAXINE ROAD
DANVILLE, VA  24541    US

**New Mailing Address:**

FEI Number: 59-3215490      FEI Number Applied For ( )      FEI Number Not Applicable ( )      Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

**Name and Address of New Registered Agent:**

ROBERT, KAPUSTA J
100 2ND AVENUE SOUTH STE 701
ST. PETERSBURG, FL  33701    US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:   ROBERT KAPUSTA JR.                                                                04/29/2011
             Electronic Signature of Registered Agent                                      Date

**OFFICERS AND DIRECTORS:**

Title:        PD
Name:        WHYTE, WILLIAM R
Address:     121 MAXINE ROAD
City-St-Zip: DANVILLE, VA  24541 US

Title:        VPST
Name:        VENTIMIGLIA, JOHN
Address:     121 MAXINE ROAD
City-St-Zip: DANVILLE, VA  24541 US

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:   WILLIAM R. WHYTE                                  P                  04/29/2011
             Electronic Signature of Signing Officer or Director                              Date

---

82. On April 12, 2012, Whyte once again renewed Armet's registration as a for-profit corporation in Florida, listing his address as 121 Maxine Road, Danville, VA 24541.

| **Current Mailing Address:** | | **New Mailing Address:** | |
|---|---|---|---|

495 GRAND BLVD., STE. 206
MIRAMAR BEACH, FL  32550      US

| FEI Number: 59-3215490 | FEI Number Applied For ( ) | FEI Number Not Applicable ( ) | Certificate of Status Desired ( ) |
|---|---|---|---|

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|

ROBERT, KAPUSTA J
100 2ND AVENUE SOUTH STE 701
SUITE 701
ST. PETERSBURG, FL  33701  US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                        Date

**OFFICERS AND DIRECTORS:**

| Title: | PTD |
|---|---|
| Name: | WHYTE, WILLIAM R |
| Address: | 121 MAXINE ROAD |
| City-St-Zip: | DANVILLE, VA  24541 US |

| Title: | S |
|---|---|
| Name: | AYERS, KIMBERLEY |
| Address: | 121 MAXINE ROAD |
| City-St-Zip: | DANVILLE, VA  24541 US |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:   WILLIAM R WHYTE                                  PTD              04/11/2012
                        Electronic Signature of Signing Officer or Director                      Date

83.  On April 30, 2013, Whyte renewed Armet's registration as a-for profit corporation in

Florida, but this time listed his address as being in Canada.

<u>2013 FLORIDA PROFIT CORPORATION ANNUAL REPORT</u>

DOCUMENT# P93000031837

**Entity Name:** ARMET ARMORED VEHICLES INC.

**FILED**
**Apr 30, 2013**
**Secretary of State**
**CC0470845615**

**Current Principal Place of Business:**

121 MAXINE ROAD
DANVILLE, VA 24541

**Current Mailing Address:**

121 MAXINE ROAD
DANVILLE, VA 24541 US

**FEI Number: 59-3215490**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

ROBERT, KAPUSTA J
100 2ND AVENUE SOUTH STE 701
SUITE 701
ST. PETERSBURG, FL 33701 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:
_____
Electronic Signature of Registered Agent          Date

**Officer/Director Detail :**

| | |
|---|---|
| Title | PTS |
| Name | WHYTE, WILLIAM R |
| Address | PO BOX 273 |
| City-State-Zip: | KING CITY  ON  L7B1A-6 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIAM R WHYTE          CEO          04/30/2013
Electronic Signature of Signing Officer/Director Detail          Date

84.  On August 29, 2014, <u>a mere 11 days prior</u> to filing this First Amended Complaint, Whyte again updated Armet's registration as a for-profit corporation in Florida, this time changing Armet's principal place of business to a Canadian address.

20

<u>2014 FLORIDA PROFIT CORPORATION ANNUAL REPORT</u>

DOCUMENT# P93000031837

**FILED**
**Aug 29, 2014**
**Secretary of State**
**CC6609598361**

Entity Name: ARMET ARMORED VEHICLES INC.

**Current Principal Place of Business:**

P.O BOX 273
KING CITY, ONTARIO L7B 1A6

**Current Mailing Address:**

P.O. BOX 273
KING CITY, ONTARIO L7B 1A6 CA

FEI Number: 59-3215490                    Certificate of Status Desired: No

**Name and Address of Current Registered Agent:**

ROBERT, KAPUSTA J
100 2ND AVENUE SOUTH STE 701
SUITE 701
ST. PETERSBURG, FL 33701 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

       Electronic Signature of Registered Agent                    Date

**Officer/Director Detail :**

| | |
|---|---|
| Title | PTS |
| Name | WHYTE, WILLIAM R |
| Address | PO BOX 273 |
| City-State-Zip: | KING CITY ON L7B1A-6 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: WILLIAM WHYTE                    CEO                    08/29/2014

    Electronic Signature of Signing Officer/Director Detail                    Date

85.   For nearly two decades, Whyte has personally, continuously, and systematically engaged in business in the United States, taking advantage of the privileges and protections afforded to him by U.S. law.

86.   For nearly two decades Whyte has certified and recertified to the State of Florida that his address was in either Largo, Florida or Danville, Virginia.

87.   In recent weeks Whyte has attempted to hide this fact by changing Armet's principal place of business to Canada.

88.   Whyte filed with the State of Florida one day after the Hon. Judge Kiser ruled on

Relator's Complaint.

89.   Whyte's last-minute attempt to hide his activities in Virginia and Florida only

underscores the true extent of his extensive and purposeful connections to the United States.

**II.    Whyte Owned a Second Corporation that was Incorporated and Headquartered in Florida**

90.   On or around May 26, 1996, Whyte incorporated another corporation, Prestige Plan

Admin. U.S., Inc. ("Prestige").

91.   Prestige was headquartered at 12600 Belcher Road, Largo, Florida, 33773.

92.   As with Armet, in 2001 Whyte certified to the State of Florida that his street address

was the same as Prestige's principal place of business.



93.   In 2009, Whyte reinstated Prestige, changing the corporation's principal place of

business from Largo, Florida to 121 Maxine Road, Danville, Virginia, 24541.

94. In 2009, Whyte certified to the State of Florida that his street address was 121 Maxine Road, Danville, Virginia, 24541.



95. In 2011, Whyte again certified to the State of Florida that his personal address was in Danville, Virginia.

**2011 FOR PROFIT CORPORATION REINSTATEMENT**

DOCUMENT# P96000030806

**FILED**
**Apr 29, 2011**
**Secretary of State**

**Entity Name:** PRESTIGE PLAN ADMIN. U.S., INC.

**Current Principal Place of Business:**

121 MAXINE ROAD
DANVILLE, VA  24541     US

**New Principal Place of Business:**

**Current Mailing Address:**

121 MAXINE ROAD
DANVILLE. VA  24541     US

**New Mailing Address:**

| | |
|---|---|
| Title: | DST |
| Name: | WHYTE, WILLIAM R |
| Address: | 121 MAXINE ROAD |
| City-St-Zip: | DANVILLE, VA  24541 US |

## III.  Whyte Maintained a Bank Account in the United States

95.    Whyte maintained a Chase Visa Business Card account in his name, with an account number ending in 0926.[2]

96.    J.P. Morgan Chase & Co. is headquartered in Manhattan, New York and is incorporated in Dover, Delaware.

96.    Whyte's Chase Visa account summary lists his address as 12600 Belcher Rd S Unit B, Largo, Florida 33773-1656.

97.    Whyte used his Chase Account to continuously and systematically engage in interstate commerce within the United States.

98.    At a minimum, Whyte used his Chase account to continuously engage in interstate commerce between the States of Florida and Delaware.

99.    Whyte allowed Scott Verona, Andrea Grandinetti, and John Ventimiglia to use Whyte's Chase Account to make business-related purchases within the United States.

---

[2] As per Federal Rule 5.2(a), Relator has redacted all but the last four digits of Whyte's U.S. bank account number. Should the Court require more complete information, Relator can provide Whyte's full account information.

100. Scott Verona, Andrea Grandinetti, and John Ventimiglia were all Armet employees who lived and worked in the United States.

101. Whyte issued Scott Verona, Andrea Grandinetti, and John Ventimiglia Visa credit cards, with numbers ending in 3893, 2893, and 9352 respectively.[3]

102. Whyte issued Verona, Grandinetti, and Ventimigilia Visa credit cards to use for business-related purposes.

103. All three credit cards were linked to Whyte's master account, ending in 0926, and appeared on Whyte's credit card statement.

104. Scott Verona was the Plant Engineer at Armet's Largo, Florida vehicle manufacturing facility.

105. Between May 15, 2006 and June 13, 2006, Whyte permitted Verona to use funds from Whyte's Chase Visa account to make $1,715.33 business-related purchases.

106. Between May 15, 2006 and June 13, 2006, Verona used Whyte's Chase Visa account to purchase $1,198.87 in automotive parts from JC Whitney, an online and mail-order automotive parts supplier with headquarters in LaSalle, Illinois.

107. Between May 15, 2006 and June 13, 2006, Verona used Whyte's Chase Visa account to purchase $474.02 in automotive parts from AAMP of America, an online and mail-order automotive parts supplier.

108. Between May 15, 2006 and June 13, 2006, Verona used Whyte's Chase Visa account to purchase $107.16 in automotive parts from automotive parts suppliers located in the Largo, Florida area.

---

[3] As per Federal Rule 5.2(a), Relator has redacted all but the last four digits of Whyte's credit card numbers.  Should the Court require more complete information, Relator can provide the full credit card numbers.

109. Andrea Grandinetti was the Office Manager in Armet′s Largo, Florida and Danville, Virginia facilities.

110. Between May 15, 2006 and June 13, 2006, Whyte permitted Grandinetti to use Whyte′s Chase Visa account to make $2,749.42 in business-related purchases.

111. On May 15, 2006, Grandinetti used Whyte′s Chase Visa account to purchase round-trip airline tickets from Tampa, Florida, to Greensboro, North Carolina, in order visit Armet′s Danville, Virginia vehicle manufacturing facility.

112. On June 6, 2006, Grandinetti used Whyte′ Chase Visa account to rent a vehicle from Enterprise Rent-A-Car in Danville, Virginia.

113. On June 8, 2006, Grandinetti used Whyte′s Chase Visa account to rent a vehicle from Enterprise Rent-A-Car in Martinsville, Virginia.

114. John Ventimiglia worked for Whyte as his Foreman at Armet′s Danville, Virginia vehicle manufacturing facility.

115. Between May 17, 2006 and May 27, 2006, Ventimiglia used Whyte′s Chase Visa account to purchase $224.47 worth of automotive parts in and around Largo, Florida.

116. On June 09, 2006, Whyte personally transferred $7,000.00 into his Chase Visa account, account, ending in numbers 0926.

117. Whyte personally transferred the $7,000.00 into his Chase Visa account in order to allow Armet employees to continue to conduct business in the United States.

**IV.  Whyte Directly Supervised Business Operations at Armet′s Largo, Florida and Danville, Virginia Vehicle Manufacturing Facilities**

118. Whyte made all executive decisions regarding operations at Armet′s Largo and Danville facilities.

119. Whyte communicated daily with Relator, Verona, and Ventimigilia regarding operations at Armet's Largo and Danville facilities.

120. On or around February 17, 2006, Whyte spoke with Relator in order to his preference for the location of Armet's Danville facility.

121. On or around February 17, 2006, Relator sent an email to Roland Bunch, Director of the City of Danville Office of Economic Development, stating that "I think [Whyte] preferred the airside for its location and the proximity to the firearms range.  I've cc'd [Whyte] on this for input but I'm sure that was the desired location."

122. On July 29, 2006, Whyte sent an email to Relator stating ""Frank, It's getting a little tiring hitting consistently low balls.  I'm fucking Sharman's business, having sucked out what is not her's, it's (sic) very risky.  Look what happened to Enron!"

123. Whyte's July 29, 2006 email also referred to Jim Jannard, the founder and owner of Oakley Sunglasses, indicating that Armet's financial stability was dependent on a single-vehicle contract.

Date:       Sat, 29 Jul 2006 17:36:30 -0400 (EDT)
From:      "William Whyte" <whyte@aavi.com>  📇View Contact Details
Subject:   Re: Ltr
To:         "Frank Skinner" <fs@aavi.com>

Frank,

It's getting a little tiring hitting consistently low balls. I'm fucking Sharman's business, having sucked out what is not her's, it's very risky. Look what happened to Enron!

Anyway, we will get the chassis Monday to cover us with California dreamer. Hopefully his dough will tie us over.

124. On July 29, 2006, Whyte sent a second email to Relator discussing the financial stability of Armet′s Largo, Florida manufacturing facility.

125. Whyte sent the July 29, 2006 email to Relator to discuss management and personnel issues at Largo, as well as Armet′s contract with the U.S. Navy for up-armored GMC Suburban vehicles.

126. Whyte′s July 29, 2006 email to Relator discussing the financial stability of Armet′s Largo, Florida manufacturing facility reads:

| Date: | Sat, 29 Jul 2006 12:54:41 -0400 (EDT) |
|---|---|
| From: | "William Whyte" <whyte@aavi.com> 🔲View Contact Details |
| Subject: | Re: Generator |
| To: | "Frank Skinner" <fs@aavi.com> |
| CC: | "Doug Davidson" <doug@aavi.com> |

Frank,

I had not asked about outstanding liabilities for Largo as I was more concerned with Malta and Canada. Now that I hear about it from Doug, the Largo situation now scares the shit out of me, one loss after another for jobs that should have been profitable.

I would like to talk to you on Sunday afternoon so that we can map out several survival scenarios. I think that any scenario includes cutting the life out of your present staff, management and workers. If we don't, Largo or Danville will not survive and I'm not letting my equity in the building bleed away through excessive wage cost which has consistently happened over the last year.

You have no receivables except the allowance for the two K&K vehicles which still don't appear finished.

I dare not give your employees or Scott more work as we either have a malicious intent, negligence or total incompetence in the production of vehicles. Scott should be gone this weekend, we don't need to feed him next week. I put this mismanagement squarely on mine and Scott's shoulders. I will talk about this on Sunday.

If we are going to survive in Largo, if the Gods say we must stay there, there is going to be a night of the long knives in short order. If we are Danville bound, thank God that we are starting again!

Sounds as if the venders are patiantly awaiting payment,  If they are not patient, they can petition the company to insolvancy. It will only be if the guys up complete the work to pay the liabilities and that will only happen if the Baghdad situation is resolved.

In the meantime, we are intending on incorporating another Armet Armored Vehicles Inc, so that I still have options in continuing if the creditors grab the bank account. We need to ensure that the Navy goes along unfrustrated.

Bill

127. On September 12, 2006, Whyte sent another email to Relator discussing management of Armet's Largo, Florida and Danville, Virginia facilities.

128. Whyte sent the email to Relator in order to inform Relator that Whyte had decided to pursue a different management strategy at Largo.

129. Whyte sent the email to Relator in order to inform Relator that Whyte personally disapproved of Relator's and other employees' handling of operations at Largo.

130. Whyte sent the email to Relator in order to inform Relator that Whyte was concerned about "his" sixteen years of equity in Largo.

131. Whyte sent the email to Relator in order to inform Relator that Whyte was going to visit the Largo facility on or around September 17, 2006.

132. Whyte's September, 12, 2006 email to Relator discussing management of Armet's Largo, Florida and Danville, Virginia facilities reads as follows:

Date:       Tue, 12 Sep 2006 04:21:55 -0400 (EDT)
From:       "William Whyte" <whyte@aavi.com> [icon]View Contact Details
Subject:    Re: Largo
To:         "Frank Skinner" <fs@aavi.com>
CC:         "Doug Davidson" <doug@aavi.com>


Frank,


Thanks for asking, but it's a difficult question with difficult answers and the finances are only part
of my conclusion of how Danville and Canada are to be managed in future. I had intended on
discussing the future management of Danville with you when I arrived in Largo on Sunday, but as
you have asked, I will ramble on and I will give you a few of my more serious comments now.


My analysis of what lead us down the recent disastrous road in Largo is based on what I could
see from long distance. So you have to understand that my present judgement calls are based on
what I now see with my glasses, not yours.


 I agree that some situations such as the on and off again sale of the Largo building were beyond
our control and lack of payments from Baghdad only exacerbated our problems and I agree that I
bare a great deal of the responsibility for what went wrong in Largo and Canada, but so do you.


More importantly to me, the persons that I relied upon in Largo and that includes you, lead me as
often as not down the garden path. For your part you were totally reliant on Scott, having to ask
him for each and every little detail. My perception is that with manufacturing you just don't
concentrate on or even know the product well enough to be managing it!


 Scott for his part I perceived as a bullshitter telling me what he thought I needed to hear. He lead
you down the path as well, albeit he put hours after hours at his desk, but he was a slave to his
computer and the employees, not to bettering the product or to bettering the manufacturing times!


 The production quality especially and the manufacturing times to undertake a contract went
down hill rapidly. That was my fault as I should have been insisting on what I wanted to sell and
not accepting second class because I did not oversee production, such as was the case for the

SIRS truck. My hair stands on end when I see your photographs of that particular vehicle. I can't believe that we could get another job like it from the Air Force.

As I have now concluded, I was unhappy at how the resources of Manpower were allocated, with many issues in Largo about the obvious lack of supervision of the employees. You not knowing where we were at on particular contracts without asking Scott and not knowing who was actually working and who was not. Scott in my mind was leading you on as well and you both then leading me down a slippery path.

After some consideration without discussion with Doug or you about our future, and as you know before making firm decisions, I always respect your opinion, I have decided that in future, Finances and Management will to be micro managed by experts, not amateurs.

As to your initial question, It's possible that the Financial management and check disbursement can be via the accounting program. There were many instances that we have seen in the accounts where Andrea was able to access funds for her use, albeit small amounts that I would have not agreed with. In future, accounts posted by a book keeper that works in the Danville office will be managed by the experts in accounting and that's Doug and Pam, not the plant Manager.

Frank we are turning it around in Canada and Largo/Danville, but understand that I saw my sixteen years of equity in Largo dissolve over the last two years. Having seen the gutting of Armet, I have decided that In future, the business in Canada and Danville is going to be better managed by people with a Management and engineering background, not by guys like you and I. If I could clone Joseph Axiak, I would do that, but as we can't, we are bringing in experts to run the operations as soon as possible. Even that will be a chore getting someone to come in, so it could take time.

You and I are going into sales and we are going to leave the production to experts! We may not be experts in marketing either, but we do know a lot about the players in the marketplace and we can both do proposals. In addition, I think that we are to old to be leading the stressful life that we lead over the last two years, so a change is called for!

I have only considered the foregoing, I have not developed any fixed system, I only know that I was unhappy with how largo was managed and that includes the books, expenditures, manpower

and how many other points were handled in Largo and  I'm not going in that direction again if I
can help it. So I want your continued support with this new direction!

We will discuss this situation further when I arrive in Largo on Sunday,

Thanks,

Bill

## Whyte and Armet's Business was a Disaster

133. Whyte's Largo facility was near financial ruin when Whyte directed Relator and other
Armet employees to pursue the 0028 and 0047 Contracts.

134. Throughout 2005, the Largo facility struggled to produce a handful of armored Ford
Excursion and Chevrolet Suburban vehicles for the United States Navy.

135. Armet's Canada facility was in an equally bad financial situation.

136. In or around March 6, 2006, Relator sent an email to Whyte enquiring as to why
Armet's Canada facility had not sent Largo armored glass for installation on a vehicle.

137. Relator learned that Armet's Canada facility had not sent the glass because Armet was
in arrears with the glass vendor.

138. In or around March 2006, Largo fell behind schedule because Armet's Canada facility
did not ship steel due to similar financial situation.

139. In or around March 2006, Relator sent an email to Whyte stating that "I was searching
frantically for funds to keep the vendors supplying us.  We made partial payments and in some
cases we were cut off completely until paid in full.  That situation remains.  On the heels of this
the State Revenue and Fed IRS were stuck up my ass..."

140. In or around the Spring of 2006, Whyte visited Armet's Largo facility to demand that Armet's vendors either accept a partial payment on their contracts, or that Armet would go bankrupt, and the vendors would receive nothing.

141.  Armet's Largo facility did not have the monetary reserves to buy vehicle Chassis for pre-production, and could therefore only afford to build one vehicle at a time.

142. On July 29, 2006, Whyte stated to Relator that Armet was relying on the money from a single-vehicle contract with Jim Jannard to keep Armet afloat.

143. On August 2, 2006, Andrea Grandinetti emailed Relator stating that Largo only had $66,953.54 in the bank, that that the company had to ask the bank to "front money" in order to cut payroll checks.

144. On August 2, 2006, Grandinetti sent an email to Relator stating that Armet "got hit with overdraft fees."

145. Because of Armet's precarious financial situation, Whyte, Relator, and other Armet employees knew that Armet could not pre-order chassis and other parts in order to rapidly assemble multiple vehicles.

146. Because of Armet's precarious financial situation, Whyte and other Armet employees knew that Armet could only afford to build one or two vehicles at a time.

147. Because of Armet's precarious financial situation, Whyte and other Armet employees knew that Armet would only be able to deliver vehicles in very small batches, and would require full payment on those vehicles before ordering parts to begin construction on subsequent vehicles.

### Whyte and Armet Fraudulently Induced the JCCI to Sign Contracts for 32 Armored Gun Trucks

**I.     Whyte knew that the Kestrel/ Gurkha Vehicles Did Not Meet Contract Specifications**

148. Whyte directed Armet's fraudulent inducement of the JCCI to sign the Contracts for 32 Kestrel/ Gurkha armored gun trucks.

149. Whyte fraudulently misrepresented to the U.S. Government Armet's intention to produce armored gun trucks armored to the specifications required by the Contracts.

150. Whyte, personally through and his employees and agents, represented to the U.S. Government that Armet's Kestrel/ Gurkha armored gun truck would meet the qualifications listed in Government Solicitation numbers W91GY0-06-Q-0068, W91GY0-06-Q-0115, and W91GY0-06-Q-0140.

151. Whyte designed Kestrel/ Gurkha, and was therefore aware of its ballistic and blast protection capabilities.

152. Whyte knew that the Kestrel/ Gurkha vehicle did not meet the Solicitation's requirements because key components of the Kestrel/ Gurkha were based on Armet's Balkan MK5 Armored Personnel Carrier ("Balkan APC").

153. Whyte also designed Armet's Balkan APC.

154. Whyte knew that the Balkan APC did not meet the Solicitations' armor requirements.

155. Armet's Kestrel/ Gurkha and Balkan APC were both based on the Ford F-550 chassis, and shared approximately 90% parts commonality.

156. Armet's Balkan APC did not have armor-reinforced door handles.

157. The door handles on Armet's Balkan APC were unarmored, stamped aluminum units that afforded no level of ballistic or blast protection.

158. On or around February 14, 2006, Whyte sent a proposal to the South Carolina Law Enforcement Division Captain George Booth regarding a Balkan APC.

159. Whyte's proposal to Captain Booth stated that "No gaps are permitted between opaque armor or between opaque to transparent armor transition points."

160. As designer of the Balkan APC, Whyte knew that the Balkan APC's design allowed for gaps in the vertical opaque armor on the vehicle's doors.

161. Therefore, Whyte was aware that the Balkan APC design did not match the specifications outlined in Armet's proposal.

162. Whyte's proposal to the Captain Booth reads, in part, as follows:



## ARMET ARMORED VEHICLES INC.
### BALKAN MK5 APC
**PAC-2156-1-1**     **February 14, 2006**

*Proposal*
Page 1

---

### SECURITY WARNING

Prospective purchasers and users are reminded of the importance of keeping the contents of this proposal within the knowledge of as few persons as possible. This document remains the property of Armet until ordered by the customer and therefore, for strict security reasons and copyright, must not be passed onto a third party under any circumstances.

### INTRODUCTION

a) Armet Armored Vehicles Inc, will supply the client with one (1) armored Balkan MK5.
b) Modified interior trimming, blending closely with the original interior fit and finish of the Ford cabin.
c) Armor from and including the fenders, firewall to and including the rear wall and exit door.
d) The manufacturing process will integrate transparent and opaque armor and the vehicles structural design, to ensure that the vehicles balanced structural loads will provide optimal ballistic protection to the occupants of the vehicle.
e) No gaps are permitted between opaque armor or between opaque to transparent armor transition points. Opaque armor joining or meeting on the same plane will be overlapped.
f) Door overlap system with a right angle spall return, meets transparent armor.
g) Opaque armor will be afforded a smooth protective paint coat, without seam seal, to allow for the inspection of armoring materials before trimming.



**ARMET ARMORED VEHICLES INC.**
**BALKAN MK5 APC**

PAC-2156-1-1      February 14, 2006

*Proposal*
Page 10

| | |
|---|---|
| 10.2 | Unless otherwise stipulated, the insurance document will specify the minimum amount for which the insurance cover will have effect in the same currency as the contract, for All-Risk. |
| 10.3 | In the event of loss or damage, the Purchaser, who as the holder of the insurance certificate is responsible for notifying, in writing, their claim to the insurance company, and for paying any applicable deductibles. |
| Note: | The All-Risk certificate is subject to the exclusions as set out in the Insurance Certificate and the Master Policy. |
| 11. | **Payment Terms** |
| | Armet's payment policy requires 50% deposit with the balance payable within three (3) days of receipt of notification of vehicle readiness to ship. |
| 12. | **Delivery & Shipment** |
| 13. | **Special Notices** |
| 13.1 | Armet has every confidence in the claims and statements set out in this proposal, but no guarantee can be given in respect thereof, nor shall any of the said claims and statements be deemed to be incorporated in any contract entered into with the client. |
| 13.2 | Armet reserves the right to modify and substitute armoring methods and materials at any time without prior notice, provided that such changes will not degrade the ballistic protection level of the vehicle specified in Section 2 above. |
| 13.3 | Subject to availability of product, Armet reserves the right to substitute or modify optional equipment selected at any time, without prior notice. |
| 13.4 | Armet shall not be held liable for changes or modifications in the Original equipment Manufacturer's (OEM) product offering, or delay in delivery from the OEM factory |
| 13.5 | Any customer initiated order changes or modifications, additions or deletions of special equipment may entail manufacturing delays, or adjustments in the contract or other additional charges. |
| 13.6 | Quotation is valid for a period of thirty (30) days, subject to availability of chassis |

**ARMET ARMORED VEHICLES INC.**                    February 14, 2006



William R Whyte

163. The Balkan APC destined for the South Carolina Law Enforcement Division was built at Armet's Ontario, Canada facility and exported into the United States for finishing at Armet's Largo facility.

164. In or around early February 2006, Scott Verona, Armet's Largo Facility Foreman, informed Whyte that the Balkan APC's door handles did not provide the vehicle's passengers with ballistic or blast protection.

165. Verona informed Relator that the Balkan APC's door handle design could allow for projectiles, shrapnel, fire, or blast overpressure to enter the vehicle's crew compartment.

166. Between February and August 2006, Relator, Verona, and Whyte had multiple telephonic discussions and email communications regarding the Balkan MK5's door handle.

167. Relator and Verona told Whyte that the Balkan APC's unarmored door handle created an approximately three by four inch gap in the vehicle's armor.

168. Whyte told Relator and Verona that U.S. police were not exposed to Improvised Explosive Devices ("IEDs"), and that the risk of a bullet striking the door handle was minimal.

169. Whyte told Relator and Verona that although the Balkan's door armor did not provide complete coverage for the vehicle's occupants, the design was "good enough."

170. In order to save costs, Whyte ordered that the door handles not be armor reinforced and that the vehicle be delivered without modification.

171. In or around late February 2006, a Balkan APC was shipped from Armet's Largo facility to the South Carolina Law Enforcement Division.

**II.   The Kestrel/ Gurkha Used The Same Door Handle as the Balkan MK5**

172. Armet's Kestrel/ Gurkha armored gun truck used the same unarmored door handle as the Balkan MK5.

173. Unlike the South Carolina State Police's Balkan APC, however, the 32 Kestrel/ Gurkha vehicles destined for service in Iraq faced a significant risk from small-arms fire and IED blasts.

174. Relator and Verona told Whyte on multiple occasions between February and August 2006 that the Balkan APC's door handle should not be used on the Kestrel/ Gurkha, because doing so would compromise the vehicle's armor.

175. Relator repeatedly told Whyte that even the smallest gap in armor could allow the pressure wave from an IED explosion to enter the vehicle and kill or seriously injure the occupants.

176. Whyte dismissed Relator and Verona's concerns, and instead shifted the discussion by blaming Relator and Verona for production delays at Armet's Largo facility.

177. Whyte then decided to have all unfinished Kestrel/ Gurkha vehicles shipped from Largo to Canada.

178. Whyte personally oversaw final construction of the vehicles at Armet's Canada facility.

179. Whyte disregarded the language of the Contracts and repeated warnings from Relator and Verona, and delivered to the JCCI seven unmodified Kestrel/ Gurkha vehicles.

180. In total, Whyte shipped seven (7) Kestrel/ Gurkhas to Iraq that were outfitted with unarmored door handles.

**III.   The Kestrel/ Gurkha Vehicles Were Not Outfitted with Thika Mineplate**

181. Whyte represented to the U.S. Government that Armet's Kestrel/ Gurkha armored gun truck would meet the qualifications listed in Government Solicitation numbers W91GY0-06-Q-0068, W91GY0-06-Q-0115, and W91GY0-06-Q-0140.

179.  All three Solicitations required that the vehicles be able to "defeat the blast of two German DM51 or two US M67 anti-personnel grenades."

180.  As designer of the Kestrel/ Balkan, Whyte knew that in order to defeat such blasts, specialized armor plate needed to be mounted to the vehicle's "belly."

181.  In each proposal to the U.S. Government, Whyte stated that each vehicle would be armored with twelve layers of "Thika Mineplate."

182.  In or around August 2006, Relator sent John Ventimigilia to inspect Armet's vehicle production in Canada in order to make sure that Whyte and Armet were complying with the Contracts.

183.  Ventimigilia reported to Relator that the vehicles being readied for shipment were not outfitted with belly armor.

184.  Ventimigilia reported to Relator that the vehicles being readied for shipment were outfitted with an unarmored floor consisting of thin diamond steel plate and painted, three-quarter inch plywood.

185.  Subsequently, Relator acquired additional, personal knowledge that the Kestrel/ Gurkha vehicles shipped to Iraq were not fitted with belly armor.

186.  After the U.S. Government filed a criminal indictment against Whyte and Armet, Relator was invited to inspect the impounded Kestrel/ Gurkha vehicles at the F.B.I.'s laboratory in Quantico, Virginia.

187.  Relator personally observed that the impounded vehicles did not have belly armor of any sort installed.

188.  Relator personally observed that the impounded vehicles did not even have a plywood floor installed in the area surrounding the vehicle's transmission.

189.  Relator personally observed that the area around the vehicles' transmission was protected by nothing more than a rubber boot, which when peeled back left the vehicle's occupants directly exposed the ground below.

190.  Relator also personally observed the results of live-fire tests conducted by the F.B.I. against a Kestrel/ Gurkha vehicle.

191.  Relator personally observed the fact that the Kestrel/ Gurkha's vertical armor did not provide B7 level protection, as 5.56x45mm SS109 rifle rounds were able to penetrate the crew compartment of the vehicle.

**IV.  Whyte Fraudulently Induced the U.S. Government to Award Armet the 0028 Contract.**

192. Whyte drafted all documents used to fraudulently induce the U.S. Government to award Armet the Contracts for 32 Kestrel/ Gurkha armored gun trucks.

193. Prior to each Contract, Armet submitted proposals to the U.S. Government.

194. Armet's proposals were in documents titled Armet Proposal Florida ("PAF") or Armet Proposal Canada ("PAC").

195. Whyte personally drafted all PAFs and PACs that were sent to prospective buyers.

196. Whyte personally signed multiple replies to U.S. Government Solicitations for the production of armored vehicles.

197. If Whyte did not sign the replies, Whyte required that Relator sign the replies submitted to the U.S. Government.

198. Whyte demanded that Relator sign many of Armet's proposals that were drafted in response to U.S. Government Solicitations.

199. Whyte demanded that Relator sign the documents so that the replies appeared to originate directly from Largo or Danville.

200. Whyte sent all proposals to Relator in the form of locked Portable Document Format ("PDF") documents so that Relator could not alter the documents.

201. Whyte personally drafted PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4.

202. PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4 all state that the Kestrel/ Gurkha vehicles would meet the armor and blast requirements stated in Solicitation W91GY0-06-Q-0068.

203. On March 14, 2006, Whyte electronically signed an addendum to PAF number 2180-20-2, titled "Armet's addendum to the reply of the Solicitation."



**ARMET ARMORED VEHICLES INC.**
**KESTREL GUN TRUCKS**
PAF-2180-20-2   March 14, 2006     **QUOTE**

Page1

Solicitation: W91GY0-06-Q-0068

**Armet's addendum to the reply of the Solicitation**

a) Section: C.3.0 Warranty, Armet will comply with the requirement of this section
b) Section: C.4.0 Documentation, Armet will comply with the requirement of this section
c) Section D: Armet will comply with the requirement of this section
d) Section E: Armet will comply with the requirement of this section
e) Section F: Armet will comply with the requirement of this section
f) Delete item 13. of Armet's quotation replace with "As per contract".
g) Shipping cost for one vehicle to Abu Ghraib via Baghdad International Airport.......$38,000.00
h) Shipping cost for twenty vehicles to Abu Ghraib via Baghdad International Airport.......$760,000.00USD

ARMET ARMORED VEHICLES INC.           DATE: March 14, 2006

William R Whyte

204. In or around April 2006, the U.S. Government modified Solicitation number W91GY0-06-Q-0068, and re-designated it W91GY0-06-Q-0115.

205. On April 3, 2006, Whyte amended his response to the Solicitation by sending to Relator for signature a locked PDF copy of PAF 2180-24-3.

206. On April 21, 2006, Whyte sent to Relator for signature a locked PDF copy of PAF 2180-24-4.

207. PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4 all stated that Armet would build armored gun trucks "supplied and armored in accordance with Solicitation # W91GY0-06-Q-0068," that the transparent and opaque armor on the vehicles would meet European

Naturalization Committee B7 armor specifications, and that the floor and sidewall armor "would defeat the blast of two German DM51 or two US M67 anti-personnel grenades."

208. PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4 also stated that "Armet confirms that its specifications comply with or exceed Section C: STATEMENT of WORK as attached in schedule "B" attached hereto."



### ARMET ARMORED VEHICLES INC.
#### KESTREL GUN TRUCKS
**QUOTE**

**PAF-2180-24-4    April 21, 2006**

*Page 1*

### Solicitation: W91GY0-06-Q-0068

**SECURITY WARNING**

Prospective purchasers and users are reminded of the importance of keeping the contents of this proposal within the knowledge of as few persons as possible. This document remains the property of Armet until ordered by the customer and therefore, for strict security reasons and copyright, must not be passed onto a third party under any circumstances.

**INTRODUCTION**

a) *Armet Armored Vehicles Inc, will supply the client with twenty (24) armored Kestrel Gun Trucks, supplied and armoured in accordance with the Solicitation # W91GY0-06-Q-0068, issued on 6 March, 2006 by the Joint Contracting Command-Iraq, Security and Justice Sector.*

b) *Armet confirms that its specifications comply with or exceed Section C: STATEMENT of WORK as attached in schedule "B" attached hereto;*

c) Modified interior trimming, blending closely with the original interior fit and finish of the Ford cabin.

d) Armor from and including the fenders, firewall to and including the rear wall and exit door.

e) The manufacturing process will integrate transparent and opaque armor and the vehicles structural design, to ensure that the vehicles balanced structural loads will provide optimal ballistic protection to the occupants of the vehicle.

f) No gaps are permitted between opaque armor or between opaque to transparent armor transition points. Opaque armor joining or meeting on the same plane will be overlapped.

g) Door overlap system with a right angle spall return, meets transparent armor.



**ARMET ARMORED VEHICLES INC.**
**KESTREL GUN TRUCKS**

**QUOTE**

PAF-2180-24-4    April 21, 2006

Page7

### Solicitation: W91GY0-06-Q-0068

6.       **Floor & sidewall Protection**

6.1      Armet's THIKA MINEPLATE blast protection exceeds the requirement of NATO
          Stanag regulation 2920, level F6.

          THIKA MINEPLATE with a layered thickness of 12mm weighs 19.5kg Per
          square meter  and will defeat 600 grams of C4 or SEMTEX (RDX & PETN)
          plastic explosive at a point  blank range.
            When standoff distance is increased, or a heavier amount OF THIKA MINEPLATE
          is added   as additional protection, a stronger charge of PEX or blast material will
          be defeated.  An estimation of the amount of increased protection can only be
          performed after taking into account many variables including, at what position
          underneath or at the side of the vehicle that the device explodes, the weight of
          the vehicle, and the height of its deck pan off the ground and the thickness of
          THIKA MINEPLATE installed within or underneath the vehicle.

          The floor in this vehicles defeat the blast of two German DM51 or two US M67
          anti-personnel grenades. THIKA MINEPLATE defeats both of these devices and
          was certified by the US military at TACOM on October 31, 2000 to defeat the M67
          grenade.



# ARMET ARMORED VEHICLES INC.
## KESTREL GUN TRUCKS
### PAF-2180-24-4    April 21, 2006

**QUOTE**

*Page4*

*Solicitation: W91GY0-06-Q-0068*

The driver compartment vertical opaque armor was tested to defeat three hits, each one being fired on the apex of an equilateral triangle as specified. The weapon was positioned five meters from the target, the target being placed at a 90-degree angle from the weapon.  Using this test method, the opaque armor being used in this quotation will defeat the following projectiles:

| | | |
|---|---|---|
| 7.62 x 39mm | 57-N-231 – PS (AK-47) | 3 Hits |
| 7.62 x 51mm | NATO M80 (Enfield SLR L1A1) | 3 Hits |
| 5.56 x 45mm | M855, NATO SS109 (Colt M 16) | 3 Hits |
| 7.62 x 54mm | 57-N-323S– LPS, Dragunov SVD | 3 Hits |
| 7.62 x 39mm | 57-BZ-231 –API (AK-47) | 3 Hits |
| 7.62 x 54mm | 57-BZ-323 API– Dragunov SVD | 3 Hits |
| 7.62 x 51mm | NATO P80, M61 AP (Enfield SLR L1A1) | 3 Hits |

**2.2**     Opaque Ceiling Armor Level:  European Naturalization Committee (CEN) EN 1063 B7

The ceiling armor was tested to defeat three hits, each being fired on the apex of an equilateral triangle as specified. The weapon was positioned 5 meters from the target, the target being placed at a 90-degree angle from the weapon. Using this test method, the opaque armor being used is this quotation will defeat the following projectiles:

| | | |
|---|---|---|
| 7.62 x 39mm | 57-N-231 – PS (AK-47) | 3 Hits |
| 7.62 x 51mm | NATO M80 (Enfield SLR L1A1) | 3 Hits |
| 5.56 x 45mm | M855, NATO SS109 (Colt M 16) | 3 Hits |
| 7.62 x 54mm | 57-N-323S– LPS, Dragunov SVD | 3 Hits |
| 7.62 x 39mm | 57-BZ-231 –API (AK-47) | 3 Hits |
| 7.62 x 54mm | 57-BZ-323 API– Dragunov SVD | 3 Hits |
| 7.62 x 51mm | NATO P80, M61 AP (Enfield SLR L1A1) | 3 Hits |

**2.3**     Engine Compartment Armor Level: European Naturalization Committee (CEN) EN 1063 B7

The combination engine and firewall vertical opaque armor was tested to defeat three hits, each one being fired on the apex of an equilateral triangle as specified. The weapon was positioned five meters from the target, the target being placed at a 90-degree angle from the weapon.  Using this test method, the opaque armor being used in this quotation will defeat the following projectiles:

| | | |
|---|---|---|
| 7.62 x 39mm | 57-N-231 – PS (AK-47) | 3 Hits |
| 7.62 x 51mm | NATO M80 (Enfield SLR L1A1) | 3 Hits |
| 5.56 x 45mm | M855, NATO SS109 (Colt M 16) | 3 Hits |
| 7.62 x 54mm | 57-N-323S– LPS, Dragunov SVD | 3 Hits |
| 7.62 x 39mm | 57-BZ-231 –API (AK-47) | 3 Hits |
| 7.62 x 54mm | 57-BZ-323 API– Dragunov SVD | 3 Hits |
| 7.62 x 51mm | NATO P80, M61 AP (Enfield SLR L1A1) | 3 Hits |

**2.4**     Transparent Armor Level: European Naturalization Committee (CEN) EN 1063 B7

209.  Specifically, the Statement of Work required that:

### C.2.0. General Specifications and Salient Features

**C.2.1.** Contractor shall provide minimum of 20 platforms that are armor protected with a minimum of Central European Norm (EU) <u>B7 protection</u> to include engine, radiator, fuel cell and other components protection as well.

**C.2.2. Platform Description (Vehicle):**
The vehicle furnished under this contract shall be new (2005/06) and meet all of following specifications.

**C.2.2.1. Exterior:**

<u>Key characteristics</u>:

W91GY-06-F-0028                                                                Page 3 of 8

   (a)   Platform must be armor protected with a minimum of Central European Norm (EU) B7 protection or one of the accepted international ballistic standards in existence, including NIJ, Underwriter Laboratories, or German DIN listed.

210. The U.S. Government relied on Whyte's knowingly false representations when deciding to award Armet the 0028 Contract.

211. On April 25, 2006, the U.S. Government signed a contract with Armet, designated W91GY0-06-F-0028, for the production of 24 Kestrel/Gurkha armored gun trucks.



W91GY-06-F-0028                                                       Page 2 of 8

Section B

ARMET Quote # PAF-2180-24-4, April 21, 2006

| LINE | DESCRIPTION OF SUPPLY | Quantity | U/I | U/P | TOTAL |
|------|----------------------|----------|-----|-----|-------|
| 0001 | Armored Kestrel | 24 | ea. | $161,408.94 | $3,873,814.56 |
| 0002 | Shipping | 24 | ea. | $30,000.00 | $720,000.00 |
| 0003 | Communication Equip. (open Market) | 48 | se. | $3,872.475 | $185,878.80 |

212.  The 0028 Contract required that all 24 vehicles be delivered no later than July 31, 2006.

| ☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED  ☐ SEE ADDENDUM | | | |
|---|---|---|---|---|---|
| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
| | See Page 2- Order for Supplies Schedule<br><br>Deliver  4 vehicles within 45 days after receipt of award. Remaining 20 vehicles will be delivered NLT 31 July 2006. Contractor must obtain EUC within 30 days after award.<br>*(Attach Additional Sheets as Necessary)* | 24 | EA | | |
| 25. ACCOUNTING AND APPROPRIATION DA 21 NA 2005 2092.0000 P0 2005IQ IQJ8 23000000000 4044 252G HD8574 NA 30740J | | | | 26. TOTAL AWARD AMOUNT  *(For Govt. Use Only)*  $4,779,693.36 | |

## V.  Whyte Fraudulently Induced the U.S. Government to Award Armet the 0047 Contract.

213.  On or around June 8, 2006, Whyte sent Relator a locked PDF of PAF 3042-8-1, a reply to U.S. Government Solicitation number W91GY0-06-Q-0140.

214.  Just as with Armet's PAF that secured the 0028 Contract, PAF-3042-8-1 stated that the Kestrel/ Gurkha vehicles would be armored to B7 Norm, would be able to resist an explosion equivalent to two M67 or DM51 anti-personnel grenades, and that there would not be any gaps in the Kestrel/ Gurkha vehicles' opaque armor.

215.  Whyte knowingly directed Armet employees and agents to submit a false statement to the U.S. Government regarding the Kestrel/ Gurkha's armor capabilities because Whyte knew that the door handle was unarmored.

216.  Whyte knowingly misrepresented the armor capabilities of the Kestrel/ Gurkha in PAF 3042-8-1.

47

217. Whyte knowingly misrepresented his intention to comply with the vehicle requirements set out in the Statement of Work.

218. Whyte knowingly directed the submission of PAF 3042-8-1 in order to induce the U.S. Government to award Armet the 0047 Contract.



**ARMET ARMORED VEHICLES INC.**
**KESTREL GUN TRUCKS**            **QUOTE**

PAF-3042-8-1   June 8, 2006   *Page1*
Solicitation: W91GY0-06-Q-0115

**SECURITY WARNING**

Prospective purchasers and users are reminded of the importance of keeping the contents of this proposal within the knowledge of as few persons as possible. This document remains the property of Armet until ordered by the customer and therefore, for strict security reasons and copyright, must not be passed onto a third party under any circumstances.

**INTRODUCTION**

a)  Armet Armored Vehicles Inc, will supply the client with eight (8) armored Kestrel Gun Trucks, supplied and armoured in accordance with the Solicitation # W91GY0-06-Q-0115, issued on 7 June, 2006 by the Joint Contracting Command-Iraq, Security and Justice Sector.
b)  Armet confirms that its specifications comply with or exceed Section C: STATEMENT of WORK as attached in schedule "B" attached hereto;
c)  Modified interior trimming, blending closely with the original interior fit and finish of the Ford cabin.
d)  Armor from and including the fenders, firewall to and including the rear wall and exit door.
e)  The manufacturing process will integrate transparent and opaque armor and the vehicles structural design, to ensure that the vehicles balanced structural loads will provide optimal ballistic protection to the occupants of the vehicle.
f)  No gaps are permitted between opaque armor or between opaque to transparent armor transition points. Opaque armor joining or meeting on the same plane will be overlapped.

219. The Statement of Work from the 0047 Contract reads, in part, as follows:

**C.2.0. General Specifications and Salient Features**

**C.2.1.** Contractor shall provide minimum of 8 platforms that are armor protected with a minimum of Central European Norm (EU) **B7 protection** to include engine, radiator, fuel cell and other components protection as well.

**C.2.2. Platform Description (Vehicle):**
The vehicle furnished under this contract shall be new (2005/06) and meet all of following specifications.
**C.2.2.1. Exterior:**

---

W91GYO-06-F-0047                                              Page 3 of 18

Key characteristics:

(a)   Platform must be armor protected with a minimum of Central European Norm (EU) B7 protection or one of the accepted international ballistic standards in existence, including NIJ, Underwriter Laboratories, or German DIN listed.

### VI.  Whyte Knew that Armet Could Not Deliver the Vehicles by the Dates Specified in the Contracts

220. Prior to submitting the PAFs in response to the U.S. Government's Solicitations for armored vehicles, Relator told Whyte that Armet would not be able to construct and deliver the vehicles by the deadlines required by the U.S. Government Solicitations.

221. Relator told Whyte that Armet would not be able to build the vehicles simultaneously, and would instead have to build the vehicles one at a time.

222. Relator told Whyte that Armet would not be able to build and deliver the vehicles as per the deadlines in the Contracts because Armet did not have the financial resources to allow for production of numerous vehicles at the same time.

223. Whyte dismissed Relator's concerns, and replied "This is just how the game is played."

224. In directing the submission of PAFs for both the 0028 and 0047 Contracts, Whyte fraudulently misrepresented to the JCCI Armet's ability to timely produce 32 Kestrel/Gurkha armored gun trucks.

225. On April 25, 2006, The U.S. Government awarded Armet the 0028 Contract because Whyte fraudulently represented that Armet could produce four vehicles within 45 days, and the remaining 20 vehicles by July 31, 2006.

| | 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED   ☐ SEE ADDENDUM | | | |
|---|---|---|---|---|---|---|
| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
| | See Page 2- Order for Supplies Schedule

Deliver 4 vehicles within 45 days after receipt of award. Remaining 20 vehicles will be delivered NLT 31 July 2006. Contractor must obtain EUC within 30 days after award.

*(Attach Additional Sheets as Necessary)* | | 24 | EA | | |
| 25. ACCOUNTING AND APPROPRIATION DA
21 NA 2005 2092.0000 P0 2005IQ IQJ8 23000000000 4044 252G HD8574 NA 30740J | | | | | 26. TOTAL AWARD AMOUNT *(For Govt. Use Only)*
$4,779,693.36 | |

226.  In PAF-2180-24-4, Whyte knowingly, falsely stated that Armet would deliver the vehicles "As per contract."

49



**ARMET ARMORED VEHICLES INC.**
**KESTREL GUN TRUCKS**

**QUOTE**

**PAF-2180-24-4   April 21, 2006**

Page10

### Solicitation: W91GY0-06-Q-0068

| 11.4 | Ownership or Title documents with one set of keys sent by courier to client |
| 11.5 | Photocopy of Ownership or Title document with key shipped with vehicle |
| 11.6 | Original Commercial Invoice sent by courier to client |
| 11.7 | Original Insurance Certificate sent by courier to client |
| 11.8 | Final inspection report signed by two Armet Quality Inspectors, original sent to client by courier. |
| | |
| **12.** | **Shipping & Insurance** |
| | |
| 12.1 | Shipping and insurance rates are subject to change without notice. |
| 12.2 | Unless otherwise stipulated, the insurance document will specify the minimum amount for which the insurance cover will have effect in the same currency as the contract for All-Risk. |
| 12.3 | In the event of loss or damage, the Purchaser, who as the holder of the insurance certificate is responsible for notifying, in writing, their claim to the insurance company, and for paying any applicable deductibles. |
| | |
| Note: | The All-Risk certificate is subject to the exclusions as set out in the Insurance Certificate and the Master Policy. |
| | |
| **13.** | **Payment Terms** |
| | Armet's payment policy requires 50% deposit with the balance payable within three  (3) days of receipt of notification of each vehicle's readiness to ship. |
| | |
| **14.** | **Delivery & Shipment** |
| | As per contract |

227.  On June 18, 2006, The U.S. Government awarded Armet the 0047 Contract because Whyte fraudulently represented that Armet could produce 8 vehicles within 90 days of the date of the contract.

| ☐ 17b.  CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | | 18b.  SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED   ☐ SEE ADDENDUM | | | |
|---|---|---|---|---|---|
| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
| | See Page 2- Order for Supplies Schedule (Shipping included to location in Block 15) Delivery Date. Contractor must obtain EUC within 60 days after award.  All 8 vehicles shall be delivered no later than 90 days after contract award. | 8 | EA | $ 199,153.89 | $ 199,153.89 |
| | *(Attach Additional Sheets as Necessary)* | | | | |
| 25. ACCOUNTING AND APPROPRIATION DATA | | | | 26. TOTAL AWARD AMOUNT  *(For Govt. Use Only)* $1,593,231.10 | |

228. Whyte knew that Armet could not meet the delivery dates required by the 0028 and 0047 Contracts because Armet did not have the resources or manpower to produce a total of 32 armored gun trucks in just over four months.

229. Whyte knew that the vehicles could not be produced at his Largo production facility because he had personally decided to shut down operations in Largo.

230. Whyte knew that Armet could not produce the vehicles at Armet's Ontario facility because Armet employed fewer than ten assembly staff in Canada.

231. Whyte knew that Armet could not produce the vehicles as per the deadlines in the Contracts because Armet did not have the financial resources to per-order materials required to complete the vehicles.

232. Whyte knowingly made false representations to the U.S. Government in order to induce the Government to sign the 0028 and 0047 Contracts.

**Whyte and Armet Made Materially False Statements That Led to False Claims for Payments**

233. On or around August 23, 2006, Whyte directed Armet employees located at Armet's Danville facility to submit to the U.S. Army Corps of Engineers ("USACE") Finance Center in Millington, Tennessee an invoice for payment of the first two Kestrel/ Gurkha vehicles delivered under the 0028 Contract.

234. On or around August 23, 2006, Whyte also directed Armet employees located at Armet's Danville facility to submit a Form DD-250 "Material Inspection and Receiving Report" to the JCCI in Baghdad.

235. Armet Invoice No. 10103 directed the USACE to wire $398.307.80 to the Fifth Third Bank in Seminole, Florida, to a bank account number ending in 9288.[4]

236. Fifth Third Bank is a U.S. based bank, headquartered in Ohio.

---

[4] As per Federal Rule 5.2(a), Relator has redacted all but the last four digits of Armet's U.S. bank account number. Should the Court require more complete information, Relator can provide Armet's full account number.

237. Whyte directed that Armet Invoice No. 10103 be submitted to the USACE even though he knew that the Kestrel/ Gurkha vehicles for which Whyte sought payment did not meet the armor specifications detailed in the 0028 Contract.

238. Whyte directed that Armet Invoice No. 10103 be submitted to the USACE for payment even though Whyte knew that the Kestrel/ Gurkha vehicles for which Whyte sought payment did not conform to the standards described in either Armet's PAF or in the Government's Statement of Work.

239. The details of Armet Invoice No. 10103 are as follows:



**Armet Armored Vehicles Inc.**
12600 Belcher Road South, Unit " B"
Largo, Florida 33773
U.S.A.

Tel: +1 727 535 3359
Fax: +1 727 530 9519
E-mail fs@aavi.com
Web Site: www.aavi.com

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/23/2006 | 10103 |

**Bill To**

USACE Finance Center
5722 Integrity Dr.
Milington, TN
38054-5005

**Ship To**

Abu Ghraib
Grid: 38S MB 26628726

| Terms |
|-------|
| Due Upon Shipping |

| Item | Description | Prior Amt | Total % | Qty | Amount |
|------|-------------|-----------|---------|-----|--------|
| Vehicle Armori... | Kestrel Gun Truck | | | 2 | 322,817.88 |
| Shipping | Shipping | | | 2 | 60,000.00 |
| 1 | Communication Equipment | | | 4 | 15,489.92 |
| | Contract No. W91GYO-06-F-0028 | | | | |
| | "These vehicles were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited." | | | | |

| | |
|---|---|
| **Subtotal** | $398,307.80 |
| **Sales Tax** | $0.00 |
| **Total** | $398,307.80 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $398,307.80 |

Bank Information:  Fifth Third Bank
10899 Park Boulevard
Seminole, Florida 33772

ABA:        #█████0314 for wire transfer
Account:    #█████9288
SWIFT CODE: █████3C

240. On or around August 23, 2014, the USACE wired into Armet's U.S. bank account the amount of $398,307.80.

241. Whyte and Armet accepted payment for the two Kestrel/ Gurkha vehicles billed for in Armet Invoice No. 10103, even though Whyte knew that the vehicles did not conform to either the 0028 Contract's Statement of Work or to Armet's own PAF.

242. On or around October 17, 2006, Whyte directed Armet employees to submit to the USACE Finance Center in Millington, Tennessee a second invoice for payment for the third and fourth Kestrel/ Gurkha vehicles delivered under the 0028 Contract.

243. Whyte directed that Armet submit the October invoice to the USACE Finance Center in Millington, Tennessee, even though he knew that the two Kestrel/ Gurkha vehicles did not meet the armor standards outlined in the 0028 Contract.

244. Whyte directed that Armet submit the October invoice even though he knew that the two Kestrel/ Vehicles did not meet the standards outlined in the 0028 Contract's Statement of Work or in Armet's own PAF.

245. On or around October 17, 2006, Whyte and Armet accepted payment of approximately $400,000 for the two Kestrel/ Gurkha vehicles billed for in Armet's October 17, 2006 invoice.

246. Whyte and Armet accepted payment of approximately $400,000 even though Whyte and Armet knew that the two vehicles billed for did not meet the armor standards required by the 0028 Contract.

247. On or around February 9, 2007, Whyte directed that Armet submit an invoice to the USACE Finance Center in Millington, Tennessee, for a single Kestrel/ Gurkha vehicle.

248. Whyte directed that Armet submit the February 2007 invoice even though he knew that the Kestrel/ Gurkha vehicle in question did not meet the standards outlined in the 0028 Contract's Statement of Work.

249. On or around February 9, 2007, Whyte and Armet accepted payment of approximately $200,000 even though Whyte and Armet knew that the vehicle billed for did not meet the standards required by the 0028 Contract.

250. On or around September 21, 2007, Whyte directed that Armet submit an invoice to the USACE Finance Center in Millington, Tennessee, for a single Kestrel/ Gurkha vehicle.

251. Whyte directed that Armet submit the September 2007 invoice even though he knew that the Kestrel/ Gurkha vehicle in question did not meet the standards outlined in the 0028 Contract's Statement of Work.

252. On or around September 21, 2007, Whyte and Armet accepted payment of approximately $200,000 even though Whyte and Armet knew that the vehicle billed for did not meet the standards required by the 0028 Contract.

253. On or around January 1, 2008, Whyte directed that Armet submit an invoice to the USACE Finance Center in Millington, Tennessee, for a single Kestrel/ Gurkha vehicle.

254. Whyte directed that Armet submit the January 2008 invoice even though he knew that the Kestrel/ Gurkha vehicle in question did not meet the standards outlined in the 0028 Contract's Statement of Work.

255. On or around January 1, 2008, the JCCI determined that it would not accept the Kestrel/ Gurkha vehicle in question.

256. On or around January 1, 2008, the USACE Finance Center declined to pay Whyte and Armet approximately $200,000 for the seventh vehicle to be delivered under the 0028 Contract.

**<u>Whyte and Armet Made False Statements, False Certifications, and Fraudulently Induced the Government to Make an Advance Progress Payment of $825,531.00</u>**

257. On or around November 30, 2006, Whyte directed Armet employees to submit to the USACE Finance Center in Millington, Tennessee a Standard Form 30 ("SF30") Request for Progress Payment on the 0028 Contract.

258. Whyte directed that Armet request a progress payment for an amount of $824,531.00.

259. Whyte and Armet falsely represented to the USACE and the U.S. Government that Armet needed the progress payment in order continue to produce Kestrel/ Gurkha vehicles to the specifications required by the 0028 Contract's Statement of Work.

260. Whyte and Armet falsely represented to the USACE and the U.S. Government that any and all money received would be spent on building additional Kestrel/ Gurkha vehicles that conformed to the standards set out in the 0028 Contract's Statement of Work.

261. On November 30, 2006, Whyte directed Armet employees to submit Armet Invoice No. 10383 to the USACE for a Progress Payment for the 0028 Contract for the amount of $824.531.00.

262. Armet Invoice No. 10383 requested that the USACE transfer the $824,531.00 to Armet's U.S. bank account ending in 9288, maintained by a branch of First Third Bank located in Seminole, Florida.

263. Armet Invoice No. 10383 stated that the Progress Payment would be used for "Vehicle Armoring."

264. Whyte directed Armet employees to submit Armet Invoice No. 10383 even though he knew that the Kestrel/ Gurkha door handles did not meet the armor specifications required by the 0028 Contract.

265. Armet Invoice No. 10383 reads as follows:



**Armet Armored Vehicles Inc.**
12600 Belcher Road South, Unit " B"
Largo, Florida 33773
U.S.A.

Tel: +1 727 535 3359
Fax: +1 727 530 9519
E-mail fs@aavi.com
Web Site: www.aavi.com

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/30/2006 | 10383 |

| Bill To |
|---------|
| USACE Finance Center<br>5722 Integrity Dr.<br>Milington, TN<br>38054-5005 |

| Ship To |
|---------|
| Abu Ghraib<br>Grid: 38S MB 26628726 |

| Terms |
|-------|
| Due on receipt |

| Item | Description | Qty | Amount |
|------|-------------|-----|--------|
| Vehicle Armoring | Progress Payment for Contract #  W91GYO-06-0028 | | 824,531.00 |
| | "This shipment is exported from the United States in accordance with the Export Administration Regulations.  Diversion contrary to U.S. law is prohibited." | | |

| | |
|---|---|
| **Subtotal** | $824,531.00 |
| **Sales Tax** | $0.00 |
| **Total** | $824,531.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $824,531.00 |

Bank Information:  Fifth Third Bank
10899 Park Boulevard
Seminole, Florida 33772

ABA:            #▮▮▮▮0314 for wire transfer
Account:     #▮▮▮▮9288
SWIFT CODE:  ▮▮▮▮▮3C

266. On December 2, 2006, the JCCI approved Armet's SF 30 for the advance Progress

Payment for "Vehicle Armoring."

267. The approved SF 30 explicitly stated that "All other Terms and Conditions of the Contract remain in full effect."

268. The SF 30 required that Armet sign and return a copy of the SF 30 to the issuing office.

OMB Approval 2700-0042

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE | OF | PAGES |
|---|---|---|---|---|---|---|
| | | | | 1 | | 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | | 5. PROJECT NO. (If applicable) |
|---|---|---|---|---|
| P00001 | See Block 16C | W915WE53574697 | | |

6. ISSUED BY          CODE
Joint Contracting Command – Iraq
Phoenix Base, MNSTC-I Support Division
Baghdad - Iraq   APO AE 09348

7. ADMINISTERED BY (If other than Item 6)          CODE
See block 6

8. NAME AND ADDRESS OF CONTRACTOR (No. Street, county, State and ZIP Code)
Armet Armored Vehicles, Inc.
Attn: Frank Skinner
12600 Belcher Rd. South, Unit B
Largo, Fl. 33773-1656
Telephone NO. 727-535-3359

(4)   9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X   10A. MODIFICATION OF CONTRACT/ORDER NO.
W91GY0-06-F-0028
10B. DATED (SEE ITEM 13)
April 25, 2006

CODE                          FACILITY CODE

E. IMPORTANT: Contractor ____ is not, __X__ is required to sign this document and return __1__ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation contract subject matter where feasible.)

This Modification incorporates 52.232-16 Alt 1 to Section I of the Contract to allow for Progress Payments.

The total cost of the contract has not been affected.

All other Terms and Conditions of the Contract remain in full effect.

269. Whyte directed Relator and other Armet employees to falsely certify Armet's compliance with the requirements of the SF 30 and the terms and conditions of the 0028 Contract in order to obtain the advance payment of $824,531.00.

270. On or around December 6, 2006, the USACE Finance Center in Millington, Tennessee wired $824,531.00 into Armet's U.S. bank account.

271. Shortly after December 6, 2006, Whyte transferred the $824,531.00 from Armet's U.S. bank account to a personal bank account in Canada.

272. Whyte knowingly used the money received from the Progress Payment to make personal expenditures unrelated to the 0028 Contract.

273. Whyte directed Relator and other Armet employees to submit and certify the SF 30 so that Whyte could use the money received from the Progress Payment for personal expenditures unrelated to the 0028 Contract.

### Whyte Conspired to Illegally Sell Kestrel/Gurkha Gun Trucks Built for the 0028 Contract to the Nigerian Border Police

274. In or around early 2007, Armet shipped three Kestrel/ Gurkha vehicles to Abu Dhabi for transfer to the JCCI in Iraq.

275. Whyte, however, directed that delivery of the vehicles be delayed.

276. Instead of transferring the vehicles on to Iraq, Whyte directed that the vehicles be held in Abu Dhabi.

277. Whyte directed that the vehicles be held in Abu Dhabi because officials with the Nigerian Police had offered to buy them for $30,000 more than the contract price with the U.S. Government.

278. Armet had previously sold seven vehicles to the Nigerian Police.

279. Shortly before the three vehicles were shipped to Abu Dhabi, a Mr. Lucky and Mr. Sampson, from Nigeria, had approached Relator and other Armet officials about buying additional vehicles.

280. Armet, however, did not have authority from the U.S. Government to export more than seven vehicles to Nigeria.

281. Armet only had authority to ship the 32 Kestrel/ Gurkha vehicles to Iraq.

282. Armet had signed forms DSP-5 and DSP-61, which explicitly stated that the Kestrel/ Gurkha vehicles could only be shipped to Iraq.

283. Relator has personal knowledge that the three Kestrel/ Gurkha vehicles in question were never shipped to Iraq.

284. Relator has personal knowledge that Armet delivered a total of seven vehicles to Iraq, only six of which were accepted by the JCCI.

285. Relator has personal knowledge that Armet delivered a single Kestrel/ Gurkha to the JCCI on or around February 9, 2007.

286. Relator has personal knowledge that Armet delivered a single Kestrel/ Gurkha to the JCCI on or around September 21, 2007.

287. Relator has personal knowledge that Armet attempted to deliver a single Kestrel/ Gurkha to the JCCI on or around January 1, 2008, but that vehicle was rejected.

288. Relator has personal knowledge that Armet did not deliver three Kestrel/ Gurkha vehicles to the JCCI in the first quarter of 2007.

289. Relator subsequently learned from Cynthia Braden, an Armet employee, that the three vehicles delayed in Abu Dhabi were sold to Nigeria.

290. Braden told Relator that once the vehicles reached Abu Dhabi, the vehicles were loaded onto an Ilyushin IL-76 transport aircraft bound for Nigeria.

291. Braden confirmed to Relator that the vehicles were shipped to Nigeria without proper export permits.

292. On May 20, 2007, Whyte sent Relator an email professing that he had not shipped the three vehicles to Nigeria.

293. Armet did not deliver any other vehicles to the JCCI, despite having shipped three additional vehicles to Abu Dhabi which were purportedly bound for Iraq, in the first quarter of 2007.

294. Whyte knowingly diverted the three Kestrel/ Gurkha vehicles away from Iraq and to Nigeria.

295. Whyte sold the three Kestrel/ Gurkha vehicles to Nigeria because the Nigerian buyers agreed to pay $30,000 more per vehicle than Armet would have received had the vehicles been delivered under the 0028 Contract.

296. Whyte knowingly sold the three Kestrel/ Gurkha vehicles to Nigeria even though Armet did not have the proper U.S. export permits to do so.

## COUNT ONE

### WHYTE'S FRAUDULENT INDUCEMENT OF THE 0028 CONTRACT WITH RESPECT TO THE VEHICLE SPECIFICATIONS

297. Relator re-alleges and incorporates the allegations in paragraphs 1-296 as if fully set forth herein.

298. By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States false or fraudulent claims about vehicle specifications to induce the government to enter into the 0028 Contract, in violation of the FCA.

299. Whyte, by representing to U.S. Government entities such as the Department of Defense and the JCCI that Armet's Kestrel/ Gurkha vehicle would comply with B7 armor requirements and would be able to defend against a blast equivalent to two German DM51 or U.S. M67 anti-personnel grenades, fraudulently induced the U.S. Government to sign the 0028 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

300. The U.S. Government relied on Whyte's misrepresentations about the Kestrel/ Gurkha's armor capabilities, would not have signed the contracts had it been aware of the vehicles' deficient armor capabilities.

301. Whyte personally designed Armet's Kestrel/ Gurkha and Balkan MK5 vehicles.

302. In or around the fall of 2005, Scott Verona made Whyte aware that the Balkan MK5's door handle assembly was unarmored, and created a gap in the vehicle's armor through which bullets, shrapnel, fire, and blast overpressure could pass.

303. At the same time, Verona also made Relator aware of the design defect in the Balkan MK5's door handle.

304. Throughout the end of 2005 and early 2006, Verona and Relator discussed with Whyte on multiple occasions the fact that the Balkan MK5's door handle created a gap in the vehicle's vertical opaque armor.

305. Whyte repeatedly refused to alter the design, citing high costs as well as that the risk posed to the vehicle's occupants was minimal as U.S. law enforcement personnel would not be exposed to IEDs.

306. Whyte's design for the Kestrel/ Gurkha vehicle used the same door handle assembly as the Balkan MK5.

307. Whyte personally drafted Armet's proposals to the U.S. Government in response to Solicitation No. W91GY0-06-Q-0068 and W91GY0-06-Q-0068.

308. Whyte required Armet employees to submit to the U.S. Government PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4, as well as an amendment to PAF 2180-20-2, which was signed by Whyte.

309. Each PAF stated that the Kestrel/ Gurkha vehicle would meet European Naturalization Committee (CEN) B7 armor protection and that "no gaps are permitted between opaque armor or between opaque to transparent armor transition points."

310. The Statement of Work for Solicitation No. W91GY0-06-Q-0068 required that the vehicles be "armor protected with a minimum of Central European Norm (EU) **B7 protection** to include engine, radiator, fuel cell and other components protection as well." (emphasis in the original).

311. The U.S. Government relied on Whyte and Armet's PAFs when deciding to award the 0028 Contract to Armet, as the PAFs specifically stated that the Kestrel/ Gurkha vehicle would provide complete B7 level protection, with no gaps in the armor.

312. The U.S. Government relied on Whyte's representations that Armet's vehicles would comply with the requirements contained in the Statement of Work.

313. The U.S. Government relied on Whyte's knowing misstatement of material facts regarding the vehicles' armor capabilities.

314. The U.S. Government would not have awarded the 0028 Contract to Armet had the Government known that the PAFs contained a materially false statement regarding the vehicles' armor capabilities.

315. The U.S. Government would not have awarded the 0028 Contract had it known that the Kestrel/ Gurkha's door handle design afforded no protection against small arms fire or blasts caused by explosions, and would have compromised the safety of the vehicles' occupants had the vehicles been exposed to enemy fire.

316. The representations that Whyte made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

317. Had the U.S. Government and its agencies known that Whyte fraudulently misrepresented Armet's ability to provide compliant, conforming products, the Government would not have entered into the Contract with Whyte and Armet.

## COUNT TWO

### ARMET'S FRAUDULENT INDUCEMENT OF THE 0028 CONTRACT WITH RESPECT TO THE VEHICLE SPECIFICATIONS

318. Relator re-alleges and incorporates the allegations in paragraphs 1-317 as if fully set forth herein.

319. By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the United States false or fraudulent claims about vehicle specifications to induce the government to enter into the 0028 Contract, in violation of the FCA.

320. Armet, by representing to U.S. Government entities such as the Department of Defense and the JCCI that Armet's Kestrel/ Gurkha vehicle would comply with B7 armor requirements and would be able to defend against a blast equivalent to two German DM51 or U.S. M67 anti-personnel grenades, fraudulently induced the U.S. Government to sign the 0028 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

321. The U.S. Government relied on Armet's misrepresentations about the Kestrel/ Gurkha's armor capabilities, would not have signed the contracts had it been aware of the vehicles' deficient armor capabilities.

322. Armet's design for the Kestrel/ Gurkha vehicle relied extensively on Armet's Balkan MK5 vehicle, and both vehicles shared the same door handle assembly.

323. In or around the fall of 2005, Scott Verona, an Armet employee, became aware that the Balkan MK5's door handle assembly was unarmored, and created a gap in the vehicle's armor through which bullets, shrapnel, fire, and blast overpressure could pass.

324. At the same time, Verona made Relator, Whyte, and other Armet employees aware of the design defect in the Balkan MK5's door handle.

325. Throughout the end of 2005 and early 2006, Verona and Relator discussed on multiple occasions the fact that the Balkan MK5's door handle created a gap in the vehicle's vertical opaque armor.

326. Relator and Verona's concerns were relayed to Armet management on multiple occasions.

327. Armet management repeatedly refused to alter the design, citing high costs as well as that the risk posed to the vehicle's occupants was minimal as U.S. law enforcement personnel would not be exposed to IEDs.

328. Armet's design for the Kestrel/ Gurkha vehicle used the same door handle assembly as the Balkan MK5.

329. Despite knowing that the Kestrel/ Gurkha's door handle assembly did not afford the required amount of crew protection, Armet submitted multiple proposals to the U.S. Government in response to Solicitation No. W91GY0-06-Q-0068 and W91GY0-06-Q-0115.

330. At the direction of Armet management, Relator submitted to the U.S. Government Armet's solicitations, PAF numbers 2180-20-2, 2180-24-3, and 2180-24-4, as well as an amendment to PAF 2180-20-2, which was signed by Whyte.

331. Each PAF stated that the Kestrel/ Gurkha vehicle would meet European Naturalization Committee (CEN) B7 armor protection and that "no gaps are permitted between opaque armor or between opaque to transparent armor transition points."

332. The Statement of Work for Solicitation No. W91GY0-06-Q-0068 required that the vehicles be "armor protected with a minimum of Central European Norm (EU) **B7 protection** to include engine, radiator, fuel cell and other components protection as well."  (emphasis in the original).

65

333. The U.S. Government relied on Armet's PAFs when deciding to award the 0028 Contract to Armet, as the PAFs specifically stated that the Kestrel/ Gurkha vehicle would provide complete B7 level protection, with no gaps in the armor.

334. The U.S. Government relied on Armet's representations that the vehicles would comply with the requirements contained in the Statement of Work.

335. The U.S. Government relied on Armet's knowing misstatement of material facts regarding the vehicles' armor capabilities.

336. The U.S. Government would not have awarded the 0028 Contract to Armet had the Government known that the PAFs contained a materially false statement regarding the vehicles' armor capabilities.

337. The U.S. Government would not have awarded the 0028 Contract had it known that the Kestrel/ Gurkha's door handle design afforded no protection against small arms fire or blasts caused by explosions, and would have compromised the safety of the vehicles' occupants had the vehicles been exposed to enemy fire.

338. The representations that Armet made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

339. Had the U.S. Government and its agencies known that Armet fraudulently misrepresented its ability to provide compliant, conforming products, the Government would not have entered into the Contract with Armet.

## COUNT THREE

### WHYTE'S FRAUDULENT INDUCEMENT OF THE 0047 CONTRACT WITH RESPECT TO THE VEHICLE SPECIFICATIONS

340. Relator re-alleges and incorporates the allegations in paragraphs 1-339 as if fully set forth herein.

341. By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States false or fraudulent claims about vehicle specifications to induce the government to enter into the 0047 Contract, in violation of the FCA.

342. Whyte, by representing to U.S. Government entities such as the Department of Defense and the JCCI that Armet's Kestrel/ Gurkha vehicle would comply with B7 armor requirements and would be able to defend against a blast equivalent to two German DM51 or U.S. M67 anti-personnel grenades, fraudulently induced the U.S. Government to sign the 0028 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

343. The U.S. Government relied on Whyte's misrepresentations about the Kestrel/ Gurkha's armor capabilities, would not have signed the contracts had it been aware of the vehicles' deficient armor capabilities.

344. Whyte personally designed Armet's Kestrel/ Gurkha and Balkan MK5 vehicles.

345. In or around the fall of 2005, Scott Verona made Whyte aware that the Balkan MK5's door handle assembly was unarmored, and created a gap in the vehicle's armor through which bullets, shrapnel, fire, and blast overpressure could pass.

346. At the same time, Verona also made Relator aware of the design defect in the Balkan MK5's door handle.

347. Throughout the end of 2005 and early 2006, Verona and Relator discussed with Whyte on multiple occasions the fact that the Balkan MK5's door handle created a gap in the vehicle's vertical opaque armor.

348. Whyte repeatedly refused to alter the design, citing high costs as well as that the risk posed to the vehicle's occupants was minimal as U.S. law enforcement personnel would not be exposed to IEDs.

349. Whyte's design for the Kestrel/ Gurkha vehicle used the same door handle assembly as the Balkan MK5.

350. Whyte personally drafted Armet's proposal, PAF Number 3042-8-1, for submission to the U.S. Government in response to Solicitation No. W91GY0-06-Q-0140.

351. At Whyte's request, Relator submitted to the U.S. Government PAF 3042-8-1.

352. The PAF stated that the Kestrel/ Gurkha vehicle would meet European Naturalization Committee (CEN) B7 armor protection and that "no gaps are permitted between opaque armor or between opaque to transparent armor transition points."

353. The Statement of Work for Solicitation No. W91GY0-06-Q-0140 required that the vehicles be "armor protected with a minimum of Central European Norm (EU) **B7 protection** to include engine, radiator, fuel cell and other components protection as well."  (emphasis in the original).

354. The U.S. Government relied on Whyte's PAF when deciding to award the 0047 Contract to Armet, as the PAF specifically stated that the Kestrel/ Gurkha vehicle would provide complete B7 level protection, with no gaps in the armor.

355. The U.S. Government relied on Whyte's representations that Armet's vehicles would comply with the requirements contained in the Statement of Work.

356. The U.S. Government relied on Whyte's knowing misstatement of material facts regarding the vehicles' armor capabilities.

357. The U.S. Government would not have awarded the 0047 Contract to Armet had the Government known that the PAFs contained a materially false statement regarding the vehicles' armor capabilities.

358. The U.S. Government would not have awarded the 0047 Contract had it known that the Kestrel/ Gurkha's door handle design afforded no protection against small arms fire or blasts caused by explosions, and would have compromised the safety of the vehicles' occupants if the vehicles had been exposed to enemy fire.

359. The representations that Whyte made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

360. Had the U.S. Government and its agencies known that Whyte fraudulently misrepresented Armey's ability to provide compliant, conforming products, the Government would not have entered into the Contract with Whyte and Armet.

## COUNT FOUR

### ARMET'S FRAUDULENT INDUCEMENT OF THE 0047 CONTRACT WITH RESPECT TO THE VEHICLE SPECIFICATIONS

361. Relator re-alleges and incorporates the allegations in paragraphs 1-360 as if fully set forth herein.

362. By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the United States false or fraudulent claims about vehicle specifications to induce the government to enter into the 0047 Contract, in violation of the FCA.

363. Armet, by representing to U.S. Government entities such as the Department of Defense and the JCCI that Armet's Kestrel/ Gurkha vehicle would comply with B7 armor requirements and would be able to defend against a blast equivalent to two German DM51 or U.S. M67 anti-personnel grenades, fraudulently induced the U.S. Government to sign the 0047 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

364.  The U.S. Government relied on Armet's misrepresentations about the Kestrel/ Gurkha's armor capabilities, would not have signed the contracts had it been aware of the vehicles' deficient armor capabilities.

365. Armet's design for the Kestrel/ Gurkha vehicle relied extensively on Armet's Balkan MK5 vehicle, and both vehicles shared the same door handle assembly.

366. In or around the fall of 2005, Scott Verona, an Armet employee, became aware that the Balkan MK5's door handle assembly was unarmored, and created a gap in the vehicle's armor through which bullets, shrapnel, fire, and blast overpressure could pass.

367. At the same time, Verona made Relator and other Armet employees aware of the design defect in the Balkan MK5's door handle.

368. Throughout the end of 2005 and early 2006, Verona and Relator discussed on multiple occasions the fact that the Balkan MK5's door handle created a weak spot in the vehicle's armor.

369. Relator and Verona's concerns were relayed to Armet management on multiple occasions.

370. Armet management repeatedly refused to alter the design, citing high costs as well as that the risk posed to the vehicle's occupants was minimal as U.S. law enforcement personnel would not be exposed to IEDs.

371. Armet's design for the Kestrel/ Gurkha vehicle used the same door handle assembly as the Balkan MK5.

372. Despite knowing that the Kestrel/ Gurkha's door handle assembly did not afford the necessary amount of crew protection, Armet submitted a proposal to the U.S. Government in response to Solicitation No. W91GY0-06-Q-0140.

373. At the direction of Armet management, Relator submitted to the U.S. Government Armet's solicitations, PAF number 3042-8-1.

374. The PAF stated that the Kestrel/ Gurkha vehicle would meet European Naturalization Committee 9CEN) B7 armor protection and that "no gaps are permitted between opaque armor or between opaque to transparent armor transition points."

375. The Statement of Work for Solicitation No. W91GY0-06-Q-140 required that the vehicles be "armor protected with a minimum of Central European Norm (EU) **B7 protection** to include engine, radiator, fuel cell and other components protection as well." (emphasis in the original).

376. The U.S. Government relied on Armet's PAF when deciding to award the 0047 Contract to Armet, as the PAF specifically stated that the Kestrel/ Gurkha vehicle would provide complete B7 level protection, with no gaps in the armor.

377. The U.S. Government relied on Armet's representations that the vehicles would comply with the requirements contained in the Statement of Work.

378. The U.S. Government relied on Armet's knowing misstatement of material facts regarding the vehicles' armor capabilities.

379. The U.S. Government would not have awarded the 0047 Contract to Armet had the Government known that the PAF contained a materially false statement regarding the vehicles' armor capabilities.

380. The U.S. Government would not have awarded the 0047 Contract had it known that the Kestrel/ Gurkha's door handle design afforded no protection against small arms fire or blasts caused by explosions, and would have compromised the safety of the vehicle's occupants had the vehicles been exposed to enemy fire.

381. The representations that Armet made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

382. Had the U.S. Government and its agencies known that Armet fraudulently misrepresented its ability to provide compliant, conforming products, the Government would not have entered into the Contract with Armet.

## COUNT FIVE

### WHYTE'S FRADULENT INDUCEMENT OF THE 0028 CONTRACT WITH RESPECT TO THE VEHICLES' AGREED UPON DELIVERY DATE

383. Relator re-alleges and incorporates the allegations in paragraphs 1-382 as if fully set forth herein.

384. By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States false or fraudulent claims about Armet's ability to deliver the vehicles by a certain date to induce the Government to enter into the 0028 Contract, in violation of the FCA.

385. Whyte, by representing to U.S. Government entities such as the Department of Defense and the JCCI on April 25, 2006 that Armet would deliver four vehicles within 45 days of being awarded the contact and the remaining 20 vehicles by July 31, 2006, fraudulently induced the U.S. Government to sign the 0028 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

386. The U.S. Government relied on Whyte's misrepresentations about Armet's ability to supply Kestrel/ Gurkha vehicles in a timely manner as required by the Contract, and would not have signed the Contract had it been aware of Armet's complete inability to meet the deadlines.

387. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that Armet was barely solvent, and was unable to meet deadlines set in prior single-vehicle contracts with the U.S Navy.

388. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that Armet's Largo facility would have to shut down due to financial difficulties.

389. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that he would have to sell his property in Largo in foreclosure.

390. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that Armet's Danville facility would not be fully operational for three to four months.

391. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that any and all work on the Kestrel/ Gurkha vehicles would need to be transferred from Largo to Canada.

392. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that Armet had not previously built a Kestrel/ Gurkha vehicle.

393. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that the Kestrel/ Gurkha design was flawed, and that armor modifications would need to be made to bring the vehicle up to the standards required by the Solicitation.

394.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Whyte knew that Armet did not have sufficient funds to pre-order enough parts and materials to build the vehicles at the speed required by the Contracts.

395. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Relator had expressed to Whyte his concern that Armet could not meet the deadlines imposed by the Solicitation Order.

396. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Relator told Whyte that Armet would not be able to meet the deadlines, and Whyte responded to Relator by saying "that is just how the game is played."

397. The representations that Whyte made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

398. Had the U.S. Government and its agencies known that Whyte fraudulently misrepresented Armet′s ability to timely provide vehicles in the quantities needed, the Government would not have entered into the Contract with Armet.

## COUNT SIX

**ARMET′S FRADULENT INDUCEMENT OF THE 0028 CONTRACT WITH RESPECT TO THE VEHICLES′ AGREED UPON DELIVERY DATE**

399. Relator re-alleges and incorporates the allegations in paragraphs 1-398 as if fully set forth herein.

400. By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the United States false or fraudulent claims about Armet′s ability to deliver the vehicles by a certain date to induce the government to enter into the 0028 Contract, in violation of the FCA.

401. Armet, by representing to U.S. Government entities such as the Department of Defense and the JCCI on April 25, 2006 that Armet would deliver four vehicles within 45 days of being awarded the contact and the remaining 20 vehicles by July 31, 2006, fraudulently induced the U.S. Government to sign the 0028 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

402. The U.S. Government relied on Armet′s misrepresentations about Armet′s ability to supply Kestrel/ Gurkha vehicles in a timely manner as required by the Contract, and would not have signed the Contract had it been aware of Armet′s complete inability to meet the deadlines.

403. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet was barely solvent, and was unable to meet deadlines set in prior single-vehicle contracts with the U.S Navy.

404. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet's Largo facility was being forced to shut down due to financial difficulties.

405. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet management was aware that Armet's Largo property would be sold in foreclosure.

406. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet management was aware that Armet's Danville facility would not be fully operational for three to four months.

407. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet management knew that any and all work on the Kestrel/ Gurkha vehicles would need to be transferred from Largo to Canada.

408. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet had not previously built a Kestrel/ Gurkha vehicle.

409. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet management knew that the Kestrel/ Gurkha design was flawed, and that armor modifications would need to be made to bring the vehicle up to the standards required by the Solicitation.

410. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Armet did not have sufficient funds to pre-order enough parts and materials to build the vehicles at the speed required by the Contracts.

411. Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Relator had expressed his concern that Armet could not meet the deadlines imposed by the Solicitation Order.

412.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0068, Relator told the owner of Armet that Armet would not be able to meet the deadlines, and Relator received the response "that is just how the game is played."

413.  The representations that Armet made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

414.  Had the U.S. Government and its agencies known that Armet fraudulently misrepresented its ability to timely provide vehicles in the quantities needed, the Government would not have entered into the Contract with Armet.

## COUNT SEVEN

### WHYTE'S FRADULENT INDUCEMENT OF THE 0047 CONTRACT WITH RESPECT TO THE VEHICLES' AGREED UPON DELIVERY DATE

415.  Relator re-alleges and incorporates the allegations in paragraphs 1-414 as if fully set forth herein.

416.  By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States false or fraudulent claims about Armet's ability to deliver the vehicles by a certain date to induce the Government to enter into the 0047 Contract, in violation of the FCA.

417.  Whyte, by representing to U.S. Government entities such as the Department of Defense and the JCCI that Armet would deliver eight vehicles within 90 days of being awarded the contact on June 18, 2006, fraudulently induced the U.S. Government to sign the 0047 Contract in violation of 31 U.S.C. §3729(a)(1)(A).

418.  The U.S. Government relied on Whyte's misrepresentations about Armet's ability to supply Kestrel/ Gurkha vehicles in a timely manner as required by the Contract, would not have signed the Contract had it been aware of Armet's complete inability to meet the deadlines.

419.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that Armet was barely solvent, and was unable to meet deadlines set in prior single-vehicle contracts with the U.S Navy.

420.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that Armet's Largo facility would have to shut down due to financial difficulties.

421.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that he would be forced to sell his property in Largo in foreclosure.

422.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that Armet's Danville facility would not be fully operational for three to four months.

423.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that any and all work on the Kestrel/ Gurkha vehicles would need to be transferred from Largo to Canada.

424.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that Armet had not previously built a Kestrel/ Gurkha vehicle.

425.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that the Kestrel/ Gurkha design was flawed, and that armor modifications would need to be made to bring the vehicle up to the standards required by the Solicitation.

426.   Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Whyte knew that Armet did not have sufficient funds to pre-order enough parts and materials to build the vehicles at the speed required by the Contracts.

427.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Relator had expressed to Whyte his concern that Armet could not meet the deadlines imposed by the Solicitation Order.

428.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Relator told

Whyte that Armet would not be able to meet the deadlines, and Whyte replied "that is just how

the game is played."

429.  The representations that Whyte made to the U.S. Government and its agencies were

material to the decision by the U.S. Government and its agencies to contract with Armet.

430.  Had the U.S. Government and its agencies known that Whyte fraudulently

misrepresented Armet's ability to timely provide vehicles in the quantities needed, the

Government would not have entered into the Contract with Armet.

## COUNT EIGHT

### ARMET'S FRADULENT INDUCEMENT OF THE 0047 CONTRACT WITH RESPECT TO THE VEHICLES' AGREED UPON DELIVERY DATE

431.  Relator re-alleges and incorporates the allegations in paragraphs 1-430 as if fully set

forth herein.

432.  By virtue of the acts described in the preceding paragraphs, Armet knowingly made,

used, and caused to be presented to the United States false or fraudulent claims about Armet's

ability to deliver the vehicles by a certain date to induce the Government to enter into the 0047

Contract, in violation of the FCA.

433.  Armet, by representing to U.S. Government entities such as the Department of Defense

and the JCCI that Armet would deliver eight vehicles within 90 days of being awarded the

contact on June 18, 2006, fraudulently induced the U.S. Government to sign the 0047 Contract in

violation of 31 U.S.C. §3729(a)(1)(A).

434.  The U.S. Government relied on Armet's misrepresentations about Armet's ability to

supply Kestrel/ Gurkha vehicles in a timely manner as required by the Contract, would not have

signed the Contract had it been aware of Armet's complete inability to meet the deadlines.

435.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet was barely solvent, and was unable to meet deadlines set in prior single-vehicle contracts with the U.S Navy.

436.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet's Largo facility was in the process of shutting down due to financial difficulties.

437.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet's owner knew that he would to sell his property in Largo in foreclosure.

438.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet did not have a functional facility in the United States as Armet's Danville facility would not be fully operational for three to four months.

439.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, all equipment related to the production of Kestrel/ Gurkha vehicles needed to be transferred from Largo to Canada.

440.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet had not previously built a Kestrel/ Gurkha vehicle.

441.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet employees knew that the Kestrel/ Gurkha design was flawed, and that armor modifications would need to be made to bring the vehicle up to the standards required by the Solicitation.

442.   Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Armet did not have sufficient funds to pre-order enough parts and materials to build the vehicles at the speed required by the Contracts.

443.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Relator had expressed his concern that Armet could not meet the deadlines imposed by the Solicitation Order.

444.  Prior to submitting a reply to Solicitation Number W91GY0-06-Q-0140, Relator told Armet's owner that Armet would not be able to meet the deadlines, and Armet's owner replied "that is just how the game is played."

445.  The representations that Armet made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

446.  Had the U.S. Government and its agencies known that Armet fraudulently misrepresented its ability to timely provide vehicles in the quantities needed, the Government would not have entered into the Contract with Armet.

## COUNT NINE

### WHYTE'S FALSE STATEMENTS OF CERTIFICATION WITH CONTRACT REQUIREMENTS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

447.  Relator re-alleges and incorporates the allegations in paragraphs 1-446 as if fully set forth herein.

448.  By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States false or fraudulent false records, in the form of responses to Government Solicitations, invoices for payment, and Form DD-250 Material Receiving and Inspection Reports, in order to receive U.S. Government funds.

449.  By indicating in Armet's PAFs and by instructing Armet employees to enter into the 0028 and 0047 Contracts, Whyte falsely certified that he and Armet would meet all requirements in the Contracts and Statements of Work.

450.  By agreeing to the terms of the Statements of Work, Whyte certified that Armet would abide by the requirements, terms, and conditions of the Contracts.

451.  Whyte knowingly directed Armet employees to submit falsified Form DD-250s to the U.S. Government in order to falsely certify Armet's compliance with the Contracts.

452.  Whyte knowingly directed Armet employees to submit invoices along with the DD-250s to further falsely certify Armet's compliance with the Contracts.

453.  Whyte knowingly entered into Contracts with the U.S. Government, and knowingly supplied vehicles that did not conform to the standards required by the Contracts in order to receive U.S. Government funds.

454.  The representations that Whyte made to the U.S. Government and its agencies were material to the decision by the U.S. Government and its agencies to contract with Armet.

455.  Whyte's submission of false or fraudulent records was material to furthering the U.S. Government's mistaken belief that Whyte and Armet were complying with the requirements stated in the Contracts.

456.  Had the U.S. Government and its agencies known that Whyte fraudulently misrepresented his intention to abide by the terms of the Contracts, the Government would not have entered into the Contracts with Armet.

## COUNT TEN

### ARMET'S FALSE STATEMENTS OF CERTIFICATION WITH CONTRACT REQUIREMENTS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

457.  Relator re-alleges and incorporates the allegations in paragraphs 1-456 as if fully set forth herein.

458.  By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the United States false or fraudulent false records, in the

form of responses to Government Solicitations, invoices for payment, and Form DD-250

Material Receiving and Inspection Reports, in order to receive U.S. Government funds.

459.  By indicating in Armet's PAFs and by instructing Armet employees to enter into the

0028 and 0047 Contracts, Armet falsely certified that it would meet all requirements in the

Contracts and Statements of Work.

460.  By agreeing to the terms of the Statements of Work, Armet certified that it would abide

by the requirements, terms, and conditions of the Contracts.

461.  Armet knowingly falsified Form DD-250s to the U.S. Government in order to falsely

certify Armet's compliance with the Contracts.

462.  Armet employees knowingly submitted invoices along with the DD-250s to further

falsely certify Armet's compliance with the Contracts.

463.  Armet knowingly entered into Contracts with the U.S. Government, and knowingly

supplied vehicles that did not conform to the standards required by the Contracts in order to

receive U.S. Government funds.

464.  The representations that Armet made to the U.S. Government and its agencies were

material to the decision by the U.S. Government and its agencies to contract with Armet.

465.  Armet's submission of false or fraudulent records was material to furthering the U.S.

Government's mistaken belief that Armet was complying with the requirements stated in the

Contracts.

466.  Had the U.S. Government and its agencies known that Armet fraudulently

misrepresented its intention to abide by the terms of the Contracts, the Government would not

have entered into the Contracts with Armet.

## COUNT ELEVEN

### WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT A FALSE CLAIM FOR A PROGRESS PAYMENT ON THE 0028 CONTRACT IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

467.  Relator re-alleges and incorporates the allegations in paragraphs 1-466 as if fully set forth herein.

468.  By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the United States a false claim for an advance progress payment for the armoring of vehicles to be delivered under the 0028 Contract.

469.  Whyte, by submitting to the U.S. Government a Form 1443 Request for Progress Payment for a $824,531, knowingly presented or caused to be presented to the U.S. Government false or fraudulent claims, and knowingly failed to disclose material facts with respect to Whyte's intention to misuse the money received from the progress payment, in order to obtain approval of a progress payment from the U.S. Government on the 0028 Contract, in violation of 31 U.S.C. § 3729(a)(1)(A).

470.  Whyte knowingly accepted payment of $824, 531 from the U.S. Government as a result of Armet's fraudulent submission of the Form 1443 Request for Progress Payment, knowingly transferred the money from Armet's Florida bank account number ending in 9288, to a Canadian bank account, and knowingly used the funds for personal expenditures in violation of the terms of the Progress Payment.

471.  The U.S. Government, Department of Defense, and JCCI, unaware of the falsity of Whyte's statements and claims, was substantially damaged, and paid money to Whyte and Armet that it would have otherwise not have had Whyte not made false statements and the truth were known.

## COUNT TWELVE

**ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT A FALSE CLAIM
FOR A PROGRESS PAYMENT ON THE 0028 CONTRACT
IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

472. Relator re-alleges and incorporates the allegations in paragraphs 1-471 as if fully set forth herein.

473. By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the United States a false claim for an advance progress payment for the armoring of vehicles to be delivered under the 0028 Contract.

474. Armet, by and through its officers, agents, supervisors, and employees, knowingly submitted to the U.S. Government a Form 1443 Request for Progress Payment for a sum of $824,531, knowingly presented or caused to be presented to the U.S. Government false or fraudulent claims, and knowingly failed to disclose material facts with respect to the intended use of the money, in order to obtain approval of a progress payment from the U.S. Government on the 0028 Contract, in violation of 31 U.S.C. § 3729(a)(1)(A).

475. Armet, by and through its officers, agents, supervisors, and employees, knowingly accepted payment of $824, 531 from the U.S. Government as a result of Armet's fraudulent submission of Form 1443 Request for Progress Payment, knowingly transferred the money from Armet's Florida bank account number ending in 9288 to a Canadian bank account, and knowingly used the funds for personal expenditures in violation of the terms of the Progress Payment.

476. The U.S. Government, Department of Defense and JCCI, unaware of the falsity of the records, statements, and claims submitted by Armet, and as a result thereof, was substantially

damaged, as it paid money to Armet that it otherwise would not have paid if Armet had not made the false statements and the truth were known.

## **COUNT THIRTEEN**

**WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND AUGUST 23, 2006 A FALSE CLAIM FOR PAYMENT FOR DELIVERY OF TWO NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCKS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

477.  Relator re-alleges and incorporates the allegations in paragraphs 1- 476 as if fully set forth herein.

478.  By virtue of the acts described in the preceding paragraphs, Whyte knowingly made, used, and caused to be presented to the USACE and JCCI a false claim payment for delivery of non-compliant vehicles delivered to the JCCI under the 0028 Contract.

479.  Whyte, by and through his officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of two Kestrel/ Gurkha vehicles on or around August 23, 2006 that did not meet Contract requirements.

480.  Whyte was aware that the vehicles he intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

481.  On or around August 23, 2006, Whyte directed that Armet submit Armet Invoice No. 10103 to the USACE Finance Center, located in Millington, Tennessee, for the amount of $398,307.80.

482.  Whyte directed the USACE Finance Center wire the 398, 307.80 to Armet's U.S. bank account, maintained by the Fifth Third Bank, 10899 Park Boulevard, Seminole, FL 33772.



**Armet Armored Vehicles Inc.**
12600 Belcher Road South, Unit " B"
Largo, Florida 33773
U.S.A.

Tel: +1 727 535 3359
Fax: +1 727 530 9519
E-mail fs@aavi.com
Web Site: www.aavi.com

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/23/2006 | 10103 |

| Bill To |
|---------|
| USACE Finance Center<br>5722 Integrity Dr.<br>Milington, TN<br>38054-5005 |

| Ship To |
|---------|
| Abu Ghraib<br>Grid: 38S MB 26628726 |

| Terms |
|-------|
| Due Upon Shipping |

| Item | Description | Prior Amt | Total % | Qty | Amount |
|------|-------------|-----------|---------|-----|--------|
| Vehicle Armori...<br>Shipping<br>1 | Kestrel Gun Truck<br>Shipping<br>Communication Equipment<br>Contract No. W91GYO-06-F-0028 | | | 2<br>2<br>4 | 322,817.88<br>60,000.00<br>15,489.92 |
| | "These vehicles were exported from the United<br>States in accordance with the Export Administration<br>Regulations. Diversion contrary to U.S. law is<br>prohibited." | | | | |

| | |
|---|---|
| **Subtotal** | $398,307.80 |
| **Sales Tax** | $0.00 |
| **Total** | $398,307.80 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $398,307.80 |

Bank Information:  Fifth Third Bank
10899 Park Boulevard
Seminole, Florida 33772

ABA:          #■■■0314 for wire transfer
Account:      #■■■9288
SWIFT CODE:   ■■■■3C

483.  Whyte knowingly directed that invoice No. 10103 be submitted to the U.S. Government for payment despite the fact that the two Kestrel/ Gurkha vehicles did not have armored door handles or belly armor.

484. The USACE Finance Center and the JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Whyte not directed the false statements and the truth were known.

## COUNT FOURTEEN

**ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND AUGUST 23, 2006 A FALSE CLAIM FOR PAYMENT FOR DELIVERY OF TWO NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCKS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

485. Relator re-alleges and incorporates the allegations in paragraphs 1-484 as if fully set forth herein.

486. By virtue of the acts described in the preceding paragraphs, Armet knowingly made, used, and caused to be presented to the USACE and JCCI a false claim payment for delivery of substandard vehicles delivered to the JCCI under the 0028 Contract.

487. Armet, by and through its officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of two Kestrel/ Gurkha vehicles on or around August 23, 2006 that did not meet Contract requirements.

488. Armet was aware that the vehicles it intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

489. On or around August 23, 2006, Armet submitted Invoice No. 10103 to the USACE Finance Center, located in Millington, Tennessee, for the amount of $398,307.80.

490. Armet's invoice directed the USACE Finance Center wire the 398, 307.80 to Armet's U.S. bank account, maintained by the Fifth Third Bank, 10899 Park Boulevard, Seminole, FL 33772.

491. Armet knowingly submitted invoice No. 10103 to the U.S. Government for payment despite the fact that the two Kestrel/ Gurkha vehicles did not have armored door handles or belly armor.

492. the USACE Finance Center, and the JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Armet not submitted the false statements and the truth were known.

## COUNT FIFTEEN

**WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND OCTOBER 17, 2006 A FALSE CLAIM FOR PAYMENT FOR DELIVERY OF TWO NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCKS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

493. Relator re-alleges and incorporates the allegations in paragraphs 1-492 as if fully set forth herein.

494. Whyte, by and through his officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of two Kestrel/ Gurkha vehicles on or around October 17, 2006 that did not meet Contract requirements.

495. Whyte was aware that the vehicles he intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

496. On or around October 17, 2006, Whyte directed that Armet submit an invoice for two Kestrel/ Gurkha vehicles to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $400,000.00.

497. Whyte knowingly directed that the October invoice be submitted to the U.S. Government for payment despite the fact that the two Kestrel/ Gurkha vehicles did not have armored door handles or belly armor.

498.  The USACE Finance Center and the JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT SIXTEEN

**ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND OCTOBER 17, 2006 A FALSE CLAIM FOR PAYMENT FOR DELIVERY OF TWO NON-COMPLIANT KESTREL/GURKHA VEHICLES IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

499.  Relator re-alleges and incorporates the allegations in paragraphs 1-498 as if fully set forth herein.

500.  Armet, by and through its officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of two Kestrel/ Gurkha vehicles on or around October 17, 2006 that did not meet Contract requirements.

501.  Armet was aware that the vehicles it intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

502.  On or around October 17, 2006, Armet submitted an invoice for two Kestrel/ Gurkha vehicles to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $400,000.00.

503.  Armet's October 2006 invoice was knowingly submitted to the U.S. Government for payment despite the fact that the two Kestrel/ Gurkha vehicles did not have armored door handles or belly armor.

504.  The USACE Finance Center and JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Armet not submitted the false statements and the truth were known.

## COUNT SEVENTEEN

**WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND FEBRUARY 9, 2007 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCK IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

505.     Relator re-alleges and incorporates the allegations in paragraphs 1-504 as if fully set forth herein.

506.  Whyte, by and through his officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of one Kestrel/ Gurkha vehicle on or around February 9, 2007 that did not meet Contract requirements.

507.  Whyte was aware that the vehicle he intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

508.  On or around February 9, 2007, Whyte directed that Armet submit an invoice for one Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $200,000.00.

509.  Whyte knowingly directed that the February 2007 invoice be submitted to the U.S. Government for payment despite the fact that the Kestrel/ Gurkha vehicle did not have armored door handles or belly armor.

510.  The USACE Finance Center and JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT EIGHTEEN

## ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND FEBRUARY 9, 2007 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCK IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

511.    Relator re-alleges and incorporates the allegations in paragraphs 1-511 as if fully set forth herein.

512.  Armet, by and through its officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of one Kestrel/ Gurkha vehicle on or around February 9, 2007 that did not meet Contract requirements.

513.  Armet was aware that the vehicles it intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

514.  On or around February 9, 2007, Armet submitted an invoice for one Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $200,000.00.

515.  Armet's February 2007 invoice was knowingly submitted to the U.S. Government for payment despite the fact that the Kestrel/ Gurkha vehicle did not have armored door handles or belly armor.

516.  The USACE Finance Center and JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT NINTEEN

**WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND SEPTEMBER 21, 2007 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCK IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

517.  Relator re-alleges and incorporates the allegations in paragraphs 1-516 as if fully set forth herein.

518.  Whyte, by and through his officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of one Kestrel/ Gurkha vehicle on or around September 21, 2007 that did not meet Contract requirements.

519.  Whyte was aware that the vehicles he intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

520.  On or around September 21, 2007, Whyte directed that Armet submit an invoice for one Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $200,000.00.

521.  Whyte knowingly directed that the September 2007 invoice be submitted to the U.S. Government for payment despite the fact that the Kestrel/ Gurkha vehicle did not have armored door handles or belly armor.

522.  The USACE Finance Center and JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT TWENTY

**ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND SEPTEMBER 21, 2007 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT KESTREL/GURKHA ARMORED GUN TRUCK IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

523.  Relator re-alleges and incorporates the allegations in paragraphs 1-522 as if fully set forth herein.

524.  Armet, by and through its officers, agents, and employees, knowingly presented or caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for payment for delivery of one Kestrel/ Gurkha vehicle on or around September 21, 2007 that did not meet Contract requirements.

525.  Armet was aware that the vehicles it intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

526.  On or around September 21, 2007, Armet submitted an invoice for one Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $200,000.00.

527.  Armet's September 2007 invoice was knowingly submitted to the U.S. Government for payment despite the fact that the Kestrel/ Gurkha vehicle did not have armored door handles or belly armor.

528.  The USACE Finance Center and JCCI, unaware of the falsity of the invoice, and as a result thereof, was substantially damaged, and paid money to Armet that it otherwise would not have paid had Armet not submitted the false statements and the truth were known.

## COUNT TWENTY-ONE

**WHYTE KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND
JANUARY 1, 2008 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT
KESTREL/GURKHA ARMORED GUN TRUCK
IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

529.       Relator re-alleges and incorporates the allegations in paragraphs 1-527 as if fully
set forth herein.

530.  Whyte, by and through his officers, agents, and employees, knowingly presented or
caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for
payment for delivery of one Kestrel/ Gurkha vehicle on or around January 1, 2008 that did not
meet Contract requirements.

531.  On or around January 1, 2008, Whyte directed that Armet submit an invoice for one
Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an
amount of approximately $200,000.00.

532.  Whyte knowingly directed that the January 2008 invoice be submitted to the U.S.
Government for payment despite the fact that the one Kestrel/ Gurkha vehicle did not have
armored door handles or belly armor.

## COUNT TWENTY-TWO

**ARMET KNOWINGLY PRESENTED TO THE U.S. GOVERNMENT ON OR AROUND
JANUARY 1, 2008 A FALSE CLAIM FOR PAYMENT FOR ONE NON-COMPLIANT
KESTREL/GURKHA ARMORED GUN TRUCK
IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

533.  Relator re-alleges and incorporates the allegations in paragraphs 1-532 as if fully set
forth herein.

534.  Armet, by and through its officers, agents, and employees, knowingly presented or
caused to be presented to the Department of Defense and the JCCI false or fraudulent claims for

payment for delivery of one Kestrel/ Gurkha vehicle on or around January 1, 2008 that did not meet Contract requirements.

535.  Armet was aware that the vehicles it intended to supply to the U.S. Government did not conform to the requirements and standards required by the 0028 Contract.

536.  On or around January 1, 2008, Armet submitted an invoice for one Kestrel/ Gurkha vehicle to the USACE Finance Center, located in Millington, Tennessee, for an amount of approximately $200,000.00.

537.  Armet's January 2008 invoice was knowingly submitted to the U.S. Government for payment despite the fact that the one Kestrel/ Gurkha vehicle did not have armored door handles or belly armor.

## COUNT TWENTY-THREE

**WHYTE KNOWINGLY FALSIFIED CERTIFIED COMPLIANCE WITH UNITED STATES EXPORT LAWS IN ORDER TO ILLICITLY EXPORT THREE KESTREL/ GURKHA ARMORED GUN TRUCKS TO NIGERIA IN VIOLATION OF 31 U.S.C.§ 3729(a)(1)(B)**

538.  Relator re-alleges and incorporates the allegations in paragraphs 1-537 as if fully set forth herein.

539.  Whyte, by and through his officers, agents, and employees, knowingly made and used false records to illegally export three Kestrel/ Gurkha armored gun trucks to Nigeria.

540.  Whyte used Armet's valid Forms DSP-5 and DSP-61, which allowed Armet to export Kestrel/ Gurkha vehicles to Iraq, to ship vehicles to another buyer in Nigeria.

541.  Whyte knowingly falsified compliance with executed Forms DSP-5 and DSP-61 in order to divert three Kestrel/ Gurkha vehicles en route to Iraq to Nigeria.

542.  Whyte knowingly shipped three Kestrel/ Gurkha vehicles built under the 0028 Contract to Abu Dhabi, with the stated intention of forwarding the vehicles on to the JCCI in Iraq.

543.  Whyte knowingly withheld delivery to Iraq three Kestrel/ Gurkha vehicles because a buyer in Nigeria offered to pay an additional $30,000 per vehicle.

544.  As a U.S. government contractor exporting armored vehicles from the United States, Whyte was obligated to comply with all export regulations pertaining to military equipment.

545.  Whyte fraudulently entered into the 0028 Contract with the U.S. Government and violated the requirements of the Contract in order to receive U.S. Government funds.

546.  Whyte used the funds received from the 0028 Contract to build armored gun trucks, which were then sold to third-party buyer.

547.  Whyte used the funds received from the 0028 Contract to build armored gun trucks that were falsely certified as being properly exported from the United States.

548.   The United States Government, unaware of the falsity of Whyte's certified compliance with U.S. export laws, was substantially damaged as a result, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT TWENTY-FOUR

**ARMET KNOWINGLY FALSIFIED CERTIFIED COMPLIANCE WITH UNITED STATES EXPORT LAWS IN ORDER TO ILLICITLY EXPORT THREE KESTREL/ GURKHA ARMORED GUN TRUCKS TO NIGERIA IN VIOLATION OF 31 U.S.C.§ 3729(a)(1)(B)**

549. Relator re-alleges and incorporates the allegations in paragraphs 1-548 as if fully set forth herein.

550.  Armet, by and through its officers, agents, and employees, knowingly made and used false records to illegally export three (3) Kestrel/ Gurkha armored gun trucks to Nigeria.

551.  Armet used its valid Forms DSP-5 and DSP-61, which allowed Armet to export Kestrel/ Gurkha vehicles to Iraq, to ship vehicles to another buyer in Nigeria.

552.  Armet knowingly falsified compliance with executed Forms DSP-5 and DSP-61 in order to divert three Kestrel/ Gurkha vehicles en route to Iraq to Nigeria.

553.  Armet knowingly shipped three Kestrel/ Gurkha vehicles built under the 0028 Contract to Abu Dhabi, with the stated intention of forwarding the vehicles on to the JCCI in Iraq.

554.  Armet knowingly withheld delivery to Iraq three Kestrel/ Gurkha vehicles because a buyer in Nigeria offered to pay an additional $30,000 per vehicle.

555.  As a U.S. Government contractor exporting armored vehicles from the United States, Armet was obligated to comply with all export regulations pertaining to military equipment.

556.  Armet fraudulently entered into the 0028 Contract with the U.S. Government and violated the requirements of the Contract in order to receive U.S. Government funds.

557.  Armet used the funds received from the 0028 Contract to build armored gun trucks, which were then sold to third-party buyer.

558.  Armet used the funds received from the 0028 Contract to build armored gun trucks that were falsely certified as being properly exported from the United States.

559.   The United States Government, unaware of the falsity of Armet's certified compliance with U.S. export laws, was substantially damaged as a result, and paid money to Armet that it otherwise would not have paid had Whyte not submitted the false statements and the truth were known.

## COUNT TWENTY-FIVE

### WHYTE AND ARMET CONSPIRED TO COMMIT FRAUD AGAINST THE UNITED STATES IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

560.  Relator re-alleges and incorporates the allegations in paragraphs 1-559 as if fully set forth herein.

561.  Through the acts and omissions described in this Complaint and from on or before at least 2005 through present, Defendants Whyte and Armet knowingly agreed and conspired to defraud the federal government by having false or fraudulent statements, records, certifications, and claims submitted to and approved by the JCCI and USACE.

562.  Armet′s operations in Virginia, Florida, and Canada are so intertwined that they are effectively one single enterprise.

563.  Whyte's management of Armet's Florida and Virginia facilities was so pervasive that Whyte's management decisions and the actions of Armet employees in Virginia and Florida are effectively one and the same.

564.  Whyte and Armet conspired to falsely certify Armet's capability and intention to comply with the 0028 and 0047 Contracts in order to receive payments from the U.S. Government.

565.  Through their conspiracy to defraud the Government, Whyte and Armet received nearly 2 million dollars by knowingly furnishing substandard armored gun trucks to the U.S. Government.

## **PRAYER FOR RELIEF**

Relator respectfully requests that this Court enter judgment against Defendants as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief, including a restraining order to freeze property traceable to the fraud, to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That Relator be awarded the maximum percentage of any recovery allowed to him pursuant to the False Claims Act, 31 U.S.C. § 3730(d)(1),(2); and

(f)     That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: September 9, 2012                    Respectfully Submitted,

                                   By:

                                        David Scher / for Cwlul with Permission

                                        R. Scott Oswald
                                        David Scher
                                        The Employment Law Group
                                        888 17th Street, NW, 9th Floor
                                        Tel. (202) 261-2802
                                        Fax. (202) 261-2835
                                        sowsald@employmentlawgroup.com
                                        dscher@employmentlawgroup.com