IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| FRANK SKINNER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:12-cv-00045 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ARMET ARMORED VEHICLES, INC., | ) | By: Hon. Jackson L. Kiser |
| and WILLIAM R. WHYTE, | ) | Senior United States District Judge |
| | ) | |
| Defendants. | ) | |

Defendants Armet Armored Vehicles, Inc. ("Armet") and William R. Whyte ("Whyte") have moved for summary judgment on Counts 1–8, 23, and 24 of Plaintiff/Relator Frank Skinner's ("Plaintiff" or "Relator") Amended Complaint. Additionally, they seek summary judgment on the issue of actual damages. The matter was briefed pursuant to my April 7, 2015, Order, and the parties argued their positions in open court on April 30, 2015. I have reviewed the pleadings, the evidence, and the applicable law, and for the reasons stated herein, I will deny Defendants' Motion for Partial Summary Judgment with respect to Counts 1–8 and on the issue of damages. Pursuant to Rule 56(f), I will defer consideration of the Motion with regard to Counts 23 and 24.

## I.     STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

Because this matter is before the Court under Federal Rule of Civil Procedure 56, the facts are recited in the light most favorable to Relator, the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007). Although there are a great number of facts which are not discussed, the facts herein relate only to those counts on which Defendants' have moved for summary judgment.

A. The Contractual Relationship between Armet and the Government

Armet is a manufacturer of armored vehicles, primarily for security forces worldwide, and Whyte is its owner. In April 2005, Whyte hired Relator to be President of Armet, and Relator was assigned to Armet's Largo, Florida, facility. (See Dep. of Frank Skinner 29:9–13; 92:22–93:1.) Despite the fact that a portion of Armet's business came from government contracts, at the time he was hired, Relator had no experience procuring government contracts, no experience or training in armored vehicles, and no training or experience in government contracting. (Id. 78:8–11; 89:2–8.) Nevertheless, Whyte hired Relator to aid in Armet's international procurements. (See id. 93:1–2; 94:6–22.)

In early March of 2006, the government prepared a Request for Quote ("RFQ") for twenty (20) armored cars to be used in Iraq. The Department of Defense conducted its contracting for the vehicles through the Joint Contracting Command in Baghdad, Iraq ("JCCI"). (Am. Compl. ¶ 3 [ECF No. 60].) On March 6, 2014, Whyte e-mailed Frank Skinner and Scott Verona, Armet's automotive engineer and one-time plant manager, and stated:

> Here we go,
> The first 20 Kestrels for Baghdad.
> Frank, I'll prepare the proposal, but you guys should forward and
> follow up. The only problems that I see is the chassis and
> FINANCE!
> Bill

(Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. Ex. 4, April 27, 2015 [ECF No. 114-1] [hereinafter "Pl.'s Br."].) "Kestrel" is a model of armored vehicle manufactured by Armet.[1]

On March 14, 2006, Armet submitted a quote for the March 2006 RFQ (Solicitation W91GYO-06-Q-*0068*), which included information regarding the level of ballistics protection

---

[1] The parties appear to use the term "Kestrel" and "Gurkha" interchangeably to refer to the vehicles manufactured by Armet for the government. Because "Kestrel" is the term used in Armet's quotes and invoices, that is the term I will adopt henceforth.

- 2 -

and a statement that "Delivery & Shipment" would be "[a]s per contract." (Id. Ex. 6.) Additionally, Armet stated that its "payment policy requires 50% deposit with the balance payable within three (3) days of receipt of notification of each vehicle's readiness to ship." (Id.) Relator signed the proposal on behalf of Armet. That same day, Whyte signed an addendum to the proposal. (Id. Ex. 5.) According to Realtor, in that addendum, Whyte agreed to the government's payment terms, but Relator has not offered the government's reply to its solicitation (the document to which Armet was responding). (See id., titled "Armet's addendum to the reply of the Solicitation.")

On April 3, 2006, Armet submitted another addendum to its 0068 solicitation. (Id. Ex. 7.) This addendum encompassed the government's request to increase the number of vehicles from 20 to 24 on the RFQ. Armet also included the shipping fee of $38,000.00 per vehicle. The "Payment Terms" and "Delivery & Shipment" sections remained the same. Armet submitted a third addendum on April 21, 2006, reducing the shipping cost to $30,000.00 per vehicle, but leaving the "Payment Terms" and "Delivery & Shipping" unchanged. (Id. Ex. 8.)    On April 25, 2006, Armet signed its first contract with the government for 24 armored Kestrel gun trucks.[2] (See id. Ex. 9.) In the contract with the government, Armet agreed to "[d]eliver 4 vehicles within 45 days after receipt of award. Remaining 20 vehicles will be delivered NLT [no later than] 31 July 2006." (Id.) The contract did not specify anything regarding the terms of payment. Shortly after Armet signed the 0028 contract, Whyte informed Relator that the majority of the vehicles would be constructed at Armet's Ontario, Canada, facility, not in Largo. (Skinner Aff. ¶ 6.) Whyte also told Relator that "he knew he couldn't meet the deadline," but

---

[2] The contract was for order number W91GYO-06-F-0028, and will thus be referred to as the "0028 contract." (See Pl.'s Br. Ex. 9.)

that he could construct the vehicles faster in Canada than in the United States. (See Skinner Dep. 340:13–15.)

On May 18, 2006, Relator e-mailed his JCCI contact, Master Sergeant Orlando Guerrero, and requested "a contract modification" to permit an "interim payment under the fixed price contract provisions." (Pl.'s Br. Ex. 20.) In essence, Relator requested what amounted "to a 40% deposit and 60%" upon delivery. (Id.) Relator sent the request at Whyte's direction, although the 40/60 recommendation was Relator's idea. (See Aff. of Frank Skinner ¶ 7, April 27, 2015 [ECF No. 114-1]; Skinner Dep. 267:3–270:4.)

In June of 2006, the government sent out a second RFQ for an additional eight (8) armored gun trucks. Armet responded with solicitation W91GYO-06-Q-0115 on June 8, 2006. (Id. Ex. 10.) The solicitation included the same "Payment Terms" and "Delivery & Shipment" language as the 0068 solicitation, and was likewise signed by Relator. The government awarded Armet the second contract on June 18, 2006.[3] (Id. Ex. 11.) Under the terms of the contract, which Relator signed on Armet's behalf, Armet agreed to deliver the additional eight Kestrel gun trucks "no later than 90 days after contract award." (Id.)

For both solicitations, Whyte prepared Armet's proposals and sent them to Relator to sign. (Skinner Aff. ¶ 8.) Relator was not able to make changes to the solicitations. (Id.) According to the Relator, "the language of the [government's] Proposal concerned [him] as it stated that Armet would only receive payment for the [Kestrels] after they had been delivered." (Id.) This was especially concerning because, when Whyte directed Relator to request a progress payment from MSGT Guerrero, "Whyte made it very clear to [Relator] that without an advance payment, Armet could not perform as required by the Contract." (Id. ¶ 7.)

---

[3] The contract was for order number W91GYO-06-F0047, and will thus be referred to as the "0047 contract." (See Pl.'s Br. Ex. 11.)

- 4 -

At some point during the summer of 2006, Relator instructed John Ventimiglia, the plant foreman, to go to the Ontario facility to inspect the Kestrels that were in production. (See Skinner Dep. 284:12–292:2; Skinner Aff. ¶ 9.) While on this visit, Ventimiglia discovered that the floors of the vehicles were not being armored to specification. (See Skinner Dep. 289:13–15; Skinner Aff. ¶ 9.) According to Relator, Ventimiglia relayed to him that he did not see any protection on the flooring, and that the Thika mineplate that was supposed to be installed for ballistic protection had been replaced by plywood. (Id.) Although its purpose is unclear, it appears play sand was used as some component of the floors. (See id. Ex. 22.)

On August 23, 2006, Armet billed the JCCI for the first two Kestrels that it shipped under the 0028 contract. (See Pl.'s Br. Ex. 43.) The bill included two gun trucks, two shipping charges, and four sets of communications equipment (two for each truck), for a total of $398,307.80. (Id.)

Around July or August of 2006, but after the first two gun trucks were shipped to Iraq, Relator contacted the Federal Bureau of Investigation ("FBI"). (See Skinner Dep. 370:3–12; Skinner Aff. ¶ 10.) Because of what Ventimiglia saw during his trip to Armet's Ontario production facility, Relator was concerned that "defective materials [were] being delivered to the troops in violation of the [c]ontract requirements." (Skinner Aff. ¶ 10.) There is no evidence that anyone at Armet knew Relator was in contact with the FBI.

Approximately four months after the government awarded Armet the 0047 contract, Whyte e-mailed Captain Kevin Bayless with JCCI regarding the delayed delivery schedule. (See Pl.'s Br. Ex. 45.) Whyte stated that he understood Capt. Bayless's frustrations, but hoped that Capt. Bayless understood his as well. Whyte stated, "Nothing has changed since the last time I attended your office and asked for payment from Commander Tommy Neville on the 32 chassis

- 5 -

that we bought and the $250,000.00 that we paid for glass and God only knows how much more for armor etc." (Id.) Capt. Bayless replied that he understood Whyte's frustration, and he inquired about the shipping schedule now that Whyte and Armet had "cracked the nut on shipping." (Id.)

Whyte responded on October 28, 2006, and stated:

> In a nutshell we can produce all vehicles in four months with money in advance. **_Without that, frankly its [sic] a lost cause. We miscalculated and were deluded when we believed that money was forthcoming to kick it off_**.

(Id. (emphasis added).) In an undated e-mail,[4] Commander Tommy Neville castigated Whyte, writing:

> You need to stop using progress payments for an excuse for your inability to deliver these vehicles against any type of credible timeline. **_I have never told you that you would be given progress payments._** Specifically I told you that once we saw your first deliveries we could then talk about it. We were supposed to meet on this subject two different times to try and reach a solution where you can systematically make deliveries…both times I have not heard from you.

(Id. (emphasis added).) Whyte responded on October 29, 2006, and stated that, the "last time that [he] was in Duke Leonard's office at Camp Victory, [he] advised [Duke Leonard] and Captain Bayless that [Armet] needed an advance payment for the 32 chassis and that [Armet] had purchased along with $250,000.00 for glass and money for the steel." (Id.) Whyte concluded the e-mail by stating: "Present funds are devoted to building vehicles for other clients. With excess funds we work on your trucks when we can. . . . In a nutshell, as to excuses, **_we may have deluded ourselves into believing that an advance payment would be made, but nevertheless it's the only thing that I could clutch on to_**." (Id. (emphasis added).)

---

[4] Although the e-mail is undated, Whyte's reply to the e-mail is dated October 29, 2006. (See Pl.'s Br. Ex. 45.) Thus, it seems clear that Commander Neville's e-mail was authored on either October 28 or 29, 2006.

- 6 -

On October 31, 2006, Armet billed JCCI for two more Kestrel gun trucks. (See id. Ex. 43.) On February 9, 2007, Armet shipped another Kestrel to the JCCI and billed it for the same. (Id.) Armet billed JCCI on August 2, 2007for the sixth Kestrel it shipped to Iraq. (Id.) JCCI was billed for the seventh Kestrel on January 8, 2008. (Id.) The JCCI eventually rejected the seventh gun truck, and JCCI unilaterally terminated its contract with Armet on March 26, 2008. (Id. Ex. 48.)

B. The Export Permits

On April 27, 2006, Armet purchased five Ford F550 chassis from Aes Kjaer. (Id. Ex. 16.) Two of the chassis had vehicle identification numbers (VINs) ending in -66165 and -67015. (Id.)

On July 18, 2006, Armet received a DSP-5 from the United States Department of State. (See id. Ex. 35.) A DSP-5 is a license "for permanent export of unclassified defense articles and related unclassified technical data." (Id.) The DSP-5 authorized Armet to export 24 "unarmed, all wheeled drive vehicle, for off road use what has been fitted with materials to provide ballistic protection to National Institute of Justice level IV." (Id.) The DSP-5 permitted Armet to ship its goods from New York, New York, to Iraq. (Id.) The foreign end user was listed as "Lt Col Jeffrey Voss, Abu Ghraib." (Id.)

On August 4, 2006, the State Department issued Armet a DSP-61, which is a "license for temporary import of unclassified defense articles. (Id. Ex. 36.) The DSP-61 permitted Armet to ship 50 "Gurkha Armored Vehicle For Operation Iraqi Freedom" from Canada to Buffalo, New York, and then on to Iraq, the "Foreign Country of Ultimate Destination." (Id.) Both the DSP-5 and the DSP-61 were valid for 48 months. (Id. Exs. 35, 36.)

On November 25, 2006, Armet shipped two Gurkhas from Largo to its facility in Ontario. (See id. Ex. 14.) The VINs for those vehicles ended in -66165 and -67015. (Id.)

On December 4, 2006, Armet entered into a contract with Pinnacle Investments LTD, a company located in Asokoro, Abuja, Nigeria. (Id. Ex. 17.) Armet agreed to supply Pinnacle with "seven (7) Ford F550 vehicles . . . . The Vehicles [were to be] modified and converted to Armet's Gurkha armored vehicles." (Id.) The contract specified the VINs of the first three vehicles that Armet would supply under the contract. Two of the three VINs ended in -66165 and -67015. (Id.)

On March 27, 2007, Andre Potempski e-mailed Whyte and stated that Pam Gauthier had changed three VINs "from US to new Nigeria contract." (Id. Ex. 26.) Neither of the three VINs ended in -66165 or -67015.

On June 15, 2007, the Canadian Department of Foreign Affairs and International Trade issued Armet an Export Permit permitting it to export "ballistically protected Police Vehicles, NOT military vehicles," to "Taraba State Government of Nigeria." (Id. Ex. 41.) The permit was valid from June 13, 2007, until May 31, 2009. (Id.)

On August 2, 2007, Cynthia Braden, an Armet employee, confirmed that seven gun trucks had been completed and shipped to Nigeria. (Id. Ex. 40.) Among the seven are two vehicles with VINs ending in -66165 and -67015. (Id.) The e-mail implies, though does not explicitly state, that all vehicles were shipped by May 31, 2007. (See id.)

C. Procedural History

Relator filed a *qui tam* action in this Court pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. 3729, *et seq.*, on October 16, 2012. (See Complaint [ECF No. 2].) The government elected not to intervene in this action. (Notice of Election to Decline Intervention,

- 8 -

Aug. 14, 2013 [ECF No. 18].)  Following various pretrial motions and the filing of an amended Complaint, twenty-four counts survived to the present stage.  (See Order, Dec. 12, 2014 [ECF No. 75]; Order, Feb. 10, 2015 [ECF No. 94].)  On April 15, 2015, Defendants moved for partial summary judgment on Counts 1–8, 23, and 24, and on the issue of actual damages.  (Defs.' Mot. for Summ. J., Apr. 15, 2015 [ECF No. 106].)  Following briefing by the parties, I heard oral argument on the motion on April 30, 2015.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009).  A genuine dispute of material fact exists "[w]here the record taken as a whole could…lead a rational trier of fact to find for the nonmoving party."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute cannot be created where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists.  Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson, 477 U.S. at 249–50, 254.  A fact is material where it might affect the outcome of the case in light of the controlling law.  Anderson, 477 U.S. at 248.  On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts.  Scott, 550 U.S. at 380.  At this stage, however, the Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial.  Anderson, 477 U.S. at 249.  It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues

- 9 -

are primarily legal rather than factual" in nature.  <u>Koehn v. Indian Hills Cmty. Coll.</u>, 371 F.3d 394, 396 (8th Cir. 2004).

### III.    <u>DISCUSSION</u>

A.  <u>Fraud in the Inducement: Counts 1–8</u>

Defendants seek summary judgment on Counts 1–4, arguing that "[n]o material facts support Relator's allegation that, at the time Armet entered into the Contracts with JCCI, Defendants made any false statements or omissions that were material to the Government's decision to award Armet the Contracts."  (Defs.' Br. in Supp. of Mot. for Summ. J. pg. 26, April 14, 2015 [ECF No. 107] [hereinafter "Defs.' Br."].)  Additionally, Defendants argue that there is no evidence that Armet and Whyte knew or should have known that they would be unable to meet the delivery schedule set out in the contracts because of Armet's financial situation.  (<u>See</u> <u>id.</u> at 27.)

"The test for False Claims Act liability . . . is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or forfeit money's due (i.e., that involved a 'claim')."  <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 788 (1999).  As is relevant here, liability attaches to those instances where "the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct."  <u>Id.</u> "That is, the fraud may have been in the inducement."  <u>U.S. ex rel. Wilson v. Kellogg, Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008).  Under such a theory, "liability for fraudulent inducement attache[s] to all claims 'submitted to the government under [the] contract . . . .'" <u>U.S. ex rel. DRC, Inc. v. Custer Battles, LLC</u>, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007) (quoting <u>Harrison</u>, 176 F.3d at 787)).

- 10 -

With regard to the "false statement or fraudulent course of conduct" element, "the statement or conduct alleged must represent an objective falsehood." Wilson, 525 F.3d at 376–77. "As a result, mere 'allegations of poor and inefficient management of contractual duties' are 'not actionable under the [FCA].'" Id. (quoting Harrison, 176 F.3d at 789).

"The test for determining materiality is 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.' The question of materiality is a mixed question of law and fact for the court to decide." Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 914 (4th Cir. 2003) ("Harrison II") (quoting United States ex rel. Berge v. Bd. of Trustess of the Univ. of Ala., 104 F.3d 1453, 1460 (4th Cir. 1997)).

Here, Relator has alleged two sources of false statements or fraudulent courses of conduct. First, in Counts 1–4, Relator alleges that Whyte and Armet falsely claimed that the Kestrels would meet certain specific ballistic protections. In Counts 5–8, he alleges that Whyte and Armet knew they could not meet the government's delivery schedule because of Armet's financial situation. Those claims are addressed in turn.

1. Ballistic Protection (Counts 1–4)

Defendants assert that there are no facts to establish an objectively false statement regarding the Kestrels ballistic protection. When taken in the light most favorable to Relator, there are material facts in dispute, and summary judgment is not warranted.

In its solicitation to the government, Armet stated the following:

> The manufacturing process will integrate transparent and opaque armor and the vehicles structural design, to ensure that the vehicles balanced structural loads will provide optimal ballistic protection to the occupants of the vehicle.

- 11 -

> No gaps are permitted between opaque armor or between opaque to transparent armor transition points. Opaque armor joining or meeting on the same plane will be overlapped.
>
>       \*     \*     \*
>
> The floor in this vehicles [*sic*] defeat the blast of two German DM51 or two US M67 anti-personnel grenades. THIKA MINEPLATE defeats both of these devices and was certified by the US Military at TACOM on October 31, 2000 to defeat the M67 grenade.
>
>       \*     \*     \*
>
> The undercarriage must have armored mine plating protection to provide the crew the ability to defend against small explosive devices. At a minimum, the protection level acceptable shall withstand blasts underneath the vehicle, grenades, and/or blasts of whatever nature equivalent to the strength of two DM 51 German ordnance. If a smaller explosion can penetrate the vehicle, then it does not meet requirements.

(Pl.'s Br. Ex. 6.) If the vehicles, as designed and manufactured, *did not* meet the ballistic standards Armet said that they would, Armet's statements in its solicitation would represent an objectively false statement.

Defendants have not offered any evidence regarding the design of the Kestrel gun trucks. Likewise, there is nothing to suggest that Whyte, as owner of Armet, was unaware of the ballistic protections of the vehicles he manufactured. Because I take all reasonable inferences in the light most favorable to the non-moving party, I assume that the gun trucks were manufactured to their normal design specifications, and that Whyte was aware of those specifications.

When reviewing the photographs of the Kestrels that were delivered to the JCCI, it is clear that the Kestrels did not meet the ballistic specifications outlined in Armet's solicitations. A single photograph illustrates this point most clearly. The photograph shows the rubber boot surrounding the gear shift. When removed, the ground is visible. (Id. Ex. 52.) It does not require expert knowledge to know that a piece of moldable rubber does not provide "optimal

- 12 -

ballistic protection" to the occupants of the vehicle. Moreover, the visibility of the grounds beneath the vehicle shows that there were "gaps" in the armor.

Defendants also argue that the claims are "honest mistakes or incorrect claims submitted through mere negligence." United States ex rel. Thomas v. Siemens AG, 991 F. Supp. 2d 540, 568 (E.D. Pa. 2014), aff'd 593 F. App'x 139 (3d Cir. 2014). There is no evidence to support such an argument. Likewise, the ballistic protection is not the type of "imprecise contractual provision" that is open to competing interpretations. See United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 378 (4th Cir. 2008).

With regard to the materiality of these provisions, I have no trouble concluding that the ballistic protection standards of the contract were material in that they "ha[d] a natural tendency to influence agency action . . . ." Berge, 104 F.3d at 1460. The vehicles were supposed to protect troops and VIPs traveling through Iraq. Clearly, the ballistic protection was the *most* important part of the contract.

Because the evidence presents a dispute over a material fact, summary judgment is not appropriate on Counts 1–4.

2. Delivery Dates and Financing (Counts 5–8)

Turning to Counts 5–8, Defendants argue there is no evidence that Whyte and Armet *knew* they would be unable to meet the performance deadlines of the 0028 and 0047 contracts because of Armet's financial situation.

First, as with the ballistics protection, I do not agree with Defendants' that the provisions at issue were "imprecise contractual provisions" open to multiple, reasonable interpretations.[5] See Wilson, 525 F.3d at 378. The 0028 contract stated, in unequivocal terms, that delivery was

---

[5] Defendants have not pointed to any extrinsic evidence regarding the contract negation or execution that would alter this analysis.

- 13 -

to be made "45 days after receipt of award," with the "[r]emaining 20 vehicles . . . delivered NLT 31 July 2006." (Pl.'s Br. Ex. 9.) The 0047 contract required delivery "no later than 90 days after contract award." (Id. Ex. 11.) Such clear and precise language is not the type of "imprecise statements or differences in interpretation growing out of a disputed legal question" that cannot be "false" under the FCA. United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

Second, there is evidence that Whyte knew he would be unable to manufacture the vehicles on the government's timetable. As Relator testified, Whyte told him "he knew he couldn't meet the deadline . . . ." (Skinner Dep. 340:13–14.) A defendant's admission that he "knew" he could not comply with the contract is persuasive evidence. Additionally, Relator stated that it would have been "virtually impossible" to meet the contracts' deadlines because Armet "couldn't get the chassis fast enough to build [the vehicles]." (Id. 227:1–2.)

Third, Realtor's testimony regarding his proposed "assembly line" manufacturing process is strong circumstantial evidence that Whyte rejected a faster production method, thereby ensuring unnecessary delays.[6] (See, e.g., id. 189:21–191:13; 248:2–12; 253:22–254:16; 340:10–341:21.)

Finally, with regard to financing the order, Whyte's own e-mails establish a factual dispute as to whether he believed financial support was forthcoming at the time he entered into

---

[6] With regard to the 0028 contract, Whyte's rejection of the assembly-line process amounts to only inefficient management of his contractual duties, a brand of negligence that is not actionable under the FCA, because there is no evidence that he was aware Armet could not physically manufacture the vehicles by the deadline. As stated herein, however, the statements regarding Armet's financial situation are enough to establish a genuine issue of material fact on the fraud in the inducement charge regarding the 0028 contract. For the 0047 contract, material facts are in dispute as to whether Whyte should have known that Armet was unable to manufacture on the requisite timetable, as Armet had missed nearly every delivery deadline prior to entering into the second contract.

- 14 -

contracts with the government.[7]  As Whyte stated, he and Armet "were deluded when [they] believed that money was forthcoming to kick [production] off."  (Pl.'s Br. Ex. 45.)  Likewise, Whyte stated that, without start-up money, completing the contracts was a "lost cause."  (Id.) Interestingly, he made these statements after the contracts were issued, indicating that funding was a necessity in order to comply with the contracts—a fact he should have known when he submitted Armet's bids.[8]  Moreover, Commander Tommy Neville made it clear that he "never told [Whyte] that [he] would be given progress payments."  (Id.)  At a minimum, there is evidence that Whyte and Armet acted with deliberate indifference to their financial situation—a state of mind which would establish FCA liability.  See 31 U.S.C. 3729(b)(1)(A)(ii)–(iii) (2014) (defining "knowingly" in the FCA as  "act[ing] in deliberate ignorance of the truth or falsity of the information" or "act[ing] in reckless disregard to the truth or falsity of the information").

As with the ballistic protection, at this stage, I believe the delivery dates were material to the government's decision to award Armet the contracts.  See Berge, 104 F.3d at 1460.  The e-mails from the leadership at JCCI make clear that timely delivery was important to the government.  For example, Captain Bayless e-mailed Whyte and stated, "[t]here are other things that hinge on the end user getting these vehicles," and Lieutenant Commander Tommy Neville stated that he wanted to meet with Whyte "to determine a concrete delivery schedule that is executable on [Whyte's] part."  (Pl.'s Br. Ex. 45.)  If the delivery dates were not material, the command at JCCI would have had little reason to discuss delivery schedules so frequently.

---

[7]  Admittedly, Whyte's attempts to secure funding undercut this argument.  (See, e.g., Skinner Dep. 234:1–238:1.)  On a motion for summary judgment, however, I view the facts in the light most favorable to Relator.  Under that framework, Whyte's attempts to secure funding confirm that he knew he could not manufacture the government vehicles as promised without outside financial assistance.

[8]  Defendants also argue that, because Relator signed the submissions to the government, that fact should absolve Armet and Whyte of liability.  Relator's testimony, however, is that he had no control over the content of the submissions, that Whyte was the sole author, and the he directed Relator to sign the submission electronically (or even signed Relator's name himself).  (See Skinner Aff. ¶ 3.)

- 15 -

For all these reasons, summary judgment is not appropriate on Counts 5–8, and Defendants' motion will be denied.

### 3. The Export Permits

Defendants next move for summary judgment on Counts 23 and 24, arguing that Relator "has not come forward with any admissible evidence to support his allegation . . . that Defendants knowingly diverted three Gurkha armored vehicles to Nigeria in violation of U.S. export laws, or that Defendants' [*sic*] diverted to Nigeria vehicles intended for the U.S. Government." (Defs.' Br. pg. 30–31.) I disagree.

As delineated above, see supra pgs. 7–8, there is evidence to suggest that Defendants exported vehicles under its Nigerian contract without obtaining the proper authorization from the Department of State. Specifically, the evidence indicates that, on November 25, 2006, Armet shipped two chassis to Ontario from Largo. Those vehicles had VINs ending in -66165 and -67015. (Pl.'s Br. Ex. 14.) The only valid export permits that have been submitted to the Court and which were in effect on that date permitted Armet to export vehicles from the United States to Iraq (id. Ex. 35), or from Canada to the United States and then on to Iraq "[f]or Operation Iraqi Freedom" (id. Ex. 36).

On December 4, 2006, Armet entered into a contract to sell armored gun trucks to Pinnacle Investments LTD. The contract listed VINs ending in -66165 and -67015 as part of the sale. (Id. 17.) The Canadian government issued an export permit that was valid from June 13, 2007, until May 31, 2009. (Id. Ex. 41.) By August 2007, an Armet employee was certifying that seven gun trucks had been shipped to Nigeria, including gun trucks with VINs ending in -66165 and -7015, and suggested that all shipments has occurred prior to May 31, 2007. (See id. Ex

- 16 -

40.)[9]  Thus, on the evidence before me, there is a genuine dispute over whether Defendants shipped gun trucks to Canada and then to Nigeria without proper authorization.

It is true that the Canadian government issued a valid export permit, and that if the vehicles were shipped to Nigeria *after* June 13, 2007 (the validity date of the Canadian permit), Defendants may not have illegally shipped the gun trucks as Relator alleges.  There is no evidence, however, to counter the implication in Cynthia Braden's e-mail that all vehicles were shipped *before* June 13, 2007.  On the record before me, and taking the facts in the light most favorable to Relator, I believe there is evidence that "Defendants knowingly diverted three Gurkha armored vehicles to Nigeria . . . , [and] Defendants[] diverted to Nigeria vehicles intended for the U.S. Government."  (Defs.' Br. pg. 30–31.)

I am deferring judgment on these counts, however, because I feel there is an evidentiary lapse that neither party has addressed.  According to the Amended Complaint, Relator alleges that the illegal export violated 31 U.S.C. § 3729(a)(1)(B), a provision of the FCA.  The section cited by Relator creates liability when one "knowingly makes, uses, or causes to be made or used, a false record or statement *material to a false or fraudulent claim* . . . ."  31 U.S.C. § 3729(a)(1)(B) (2014).  It is axiomatic that "§ 3729(a)(1) requires a 'claim,' or a request or demand for payment that if paid would result in economic loss to the government fisc, *i.e.* a request for payment from government funds . . . ."  U.S. ex rel. DRC, Inc. v. Custer Battles, LLC, 376 F. Supp. 2d 617, 641 (E.D. Va. 2005), rev'd on other grounds, 562 F.3d 295 (4th Cir. 2009).

---

[9] The DSP-5 was valid from July 18, 2006, until July 18, 2008.  (Pl.'s Br. Ex. 35.)  The DSP-61 was valid from August 4, 2006, until August 4, 2008.  (Id. Ex. 36.)  The Canadian export permit was valid from June 13, 2007, until May 31, 2009.  (Id. Ex. 41.)

On the record before me, I fail to see a factual or causal link between the allegedly illegally exportation of armored vehicles—which the government did not receive and for which it was not billed—and any "claim" for payment made to the government. Defendants, however, have not raised this argument, and consequently, Relator has not had a full and fair opportunity to rebut it. Additionally, the parties may be aware of facts that show this argument to be meritless. Nevertheless, I think it prudent to reserve ruling on Counts 23 and 24 until Relator has had the opportunity, during his case-in-chief, to present evidence linking the allegedly illegal exportation of armored cars to a request for payment from the government. See Fed. R. Civ. P. 56(f) (permitting the court to consider summary judgment on grounds not raised by a party "after notice and a reasonable time to respond . . . .").

### 4. Actual Damages

Defendants maintain they are entitled to summary judgment on Relator's damages claims for several reasons. First, they contend that, because the FBI was aware that the vehicles did not comply with the terms of the contract, the government cannot complain because it "knowingly" accepted defective goods. Permitting Relator to recover damages (other than civil penalties) would permit the government to create its own injury. Second, they argue that the appropriate measure of damages is the difference between what the government paid and what the goods were worth. Because Relator has not offered any evidence on the actual value of the vehicles that Armet delivered, there is no evidence of damages. Likewise, they assert that the "fact" that the vehicles were used undercuts any claim that the vehicles had "no" value.

Turning to the first argument, Defendants mischaracterize the so-called "government knowledge" defense. "'The inaptly-named government knowledge defense' is the principle 'that under some circumstances, the government's knowledge of the falsity of a statement or claim

can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway.' 'This defense is inaptly named because it is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim.' Under this principle, '[w]here the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises.'" United States v. Bollinger Shipyards, Inc., 775 F.3d 255, 265 (4th Cir. 2014) (quoting United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 & n.8 (5th Cir. 2003) (Jones, J., specially concurring)).

Clearly, the government knowledge defense has no applicability here. It applies only where the contractor *knows* that the government is aware that he is submitting "false" claims. There is no allegation whatsoever that Whyte and Armet were aware that the government knew its vehicles did not meet the ballistic protections standards outlined in the contract, and thus the involvement of the FBI cannot absolve Defendants of liability.

The Fourth Circuit's decision in Harrison v. Westinghouse Savannah River Co. confirms this conclusion. In that case, Westinghouse was accused of falsely certifying to the government that there were no organizational conflicts of interest ("OCI") in order to secure subcontracts on a government job. Eventually, the government learned of Westinghouse's false certification, but continued to pay Westinhouse's invoices nonetheless. Westinghouse argued that it cannot be held liabile for the invoices it submitted after the government learned of its false certification because the government's "knowledge of the potential OCI negated any scienter that Westinghouse may have had prior" to the government learning of its deception. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 920 (4th Cir. 2003) (Harrison II). The Fourth

Circuit disagreed, concluding that "the initial false certification by Westinghouse . . . tainted all of the following invoices" because Westinghouse "intended for [the government] to believe (which it did) that no OCI existed." Id. The same is true here. Regardless of what the government knew, the evidence before me adequately raises the issue of whether Whyte and Armet intended for the government to believe that the vehicles met the ballistic protection standards outlined in the contracts. Thus, the government's knowledge of problems with the vehicles would not negate Defendants' culpable states of mind.

Turning to the second argument, both parties' positions have merit. First, there are two possible measures of damages under the FCA. Under certain circumstances, as Relator argues, damages are equal to the total amount that the government paid. These damages are appropriate in cases where the goods or services rendered to the government "lacks any value." See id. at 923 n.17 (citing United States v. TDC Mgmt. Corp, 288 F.3d 421, 428 (D.C. Cir. 2002)). In all other FCA cases, the appropriate measure of damages "the amount of money the government paid by reason of the false statement over and above what it would have paid absent the false statement." Id. at 922 (citing United States v. Ekelman & Assocs., 532 F.2d 545, 550 (6th Cir.1976)). In the present case, Relator argues for the former, while Defendants insist on the latter.[10]

---

[10] I note that Defendants characterization of the measure of damages is not exactly correct. They argue that the measure of damages should be "the difference in value between what the Government paid for and what it received from Armet." (Defs.' Br. pg. 37.) In fact, the measure is the difference between what the government paid and what the government *would have paid* had it known what it was actually receiving. Under Defendants formulation, every tangible object received by the government would have *some* value, even if that value were only what the constituent parts of the good were valued. Such a statement of the law would eviscerate a measure of damages expressly permitted by the Fourth Circuit. See Harrison II, 352 F.3d at 923 n.11. But that is not what the case law establishes as a measure of damages. Rather, if the government would not have purchased the goods at all had it known about the false statement, the measure of damages is the full purchase price without regard to how much the government could receive for the goods if it stripped the vehicles down and sold them for parts. Defendants are certainly free, however, to argue that the government's use of the vehicle belies any claim that the vehicles had "no value" to it.

- 20 -

The fact is, the Fourth Circuit has not "adopted one particular standard by which damages should be measured under the FCA." Id. Here, Relator contends that the government received no value from its vehicles, and as such, the measure of damages should be the full price that the government paid. Defendants disagree, arguing that there is evidence that the government used the vehicles extensively. Because of that evidence, they claim, the government clearly received some benefit. Since it did, the "benefit of the bargain" measure is appropriate, and Relator has no evidence to prove that measure of damages.

I cannot agree (at this stage) with the conclusion of Defendants' proposed expert that the vehicles were used extensively. (See Dep. of Mike Mihajlovic 54:4–6, April 22, 2015.) Mr. Mihajlovic based his conclusion—almost exclusively—on the presence of sand in the vehicles. He assumed, therefore, that the vehicles were driven in a sandy environment. (See id. 55:14–56:13; 74:9–75:11.) The evidence shows, however, the Armet used play sand in some part of the manufacturing process; specifically, the floor of the vehicles. (See Pl.'s Br. Ex. 22.) Thus, taking the evidence in the light most favorable to Relator, the evidence underlying Mr. Mihajlovic's testimony is clearly in dispute.

At oral argument, Defendants encouraged me to examine the photos of the vehicles. Doing so, they contended, would clearly show that the government used the vehicles extensively. A review of the photos, however, can lead one to the opposite conclusion. For example, Vehicle 2 in Mihajlovic's report still has the shipping labels and a "Cargo Plaque" affixed to the windows, indicating that it had never been driven on a road. (See Defs.' Br. Ex. Y.) Vehicle 3 had a similar shipping label on the window in front of the driver's seat. (Id.) The floor of Vehicle 4 was still partially covered in packaging materials consistent with shipping. (Id.) And Vehicle 5 still has a shipping label on the driver's side of the front window. (Id.) While it is

certainly true that the vehicles do show signs of use as well, I cannot say that a reasonable juror would always reach that conclusion. Thus, I cannot conclude that the vehicles had value simply because they were used by the government; the evidence is not uncontroverted on that point.

Taking all of this into consideration, I cannot say that there is "no evidence" to support Relator's proposed computation of damages because a reasonable juror could conclude that armored cars without sufficient armoring were of no value to JCCI. At trial, Defendants are free to offer evidence to support their measure of damages, but at this stage, the evidence is appropriate for a jury to consider. Relator must prove that the government would not have bought the vehicles, just as Defendants are free to prove what the government would have paid for the vehicles had it been aware of their defects. Defendants' motion for summary judgment will be denied on this point.

## 5. <u>CONCLUSION</u>

On the record before me, I think there is sufficient evidence to permit this case to proceed to trial on all counts. There is evidence to support Relator's claims that Defendants knowingly misrepresented their ability to meet the material terms of the contract. As such, Defendants' Motion for Summary Judgment will be denied on Counts 1–8. Likewise, the evidence before me supports the conclusion that Defendants exported armored cars to Nigeria without proper authorization. Because the evidence is lacking on whether statements made in conjunction with the export permits were made in connection with a claim for payment, however, I will reserve ruling on Defendants' Motion for Summary Judgment on Counts 23 and 24. Because the

evidence can be viewed as supporting the conclusion that the goods delivered to the government had no value to the buyer, I will deny Defendants' Motion for Summary Judgment with respect to the claim for actual damages.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 12th day of May, 2015.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE